LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave # 82
Reno, Nevada 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff*

David B. Owens
LOEVY & LOEVY
100 S. King Street, #100
Seattle, WA 98104
david@loevy.com
*Will comply with LR IA 11-2 within 30 days.
*Counsel for Plaintiff Paul Browning*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA (LAS VEGAS)

| | |
|---|---|
| PAUL LEWIS BROWNING, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No.:  2:20-cv-1381 |
| | ) |
| LAS VEGAS METROPOLITAN | ) **Complaint and Jury Demand** |
| POLICE DEPARTMENT, LT. GREG | ) |
| JOLLEY, LT. JOHN CONNER, SGT. F. | ) |
| JERGOVIC, SGT. C. ALBERT, | ) |
| DETECTIVE SGT. MICHAEL BUNKER | ) |
| #653, DETECTIVE SGT. T. ROSEN, | ) |
| DETECTIVE ROBERT LEONARD | ) |
| P#471, DETECTIVE H. OREN, | ) |
| DETECTIVE BERT LEVOS  #144, | ) |
| DETECTIVE THORTON, OFFICER | ) |
| GREGORY BRANON P#2187, | ) |
| OFFICER GARY CALDWELL, P#2301, | ) |
| OFFICER DAVID RADCLIFFE P#2191, | ) |
| OFFICER R. ROBERTSON P#120, AND | ) |
| IDENTIFICATION SPECIALIST | ) |
| DAVID R. HORN #C1928, | ) |
| | ) |
| Defendants. | ) |

Now comes Plaintiff PAUL LEWIS BROWNING, by and through counsel,

and complains of Defendants the LAS VEGAS METROPOLITAN POLICE

DEPARTMENT ("Department" or "LVMPD"), former Las Vegas Metropolitan employees Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928, as follows:

## Introduction

1.     As a result of misconduct by the Defendants, Plaintiff Paul Browning was wrongfully convicted of a murder he did not commit.

2.     Browning was twice sentenced to death by execution, which would have been a tragic miscarriage of justice that could not, in any way, ever be undone.

3.     All told, Browning then spent more than 32 years on Nevada's death row, facing the prospect of a state-sanctioned killing, despite the fact he was innocent of the crime.

4.     Plaintiff's conviction was only possible due to the violation of his constitutional rights, including the Defendants' failure to disclose evidence about the perpetrator exculpating Plaintiff through police creating false evidence purporting to link Browning to the crimes.

5.     After evidence of Defendants' violations of Plaintiff's constitutional rights and other exculpatory evidence was brought to light, the wrongful conviction of Plaintiff was vacated and the charges ultimately dismissed with prejudice.

6.     Nothing can give Plaintiff years of his life—spent away from his loving, supportive family and while enduring the trauma of a possible execution—back. And, while nothing can truly account for the immense pain and trauma Plaintiff has endured, Browning brings this action to seek a measure of justice for his more than three decades of wrongful incarceration.

7.    In addition, through this action, Browning seeks to hold accountable those who caused his wrongful conviction, which was brought about not only due to the bad acts of Las Vegas Metropolitan Police Department employees, but by the Departments' own polices, practices, and customs as well. Such accountability is necessary to obtain a form of redress for the wrongs done to Plaintiff and to deter future misconduct as well.

## Jurisdiction and Venue

8.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, because Browning asserts claims for violations of his constitutional rights, including under the Fourth and Fourteenth Amendments, as described in more detail below. This Court has jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

9.    Venue is proper because the events giving rise to the claims asserted herein occurred within this district.

## Parties

10.    Plaintiff Paul Browning is a 63 year-old resident of North Carolina. When he was still in his twenties, Browning was arrested, prosecuted, and wrongfully convicted of the murder of Hugo Elsen in Las Vegas, Nevada.

11.    Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928 ("Defendant Officers" or "Individual Defendants") were at all times relevant to this Complaint employed as law enforcement officers and employees of the Las Vegas Metropolitan Police Department. The Defendant Officers acted under color of law and within the scope of their employment pursuant

to the statutes, ordinances, regulations, policies, customs, and usage of the Las Vegas Metropolitan Police Department, Clark County, and the State of Nevada. They are sued in their individual capacity. Upon information and belief, the Defendant Officers are entitled to indemnification under statute and by contract.

12.    Defendant Las Vegas Metropolitan Police Department ("LVMPD") is a political subdivision of the State of Nevada and employed the Defendant Officers. The LVMPD is liable for all state law torts committed by the Defendant Officers while they were employed by the LVMPD pursuant to the doctrine of *respondeat superior*. The LVMPD is responsible for its own policies, practices, and customs and the violation of Plaintiff's constitutional rights that were caused by its policies, and/or customs.

## Factual Background

13.    Plaintiff grew up in Los Angeles, and has always remained close to his family, particularly his mother. Before he was wrongfully convicted, Plaintiff enjoyed activities like water skiing, flying model planes, riding motorcycles and dirt bikes.

14.    In 1985, Plaintiff decided to leave California to be closer to his mother who then lived in Maryland.

15.    Plaintiff set out on an extended cross-country trip with a friend, Marsha Gaylord, and decided to stop-over in Las Vegas for a while.

16.    As part of that extended trip, on November 8, 1985, Plaintiff and Gaylord were staying at the Normandie Hotel, on Las Vegas Blvd in Las Vegas, Nevada.

17.    Plaintiff's hair was styled in a short Afro; a dry hairstyle above the head.

4

### The Robbery and Murder of Hugo Elsen on November 8, 1985

18.    Hugo Elsen and his wife, Josy Elsen, were the owners of a jewelry store in Las Vegas, Nevada a few blocks from the Normandie Hotel.

19.    The Elsen's store had a front "showroom" with jewelry displays.

20.    The store also had a back room, with storage and a place to rest.

21.    The store also had a "buzzer" for letting people inside.

22.    On November 8, 1985, while manning the showroom, Hugo Elsen was attacked and brutally stabbed during the course of a robbery where the perpetrator stole at least 70 pieces of jewelry.

23.    The crime scene was bloody.

24.    The perpetrator stole at least 70 pieces of jewelry, and fled out the front door of the store, leaving bloody footprints in his wake.

25.    At the time of the tragic crime, Josy was in a back room taking a nap.

26.    Hearing the sounds of the crime, Josy awoke and came out to the front room where she saw the perpetrator standing over Hugo with a knife.

27.    Josy did not see the perpetrator's face, but only caught a glance at his side.

28.    The perpetrator then fled the scene, leaving through the front door.

29.    After the perpetrator left, Josy rushed out of the store through the back door and went to a business nearby to seek assistance from Debra Coe.

30.    When Josy arrived at Coe's office, Coe went to her front window to see if she could see the perpetrator trying to get away.

31.    Coe saw someone proceeding near the Elsens' store.

32.    That person was not the perpetrator.

33.    In fact, Coe recognized that the person had not, and could not have, been the perpetrator fleeing the scene of the crime.

34.     Josy and Coe returned to the Elsens' store, again through the back door, after calling the police.

### The Initial Police Investigation

35.     Numerous officers from the LVMPD, including Defendants Branon, Robertson, and Horn, arrived at the Elsens' shop, very soon after the crime.

36.     These Defendants arrived at the scene before paramedics, other first responders, and detectives.

37.     These Defendant Officers learned important facts about the crime, and the perpetrator.

38.     The Defendant Officers learned that the perpetrator had left bloody footprints at the crime scene from the victim's body to the front door of the shop.

39.     The Defendant Officers also actually spoke with Hugo Elsen and knew that he was able to provide a description of the perpetrator.

40.     Hugo provided a description of the perpetrator as a man with hair that was loosely curled, shoulder length, and wet.

41.     The Defendant Officers, however, failed to disclose this information, and provided misleading information in police reports that hid the true value of the information they obtained from Hugo when they entered the store.

42.     The Defendant Officers, for example, failed to disclose that Hugo, himself, had given a lucid description of the perpetrator; they failed to disclose the actual description Hugo provided; and they failed to disclose the fact that the shoeprints leading from Hugo's body to the front door came from the perpetrator (and not someone else), as they were there when the first officers, including Branon and Robertson, arrived.

43.     In fact, the Defendant Officers went further and, in fabricating evidence, attempted to undermine the exculpatory value of the evidence they discovered, including by suggesting, among other things, that the bloody shoeprints

leading from Hugo and out the front door came from paramedics arriving later when they knew that was not the case.

### Browning Had Nothing to Do with the Murder of Hugo Elsen

44. Plaintiff was not involved in the robbery and murder of Hugo Elsen in any way whatsoever.

45. Instead, Plaintiff had been at the Normandie hotel and was heading out to walk downtown, a considerable distance.

46. After leaving the hotel, Plaintiff came across a man named Randy Wolfe, who was staying at the same hotel.

47. Plaintiff had met Randy and his wife, Vanessa Wolfe, only a day or two before at the hotel and was introduced via Gaylord.

48. Randy Wolfe was in a yellow Datsun car, agreed to give Plaintiff a ride downtown, and told Plaintiff to meet him at his hotel room.

49. Plaintiff walked back to the hotel and went to the Wolfes' hotel room.

50. There, Plaintiff observed jewelry on the beds, and saw Vanessa Wolfe cutting tags of the items but did not have any idea where the items had come from.

51. Randy and Vanessa separately left their room, leaving Plaintiff there waiting for them to return for his ride downtown.

52. Randy took a large portion of the jewelry with him.

53. Plaintiff knew nothing about the attack on Hugo, where the jewelry had come from, or what the Wolfes were doing.

### The Investigation Zeros In on Plaintiff

54. Instead of investigating a perpetrator that matched the description provided by the victim, and while suppressing the fact that the victim was even cognizant enough to provide a description of the perpetrator, the Defendant Officers nearly immediately focused on Plaintiff.

55.    The Defendant Officers, including but not limited to Defendants Bunker, Albert, Caldwell, and Radcliffe, were provided with clearly false information from Randy and Vanessa Wolfe, who were obviously involved in the crime in some way.

56.    Vanessa and Randy Wolfe lied to investigators and claimed Browning was involved, even though he was not.

57.    No reasonable police officer would have believed the story provided by the Wolfes that day, or that the Wolfes themselves were innocent.

58.    The Wolfes' obviously implausible story included claiming Browning spontaneously confessed to them in the moments after the crime, stashed the proceeds of the crime in their hotel room, then sat idly by after giving them the murder weapon (a knife) and asking them to dispose of it.

59.    The story itself was incoherent, nonsensical, and obviously and transparently false.

60.    Indeed, the Defendant Officers knew that the Wolfes lacked credibility, would provide false information to implicate others, would do so to further their own criminal ends, and that they could not be trusted.

61.    Nonetheless, in fabricating evidence, the Defendant Officers generated police reports purporting that the Wolfes were reliable, honest witnesses, when they well knew that this was untrue.

62.    Acting pursuant to the policies, practices, and customs of the LVMPD, the Defendant Officers routinely used unreliable informants, including the Wolfes, to seek bogus charges against innocent people while forgiving other criminal acts.

63.    For example, around the same time they made false statements about Plaintiff, the Wolfes falsely alleged that an innocent man, Gerald Morell, committed a crime in their presence, when he had not.

64.    As with Plaintiff, the Wolfes purported to lead the police to the purported murder weapon (also a knife), even though they had faked the whole thing.

65.    The Defendant Officers, who interacted with the Wolfes regularly on the street, suppressed the extent of the Wolfes' own modus operandi from both criminal defendants and even the Clark County District Attorney's Office.

66.    Nonetheless, with Plaintiff still waiting for a ride downtown, the Defendant Officers, including Defendants Bunker, Radcliffe, Caldwell, and possibly others, rushed in to the hotel room to arrest Plaintiff, despite the fact that the Wolfes' story was obviously false, made by people who police knew lacked credibility, and despite there being no probable cause to suspect Plaintiff was involved in the robbery and murder of Hugo Elsen.

67.    The arresting officers knew Plaintiff was not the perpetrator.

68.    The arresting officers knew, or should have known Plaintiff was innocent by what transpired next: the arresting officers searched Plaintiff's body and clothing, and did not find any blood, defensive wounds, or any other evidence indicative of him having just brutally stabbed Hugo Elsen.

69.    Plaintiff also consented to the search of his own apartment at the hotel. The search of the room produced no weapon, clothing, jewelry, or anything else related to the murder.

70.    Even though Plaintiff did not have any blood on him, his shoes could not have been the ones that left prints exiting the front of the store, his description conflicted with that of the perpetrator, he was not in possession of any of the stolen jewelry, and the Wolfes themselves were in possession of stolen jewelry, the Defendants decided to attempt to implicate Plaintiff in the crime, rather than investigate the Wolfes or who may have worked with them to commit the robbery-murder.

71.    To do so, Defendants not only suppressed exculpatory evidence, but set out to manufacture false evidence against Plaintiff.

72.    Among themselves, the Defendant Officers agreed to work together to attempt to secure Plaintiff's wrongful conviction in violation of his constitutional rights and despite his innocence.

73.    For example, at the police station, Detectives threatened Plaintiff, subjected him to an extremely cold, uncomfortable environment, and otherwise pressured him to provide a false confession.

74.    When Plaintiff attempted to truthfully provide a statement, questioning Defendants, including but not limited to Defendant Levos and Officer Radcliffe, one of the Defendants began writing it down. But, once Defendants realized that Plaintiff was providing a truthful, exculpatory statement, rather than a false confession, they not only refused to take the statement but also destroyed the only contemporaneous recording of the statements Plaintiff made on that day about what happened.

75.    Doing so amounts to a destruction of evidence, done in bad faith to prejudice Plaintiff, and assist in Defendants efforts to wrongfully prosecute and convict Plaintiff for a crime he did not commit.

76.    In addition, in fabricating evidence, Defendants indicated in reports that Plaintiff was not willing to speak to them whatsoever, despite the fact that he only invoked his *Miranda* rights after they had made it clear they would not accept his exculpatory statements.

77.    Defendants also fabricated police reports after Plaintiff had been arrested purporting to attribute to him statements he never made.

78.    Defendants further destroyed and/or failed to preserve other evidence, including crime scene evidence that likely contained the perpetrators' blood, DNA, or other genetic markers.

## Defendants Manufacture and Fabricate Evidence

79.    Defendants knew that Josy had not seen the perpetrator's face and would not be able to identify the person who committed the crime.

80.    Josy was shown a photographic lineup that included Plaintiff. At that time, Josy confirmed that she was not able to make identification; that she saw the perpetrator for only a "slight moment"; that she saw the perpetrator from the side; and that she never saw the perpetrator's full face.

81.    Josy did not select Plaintiff and could not have made an identification.

82.    Between this interaction and trial, Josy interacted with LVMPD officers and detectives who, upon information and belief, took steps to indicate to Josy that Plaintiff was the perpetrator.

83.    At trial, evidence concerning Josy identifying Browning was presented as an "identification" of the perpetrator.

84.    This "identification" was unreliable and a result of Defendants' acts.

85.    Debra Coe did not see the perpetrator when she looked out her office window.

86.    Nonetheless, Defendants decided to ignore that fact, and attempt to present her as an "identification" witness who had seen the perpetrator.

87.    Defendants were only able to do so by manipulating Coe, suppressing exculpatory and impeachment evidence of the perpetrator and their own acts, and by using suggestion to have Coe "reconsider" her description and even undermine what she actually observed.

88.    After Coe "reconsidered" her description, Defendants subjected Coe to a highly suggestive showup of Plaintiff.

89.    To make matters worse, the "show-up" took place in low light; after Plaintiff was pulled out of a police car; that car was parked near the Elsen's store; and while Plaintiff was handcuffed and not wearing a shirt.

90.    Suggestively, Defendants even told Coe that they had a suspect and asked her to make an identification of Plaintiff.

91.    Coe obliged, and claimed Plaintiff was the person she had seen through the window after Josy had come to her business and told her what happened.

92.    Defendants' tactics were unduly and unnecessarily suggestive.

93.    Thereafter, in fabricating evidence, Defendants suggested to Coe information and, in conjunction with their failure to disclose evidence, took efforts to make it appear Coe's identification of Plaintiff as the perpetrator was reliable, when that suggestion was incorrect and unreliable.

94.    As a result of Defendants' misconduct, at trial, Coe claimed that she was "certain" she had seen Plaintiff out the window and the prosecution was able to suggest that the person she had seen was the perpetrator.

95.    Defendants manipulated a third person, Charles Woods, in the area of the Elsen's shop in the aftermath of the crime.

96.    Woods also did not see the perpetrator.

97.    Woods saw a man on the street around the time of the Elsen attack.

98.    Though the police knew Woods had not seen the perpetrator fleeing the scene with jewelry, they told him they wanted him to identify a suspect, and presented Browning in a showup, again shirtless, handcuffed, and in proximity to a police car.

99.    There was no exigency or justification for the officers using obviously suggestive, unreliable showup procedures with Coe and Woods, or for telling them beforehand they should make an identification.

100.    These were textbook examples of suggestive techniques, were unreasonable, and evident of inadequate training, policies, and practices of the LVMPD with respect to identification procedures.

101.    Given the obvious faults with the statements by the Wolfes, and unreliable, fabricated nature of the purported "identifications," and evidence of Plaintiff's innocence that Defendants were aware of but suppressed and misrepresented in fabricated, inaccurate reports, there was no probable cause to believe Plaintiff committed the robbery and murder of Hugo Elsen.

102.    Throughout their investigation and efforts to secure Plaintiff's arrest, prosecution, and conviction, the Defendant Officers took contemporaneous notes of what they observed, what they were told, and the course of their investigation.

103.    These notes included material information that was both exculpatory and impeaching of prosecution witnesses.

104.    Nonetheless, in accordance with the policies, practices, and customs of LVMPD, all such notes were suppressed and/or destroyed by the Individual Defendants.

105.    Due to Defendants' actions, Plaintiff was nonetheless arrested, indicted, and prosecuted.

### Plaintiff's Wrongful Prosecution and Conviction

106.    Plaintiff was continuously deprived of his liberty between November 8, 1985, the day he was arrested, and August 2019.

107.    In 1986, Plaintiff was tried for the robbery and murder of Hugo Elsen.

108.    At trial, the Defendant Officers suppressed exculpatory evidence, including but not limited to information about the perpetrator Hugo had provided, about the bloody shoeprints, and their own misconduct.

109.    The fabricated police reports, which served to mask this prosecution were used to further the prosecution and relied upon in prosecuting Plaintiff.

110.    In addition, evidence related to the fabricated and manipulated "identifications" from Josy Elsen, Deborah Coe, and Charles Woods were introduced against Plaintiff and used to secure his conviction.

111.    The case against Plaintiff was exceedingly weak.

112.    The Wolfes, in fact, turned in the bulk of the stolen jewelry, even after two searches of their hotel room by the police—because, by the time the police arrived, the Wolfes had already taken the bulk of the jewelry out of the hotel.

113.    Owing to their deep knowledge of the Defendant Officers' willingness to suppress evidence of their crimes and even fabricate evidence on their behalf for "assistance" in prosecutions as informants, the Wolfes were brazen in their actions.

114.    Randy Wolfe wore jewelry stolen from the Elsens unabashedly after the crime and even at a preliminary hearing where he testified against Plaintiff and lied about not having kept the jewelry.

115.    None of the recovered jewelry had Plaintiff's fingerprints on them or anything linking Plaintiff to the stolen goods.

116.    Vanessa Wolfe also admitted that she and Randy ran "cons" where they "bilked" people out of their money. Despite their obvious lack of credibility and involvement in Elsen's death in some way, neither of the Wolfes were investigated by Defendants or charged for their crimes.

117.    Instead, despite the fact he was innocent, Plaintiff was convicted of four crimes involving robbery and murder of Hugo Elsen—a result of Defendants' misconduct.

118.    Plaintiff was sentenced to death.

### Plaintiff's Exoneration

119.    Plaintiff appealed his wrongful conviction, but his conviction and sentence were affirmed.

120.    Plaintiff continued to seek relief, filing a state habeas petition, which was rejected in the trial court. In 2004, the Nevada Supreme Court reversed the denial of Plaintiff's challenge to his death sentence, but Plaintiff was resentenced to death on remand.

14

121.     While he was being sentenced, again, to death, Plaintiff sought federal relief. In the end, even after DNA testing exculpated him, and lengthy proceedings in state court unearthed some of the previously-unknown suppression of evidence and other misconduct that caused his conviction, it took years for Plaintiff to obtain relief, including an acknowledgement by the Ninth Circuit Court of Appeals that Plaintiff's due process rights had been violated by the suppression of exculpatory evidence.

122.     Ultimately, it was not until August of 2019 that Plaintiff was released from prison. Plaintiff's criminal saga—a result of Defendants misconduct—was not over, until the charges were finally dismissed with prejudice in January of 2020.

### Plaintiff's Injuries

123.     Paul Browning lost over 32 years of his life—with decades of that spent on death row wondering whether the State of Nevada would actually execute an innocent man—before he was finally exonerated.

124.     In that time, while faced with the looming prospect of his state-sanctioned forcible death in violation of his constitutional rights, Plaintiff endured hardships, was deprived of his liberty, and opportunities to live a fulsome, free life. Plaintiff lost the opportunity to spend time with his family—and particularly his mother—friends, and other loved ones.

125.     Plaintiff suffered tremendous damage, including physical injury and emotional distress, as a result of his wrongful arrest, prosecution, detention, and conviction. These harms continue to this day.

## Count I: 42 U.S.C. § 1983 – Fourteenth Amendment
## Due Process

126.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

127.    In the manner described more fully above, the Defendant Officers, acting as investigators, individually, jointly and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

128.    In the manner described more fully above, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928 deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution against Plaintiff, including but not limited to evidence: that Hugo Elsen gave a description of the perpetrator; that Hugo Elsen's description of the perpetrator could not have been Plaintiff; that the bloody shoeprints from the crime scene were from the perpetrator; concerning the Wolfes' credibility and status as police informants; that they had fabricated police reports and other forms of their own misconduct.

129.    In addition, as described more fully above, the Defendant Officers deliberately fabricated and solicited false evidence, including witness statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, obtained charges against Plaintiff, obtained his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

16

Moreover, Defendants used investigative techniques that were so coercive and abusive that they knew, or were deliberately indifferent to, the fact that those techniques would yield false information that was used to convict Plaintiff.

130. In addition, as described more fully above, the Defendant Officers also used unduly and impermissibly suggestive techniques to generate unreliable identification evidence that was admitted against Plaintiff at trial and to his detriment.

131. In addition, as described more fully above, the Defendant Officers also destroyed and/or failed to preserve exculpatory and materially-favorable evidence, and allowed such evidence to be destroyed and/or unpreserved in bad faith.

132. In addition, based on information and belief, the Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

133. In addition, the Defendant Officers subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he is totally innocent, through Defendants' misconduct. Defendants' actions contravened fundamental canons of decency and fairness and violated Plaintiff's rights under the Fourteenth Amendment.

134. The Defendant Officers' misconduct directly resulted in the unjust, unconstitutional, and wrongful criminal conviction of Plaintiff, thereby denying him constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and he would not have been convicted.

135. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

136.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

137.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

138.    Upon information and belief, the Defendant Officers' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the LVMPD, in the manner more fully described herein.

**Count II: 42 U.S.C. § 1983 – Fourth Amendment**

**Detention without Probable Cause and Deprivation of Liberty**

139.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

140.    In the manner described more fully above, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928 acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

141.    In so doing, the Defendant Officers caused Plaintiff to be unreasonably seized without probable cause and deprived of liberty, in violation of Plaintiff's rights secured by the Fourth Amendment.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

143. The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

144. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

145. Upon information and belief, the Defendant Officers' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the LVMPD, in the manner more fully described herein.

### Count III: 42 U.S.C. § 1983 – Failure to Intervene

146. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

147. In the manner described more fully above, during the constitutional violations described herein, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928 each stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

148. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

149.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

150.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

151.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

152.    Prior to Plaintiff's conviction, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos  #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in this Complaint. Defendants agreed to investigate and to exert influence to cause the prosecution of Plaintiff for a crime he did not commit and took overt actions in conformity with that agreement.

153.    As further described above, the Defendant Officers agreed to fail to disclose exculpatory evidence and then, to further conceal their acts, fabricate evidence against Plaintiff in a number of ways, including generating false police reports and unreliable identification evidence.

154.    In so doing, the Defendant Officers agreed to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among

themselves to protect one another from liability by depriving Plaintiff of these rights.

155.    In furtherance of their conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

156.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

157.    As a result of the Defendant Officers misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VI**

**42 U.S.C. § 1983 – Policy & Custom Claims**

**Against LVMPD**

158.    Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

159.    Plaintiff's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the Las Vegas Metropolitan Police Department, as well as by the actions of policy-making officials for the Las Vegas Metropolitan Police Department.

160.    At all times relevant to the events described in this complaint and for a period of time before and after, the Las Vegas Metropolitan Police Department failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of homicide investigations and the questioning of criminal suspects and witnesses by officers and agents of the Las Vegas Metropolitan Police Department; the use of "informant" testimony; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence,

material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; the conduct of eyewitness identification procedures; the maintenance of investigative files and disclosure of those files in criminal proceedings.

161.    In addition or alternatively, the Las Vegas Metropolitan Police Department failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the Department, with respect to the homicide investigations, interview techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; "informant" information and evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

162.    Officers and agents of the Las Vegas Metropolitan Police Department committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

163.    Had officers and agents of the Las Vegas Metropolitan Police Department promulgated appropriate policies, then the violation of Plaintiff's constitutional rights would have been prevented.

164.    In addition, upon information and belief, at all times relevant to the events described in this complaint and for a period of time before, the Las Vegas Metropolitan Police Department had notice of a practice and custom by officers and agents of the Department pursuant to which individuals suspected of criminal activity, like Plaintiff, were falsely implicated in crimes through "informant"

testimony; subject to criminal prosecution on the basis of identification evidence that was generated through impermissibly suggestive procedures; and who were prosecuted while members of the Department and the Department itself failed to disclose exculpatory and impeachment evidence.

165.    In addition, at all times relevant to the events described in this complaint and for a period of time before, the Las Vegas Metropolitan Police Department had notice of practices and customs of officers and agents of the Department that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and/or (5) officers pursued wrongful convictions through profoundly flawed investigations, including through the use of unreliable "informant" testimony.

166.    These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the Las Vegas Metropolitan Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees in the areas identified above and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Plaintiff.

167.    The above practices and customs, so well settled as to constitute *de facto* policies of the Las Vegas Metropolitan Police Department, were able to exist and thrive, individually and/or together, because policymakers with authority over

the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

168.    In addition, the misconduct described in this count was undertaken pursuant to the Las Vegas Metropolitan Police Department policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the Department or were actually committed by persons with such final policymaking authority.

169.    As a consequence, the final policymakers for the Las Vegas Metropolitan Police Department approved of, adopted, and therefore ratified the actions of the Defendant Officers, including their violations of Plaintiff's constitutional rights, making the Las Vegas Metropolitan Police Department liable for this misconduct. In fact, based upon information and belief, rather than taking steps to correct the obvious faults and failures with the investigation, including through training or discipline, the final policy makers for the Las Vegas Metropolitan Police Department further ratified the actions of the Defendant Officers by continuing to employ them, promote them, and approve of their work on the Elsen homicide investigation that resulted in Plaintiff's wrongful conviction.

170.    Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the Las Vegas Metropolitan Police Department, including but not limited to the Defendant Officers, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

## Count VI: Nevada State Law – Malicious Prosecution

171.    Each paragraph of this Complaint is incorporated as if restated fully herein.

172.    In the manner described more fully above, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928, acting as investigators, individually, jointly, and in conspiracy with each other, and maliciously, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which he is innocent.

173.    Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

174.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

175.    Through the doctrine of *respondeat superior*, Defendant LVMPD is liable as a principal for all torts committed by its employees or agents, including the misconduct by the Defendant Officers.

176.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VII: Nevada State Law – Abuse of Process

177.    Each paragraph of this Complaint is incorporated as if restated fully herein.

178.    In the manner more fully described above, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren,

Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928, through the actions described more fully above, procured and exerted influence to continue a criminal proceeding against Plaintiff, with an ulterior purpose other than resolving a legal dispute or resolving the guilt or innocence of Plaintiff in the murder of Hugo Elsen. Defendants also committed willful acts in the use of the legal process which were not proper in the regular conduct of Plaintiff's criminal proceeding.

179.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

180.    Through the doctrine of *respondeat superior*, Defendant LVMPD is liable as a principal for all torts committed by its employees or agents, including the misconduct by the Defendant Officers.

181.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count VIII: Nevada State Law – Intentional Infliction of Emotional Distress**

182.    Each paragraph of this Complaint is incorporated as if restated fully herein.

183.    In the manner described more fully above, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928, acting as investigators, individually, jointly, and in conspiracy with each other, engaged in extreme and

outrageous conduct with the intention of, or with reckless disregard for, causing Plaintiff emotional distress, and Plaintiff suffered severe or extreme emotional distress. Defendants' misconduct was the actual and proximate cause of Plaintiff's severe or extreme emotional distress.

184.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

185.    Through the doctrine of *respondeat superior*, Defendant LVMPD is liable as a principal for all torts committed by its employees and agents, including the misconduct by Detectives described in this Count.

186.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count IX: Nevada State Law – Civil Conspiracy

187.    Each paragraph of this Complaint is incorporated as if restated fully herein.

188.    In the manner described more fully above, Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928, acting in concert with other known and unknown co-conspirators conspired and intended by concerted action to accomplish an unlawful objective for the purpose of harming Plaintiff, which resulted in damage to him. Defendants agreed to investigate and cause the prosecution of Plaintiff for a crime he did not commit and took overt actions in conformity with that agreement.

189.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

190.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

191.    Through the doctrine of *respondeat superior*, Defendant LVMPD is liable as a principal for all torts committed by its employees or agents, including the misconduct by the Defendants described in this Count.

192.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count X: Nevada State Law – Indemnification

193.    Each paragraph of this Complaint is incorporated as if restated fully herein.

194.    Nevada law provides that LVMPD is directed to pay any tort judgment for compensatory damages for which their employees are liable within the scope of their employment activities.

195.    Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928 were employees of the Defendant LVMPD and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiff, PAUL LEWIS BROWNING, by and through counsel, respectfully requests that this Court enter a judgment in Plaintiff's favor and against Defendants LAS VEGAS METROPOLITAN POLICE DEPARTMENT and former Las Vegas Metropolitan Police Officers Defendants Lt. Greg Jolley, Lt. John Conner, Sgt. F. Jergovic, Sgt. C. Albert, Detective Sgt. Michael Bunker #653, Detective Sgt. T. Rosen, Detective Robert Leonard P#471, Detective H. Oren, Detective Bert Levos #144, Detective Thorton, Officer Gregory Branon P#2187, Officer Gary Caldwell, P#2301, Officer David Radcliffe P#2191, Officer R. Robertson P#120, and Identification Specialist David R. Horn #C1928 awarding compensatory damages, costs, and attorneys' fees against each Defendant and punitive damages against the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, PAUL LEWIS BROWNING, by and through undersigned counsel, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

PAUL LEWIS BROWNING

By:  /s/ Luke Busby
Designated Resident Nevada Counsel for
Plaintiff

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave # 82
Reno, Nevada 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff*

David B. Owens
LOEVY & LOEVY
100 S. King Street, #100
Seattle, WA 98104
david@loevy.com
*Will comply with LR IA 11-2 within 30 days.
*Counsel for Plaintiff Paul Browning*