Luke Busby
NV Bar# 10319
316 California Ave., #82
Reno, NV 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff Kirstin Blaise Lobato*

Elizabeth Wang*
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*Admitted pro hac vice

David B. Owens*
LOEVY & LOEVY c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110
Seattle, WA 98145-1110
david@loevy.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA (LAS VEGAS)**

| | |
|---|---|
| THE ESTATE OF PAUL LEWIS BROWNING; EX REL. BETTY BROWNING, ADMINISTRATOR OF THE ESTATE OF PAUL LEWIS BROWNING,<br><br>　　　　Plaintiff,<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT; et al.,<br><br>　　　　Defendants. | Case No. 2:20-cv-1381-KJD-VCF<br><br>**PLAINTIFF'S *CORRECTED* RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 81]** |

**MEMORANDUM OF POINTS AND AUTHORITIES**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

GOVERNING LEGAL STANDARDS ................................................................................ 1

MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ................................. 3

    A.  The Wrongful Conviction of Paul Lewis Browning ........................................ 3

    B.  A Black Cuban Man Nicknamed "Willy" Robbed and Killed Hugo Elsen .................... 4

    C.  Witnesses Did Not See Browning .................................................................. 6

    D.  The Wolfes Provide Obviously False Accusations Against Browning, Which Defendants Supported by Fabricating Evidence Instead of Admitting The Wolfes Were Unreliable And Had Falsely Implicated An Innocent Person They Hardly Knew ................................................................................................................ 7

    E.  Defendants Arrest Browning and Conduct Show-ups With Coe, Woods, and Hoffman .................................................................. 9

    F.  Browning Was Taken to the Police Station ................................................ 12

    G.  No Reliable Evidence Connected Browning to the Crime ......................... 13

    H.  Defendants Suppressed that Fact Bloody Shoeprints at the Crime Scene Were Made by the Murderer (and Those Prints Were Not Browning's) ................ 14

    I.  Defendants Suppressed the Fact that Hugo Elsen Gave a Description of the Perpetrator that Was Not Browning ........................................................... 16

    J.  Defendants Tainted and Contaminated Witness Memories and Tainted Testimony about Eyewitness Observations ............................................................... 17

    K.  Police Used Unduly Suggestive Identification Procedures ........................ 18

    L.  Criminal Proceedings Against Browning Result in His Wrongful Conviction ............ 19

    M.  Browning's Conviction Is Overturned After The Ninth Circuit Found the Identifications Were Unduly Suggestive and Exculpatory Evidence Was Withheld ....21

    N.  LVMPD's Woefully Deficient Policies, Practices, and Failure to Train ...................... 23

ARGUMENT ...................................................................................................................25

I.    DEFENDANTS ARE COLLATERALLY ESTOPPED FROM CLAIMING
      MATERIAL EVIDENCE WAS NOT SUPPRESSED AND CAUSED BROWNING
      PREJUDICE ...........................................................................................................25

II.   BROWNING'S DUE PROCESS CLAIMS MUST PROCEED TO TRIAL .................31

      A.  A Reasonable Jury Can Easily Conclude Defendants Suppressed Material Information
          in Violation of Due Process ...........................................................................................31

          1.  The Constitution Imposes an Affirmative Obligation To Disclose Material
              Information ...........................................................................................................31

          2.  Defendants Suppressed Material Evidence That Harmed Browning ...................32

          3.  A Reasonable Jury Can Find Defendants Acted With Deliberate Indifference or
              Reckless Disregard For Browning's Rights.........................................................36

          4.  Any Suggestions Browning Should Have Found What Defendants Were Hiding
              Fail .......................................................................................................................39

      B.  A Reasonable Jury Can Easily Conclude Defendants Fabricated Evidence in Violation
          of Due Process.................................................................................................................41

          1.  The Constitution Prohibits Police From Generating False or Unreliable
              Evidence ...............................................................................................................41

          2.  A Reasonable Jury Can Find Defendants Generated False or Unreliable
              Evidence ...............................................................................................................44

      C.  At A Minimum, Material Disputes of Fact Preclude Summary Judgment on Plaintiff's
          Due Process Claims.........................................................................................................45

III.  BROWNING'S FOURTH AMENDMENT CLAIM MUST PROCEED TO
      TRIAL .....................................................................................................................45

IV.   DEFENDANTS ARE LIABLE FOR AGREEING TO FRAME BROWNING AND
      FAILING TO INTERVENE TO STOP HIS WRONGFUL IMPRISONMENT...........51

      A.  A Reasonable Jury Can Find A Conspiracy to Prosecute Browning .............................51

      B.  Defendants Can Be Liable For Failing to Intervene to Stop Browning's Wrongful
          Conviction .......................................................................................................................53

V.    QUALIFIED IMMUNITY IS UNAVAILABLE........................................................54

      A.  The Conspiracy Claims Are Clearly Established............................................................56

      B.  The General Duty To Intervene (or Intercede) Was Clearly Established in
          1984........................................................................................................................60

VI.   A REASONABLE JURY CAN EASILY CONCLUDE THE LVMPD HAD DEFICIENT POLICIES, PRACTICES, AND CUSTOMS THAT WERE THE MOVING FORCE TO VIOLATING BROWNING'S CONSTITUTIONAL RIGHTS ................................................................................................61

A.  A Reasonable Jury Can Find LVMPD Liable For the *Brady* Violations ......................62

B.  The LVMPD's Deficient Policies Concerning Unreliable Identifications Also Must Be Tried ................................................................................67

VII.   PLAINTIFF'S NEVADA CONSTITUTIONAL AND COMMON LAW CLAIMS MUST PROCEED TO TRIAL ................................................................68

A.  A Reasonable Jury Can Find Defendants Violated The Nevada Constitution's Due Process Clause ........................................................................68

B.  Plaintiff's Nevada Malicious Prosecution Claim Must Proceed to Trial ......................68

C.  A Reasonable Jury Can Find Defendants Abused Legal Process ...................................70

D.  Prosecuting an Innocent Person Constitutes Intentional Infliction of Emotional Distress ................................................................71

E.  Plaintiff's Indemnification Claim Should Not Be Dismissed ........................................73

CONCLUSION ................................................................................................72

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Cases</u>**

3   *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)................................................................2

4   *Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) .............................................................40

5   *Anderson v. Creighton*, 483 U.S. 635 (1987) ......................................................................56

6   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ..........................................................2

7   *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998).........................................................63

8   *Ashcroft v. al-Kidd,* 563 U.S. 731 (2011) .................................................................46, 56, 59

9   *Atkins v. Cty. of Riverside*, 151 F. App'x 501 (9th Cir. 2005) .......................................32, 35

10   *Avalos v. Baca*, 596 F.3d 583 (9th Cir. 2010).......................................................................57

11   *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004)...........................................47, 50

12   *Aziz v. Eldorado Resorts, LLC*, 72 F. Supp. 3d 1143 (D. Nev. 2014) .................................69

13   *B&B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138 (2015) .......................................26

14   *Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003) ......................................................................35

15   *Baker v. Roman Catholic Archdiocese*, 725 F. App'x 531 (9th Cir. 2018) ..........................2

16   *Baldwin v. Placer Cty.*, 418 F.3d 966 (9th Cir. 2005) .............................................57, 58, 59

17   *Banks v. Dretke*, 540 U.S. 668 (2004) .................................................................................40

18   *Barbee v. Warden*, 331 F.2d 842 (4th Cir.1964) .............................................................28, 29

19   *Barton v. Warden, Southern Ohio Correctional Facility*, 786 F.3d 450 (6th Cir. 2016) ..............39

20   *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ................................65

21   *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134 (9th Cir. 2021)...................................38

22   *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002).............................................................35, 40

23   *Berry v. State*, 131 Nev. 957 (2015) ......................................................................................3

24   *Bonamy v. Zenoff*, 362 P.2d 445 (Nev. 1961)..............................................................68, 69, 70

25   *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001)........................................................................35

26   *Bracy v. Gramley*, 520 U.S. 899 (1997) ...............................................................................40

27   *Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................................... *passim*

**Cases (Cont.)**

*Brandon v. HDSP Med. Unit*, 2020 WL 6876201 (D. Nev. Nov. 20, 2020) ................................68

*Braxton-Secret v. Robins Co.*, 769 F.2d 528 (9th Cir.1985)................................................52

*Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) ................................................56

*Browning v. Baker*, 871 F.3d 942 (9th Cir. 2017) ................................................3

*Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017) ................................................ *passim*

*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) ................................................60

*Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224 (2008) ................................................69

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)................................................60

*Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105 (9th Cir. 2018)............42, 43, 44, 50, 64

*Cameron v. Brown*, 721 F. App'x 612 (9th Cir. 2017)................................................47, 56

*Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) ................................................56, 58

*Camreta v. Greene*, 131 S. Ct. 2020 (2011) ................................................58

*Canton v. Harris*, 489 U.S. 378 (1989)................................................62

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) ................................................40

*Carrillo v. Cty. of Los Angeles,* 798 F.3d 1210 (9th Cir. 2015) ................................................33

*Catrone v. 105 Casino Corp.*, 414 P.2d 106 (Nev. 1966) ................................................69

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................45

*Chapman v. City of Reno*, 85 Nev. 365 (1969) ................................................69

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483 (9th Cir. 2010) ................55

*City of Los Angeles v. Heller,* 475 U.S. 796 (1986)................................................62, 63

*Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090 (9th Cir. 2005) ................................................2

*Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010)................................42, 44

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010)................................................52, 57

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014)................................................2

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000)................................................53

*Curlott v. Campbell*, 598 F.2d 1175 (9th Cir. 1979)................................................26

**Cases (Cont.)**

*Davis v. Eide*, 439 F.2d 1077 (9th Cir. 1971) ...............................................29

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ...............................41, 42

*Dirks v. Martinez,* 414 F. App'x 961 (9th Cir. 2011) ........................56, 58, 59

*Donahoe v. Arpaio*, 986 F. Supp. 2d 1091 (D. Ariz. 2013) ...........................46

*Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir. 1990) ..........................1, 72

*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019

    (9th Cir. 2008) .........................................................................46

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ...................................62, 63

*Fatai v. Ramos*, 2023 WL 2392707 (D. Haw. Mar. 7, 2023) .........................71

*Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020) .................................58, 59

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) .......................................32

*Filson v. Browning*, 138 S. Ct. 2608 (2018) ..........................................26

*Floyd v. Vannoy,* 894 F.3d 143 (5th Cir. 2018) .......................................41

*Frank v. City of Henderson*, 2015 WL 5562582 (D. Nev. Sept. 21, 2015) ...........69

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ....................................51, 57

Franks v. Delaware, 438 U.S. 154 (1978).............................................38

*Fraser v. City of New York*, 2021 WL 1338795 (S.D.N.Y. Apr. 9, 2021) ...........30

*Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982) ..........................................60

*George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014) .....................................37

*Giglio v. United States*, 405 U.S. 150 (1972) ................................... *passim*

*Gilbrook v. Cit of Westminster*, 177 F.3d 839 (9th Cir. 1999) ...........52, 57, 58, 59

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014)..............................2

*Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011) ......................................35

*Graham v. Connor*, 490 U.S. 386 (1989) ..............................................46

*Grant v. City of Long Beach*, 315 F.3d 1081 (9th Cir. 2002) ..........................47

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013).............................61

**Cases (Cont.)**

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)...............................63, 64, 65, 66, 67

*Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir.1979)......................................................51

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) ..........................................................39

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997)........................................................57

*Herrera v. Collins*, 506 U .S. 390 (1993) ........................................................................3

*Hilliard v. Williams,* 516 F.2d 1344 (6th Cir. 1975)......................................................29

*Holley v. Techtronic Indus. N. Am.*, 812 F. App'x 517 (9th Cir. 2020)..............................2

*Hope v. Pelzer,* 536 U.S. 730 (2002) .......................................................................55, 56

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009) .....................................................49

*Illinois v. Gates*, 462 U.S. 213 (1983) ..........................................................................49

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)........................29, 54, 63, 64, 66

*Jackson v. City of Cleveland, et al.*, 920 F.3d 340, 367 (6th Cir. 2019).............................54

*Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390 (6th Cir. 2001)........................................60

*Janjua v. Neufeld*, 933 F.3d 1061 (9th Cir. 2019) .....................................................26, 30

*Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013)................................................40

*Johnson v. Rollins*, 2006 WL 2546807 (E.D. Mo. Aug. 31, 2006) ...................................44

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) .................................................63

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) .................................................64

*Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002) ..........................................................57

*Jordan v. Bailey*, 113 Nev. 1038 (1997).......................................................................69

*Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 121 Nev. 44 (2005) ...................69

*Kaady v. Shiferaw*, No. 3:21-CV-00966-AR, 2023 WL 4163094 (D. Or. May 11, 2023)............38

*Smith v. Kelly*, 2013 WL 5770344 (W.D. Wash. May 2, 2013) ........................................29

*Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757 (N.D. Ill. July 25, 2017)......................64

*Kunik v. Racine County,* 946 F.2d 1574 (7th Cir. 1991) .................................................51

*Kyles v. Whitley*, 514 U.S. 419 (1995)......................................................................33, 34

**Cases (Cont.)**

*LaMantia v. Redisi*, 38 P.3d 877 (Nev. 2002) ...................................................68, 69, 70

*LaMere v. Risley*, 827 F.2d 622 (9th Cir. 1987) .........................................................41

*Land Baron Inv. v. Bonnie Springs Family LP*, 131 Nev. 686 (2015)......................70, 71

*Larson v. Napier*, 700 F. App'x 609 (9th Cir. 2017)....................................................66

*Lassiter v. City of Bremerton*, 556 F.3d 1049 (9th Cir. 2009).....................................68

*Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013) ....................37

*Lester v. Buchanen*, 112 Nev. 1426 (1996) .................................................................68

*Liston v. Cty. of Riverside*, 120 F.3d 965 (9th Cir. 1997)............................................38

*Lobato v. Las Vegas Metro. Police Dep't,* 2022 WL 4017055

    (D. Nev. Sept. 1, 2022)......................................................................38,70, 71, 72

*Long v. Cnty. of Los Angeles,* 442 F.3d 1178 (9th Cir. 2006) ......................................61

*Love v. Villacana*, No. 20-56003, ___ F.4th ___, 2023 WL 4443287

    (9th Cir. July 11, 2023) ...........................................................................25, 26

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589 (2020) .................25

*Mack v. Williams*, 138 Nev. Adv. Op. 86, 522 P.3d 434 (2022) ..................................68

*Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009)...............................................55

*Manson v. Braithwaite*, 432 U.S. 98 (1977) ...............................................................44

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ..........................................45, 46, 47, 68

*Maryland v. Pringle*, 540 U.S. 366 (2003) ..................................................................49

*Matter of Spielbauer*, 785 F. App'x 369 (9th Cir. 2019) .............................................27

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011)......................................................56

*McKenzie v. Lamb*, 738 F.2d 1005 (9th Cir. 1984).....................................................49

*Meggs v. Boulevard Ventures, LLC*, 2016 WL 1259390 (D. Nev. March 30, 2016) ..........1, 45, 72

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018)..........................................32, 33, 35, 37, 38, 40

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016) ....................................62

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) ...........51, 52

**Cases (Cont.)**

*Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001) ...............................................47

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009)................................63, 64, 65

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) .......................... *passim*

*Monroe v. Pape*, 365 U.S. 167 (1961) .........................................................61

*Mooney v. Holohan*, 294 U.S. 103 (1935) ......................................................28

*Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) ..................................................38

*Motley v. Parks*, 383 F.3d 1058 (9th Cir. 2004) ...............................................54

*Neil v. Biggers*, 409 U.S. 188 (1972)...........................................................44

*Nesmith v. Alford,* 318 F.2d 110 (5th Cir. 1963) ..............................................60

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir.2001)..............................................29

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) ............................................35

*Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918 (9th Cir. 1988) ..........45, 72

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988)..............................................60, 61

*Olivero v. Lowe*, 995 P.2d 1023 (Nev. 2000) ..................................................71

*Olivier v. Baca*, 913 F.3d 852 (9th Cir. 2019) .................................................45

*Oracle USA, Inc. v. Rimini Street, Inc.*, 2016 WL 6208254 (D. Nev. Oct. 24, 2016)................55

*Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470 (9th Cir. 1992)...........................61, 62, 66

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014)........................30

*Pac. Shores Properties, LLC v. City of Newport Beach,* 730 F.3d 1142
    (9th Cir. 2013) .............................................................50

*Paradis v. Arave*, 240 F.3d 1169 (9th Cir. 2001) ..............................................40

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)...........................................28

*Porter v. White*, 483 F.3d 1294 (11th Cir. 2007)................................................32

*Posadas v. City of Reno*, 109 Nev. 448 (1993)..................................................70

*Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933 (C.D. Cal. 2018) ...................65

*Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022 (9th Cir. 2002)............................53

**Cases (Cont.)**

*Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) ...................................................49

*Richards v. Cnty. of San Bernardino*, 39 F.4th 562 (9th Cir. 2022)................42, 62, 63

*Ricord v. C.P.R.R. Co.*, 15 Nev. 167 (1880) .........................................................69

*Rivera v. Corr. Corp of Am.*, 999 F.3d 647 (9th Cir. 2021)....................................71

*Robins v. Meecham*, 60 F.3d 1436 (9th Cir. 1995) .................................................54

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023) ....................................................54

*Rohde v. City of Roseburg*, 137 F.3d 1142 (9th Cir. 1998) .....................................48

*Rowland v. Lepire*, 313 P.2d 1332 (Nev. 1983).....................................................70

*Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 824 F.3d 1161 (9th Cir. 2016) ........26

*Sampson v. Cty. of Los Angeles*, 974 F.3d 1012 (9th Cir. 2020) .............................59

*Scafidi v. LVMPD*, 966 F.3d 960 (9th Cir. 2020) ..................................................47

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994).....................................................2, 8

*Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216 (9th Cir. 2018) ...................2

*Simmons v. United States*, 390 U.S. 377 (1968) ....................................................67

*Sims v. City of Columbus*, 2013 WL 3394001 (S.D. Ohio July 8, 2013)...................72

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ............................................2

*Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) .........................................................60

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017)......................................41, 42, 44

*Starns v. Andrews*, 524 F.3d 612 (5th Cir. 2008) ..................................................41

*Stovall v. Denno*, 388 U.S. 293 (1967) ...............................................................22

*Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138 (D. Nev. 2014)..........................71

*TCB Remarketing LLC v. Metro Auto Auction LLC,* No. CV-20-01826-PHX-MTM, 2022 WL
        16640665 (D. Ariz. Oct. 27, 2022) ...........................................................45

*Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) ......31, 32, 37

*Thomas v. County of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ................................61

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) .........................................................46

**Cases (Cont.)**

*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir. 2021) ................................................53, 54, 60

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...........................................................2, 45, 55

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ............................................................46

*Truelove v. D'Amico*, 2018 WL 1070899 (N.D. Cal. Feb. 27, 2018) ........................................46

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ............................................61, 65

*United States v. Agurs*, 427 U.S. 97, 113 (1976) ...............................................................33

*United States v. Bagley*, 473 U.S. 667 (1976) .......................................32, 34, 41, 65

*United States v. Butler*, 567 F.2d 885 (9th Cir.1978) ........................................28, 29

*United States v. Cloud*, 590 F. Supp. 3d 1364 (E.D. Wash. 2022) ........................................40

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ..........................................41

*United States v. DeLeon*, 979 F.2d 761 (9th Cir. 1992) ........................................38

*United States v. Gardner*, 475 F.2d 1273 (9th Cir. 1973) ........................................52

*United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994) ........................................53

*United States v. Lanier*, 520 U.S. 259 (1997) ........................................56

*United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969) ........................................53

*United States v. Patterson*, 230 F.3d 1168 (9th Cir. 2000) ........................................55

*United States v. Wade*, 388 U.S. 218 (1967) ........................................22, 44, 68

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539 (9th Cir.1989) ...................51

*Vargas v. City of Los Angeles,* No. 19-55967, 2021 WL 2012592

    (9th Cir. May 20, 2021) ........................................63

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434 (9th Cir. 1984)...................39

*Ward v. EEOC*, 719 F.2d 311 (9th Cir. 1983) ........................................51

*Washington v. Duty Free Shoppers*, 696 F. Supp. 1323 (N.D. Cal. 1988) ...........................57

*Wearry v. Cain*, 577 U.S. 385 (2016) ........................................34, 35

*Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968) ........................................60

*Whren v. United States*, 517 U.S. 806 (1996) ........................................46

**Cases (Cont.)**

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) ...................................................... 33

*Williams v. State*, 2015 WL 4712111 (Nev. App. July 31, 2015) ................................ 68

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................... 21

*Wilson v. City of Los Angeles*, 2020 WL 8211451 (C.D. Cal. Dec. 23, 2020) ........... 44

*Woodrum v. Woodward County, Okla.*, 866 F.2d 1121 (9th Cir. 1989) ...................... 57

*Woods v. City of Reno*, 2020 WL 4194844 (D. Nev. July 21, 2020) ...................... 71, 72

*Wyatt v. Cole*, 504 U.S. 158 (1992) ........................................................................... 54

*Wyman v. State*, 217 P.3d 572 (2009) ....................................................................... 68

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ...................................................................... 49

*Youngblood v. West Virginia*, 547 U.S. 867 (2006) ................................................... 31

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ............................................................. *passim*

**Rules**

FED. R. CIV. P. 56(a) ...................................................................................................... 2

Rule 30(b)(6) ................................................................................................................ 66

Rule 56 ..................................................................................................................... 2, 67

**Statutes**

28 U.S.C. § 2254 ...................................................................................................... 3, 21

42 U.S.C. § 1983 ................................................................................................... *passim*

NRS 34.360 .................................................................................................................. 30

NRS 34.900 .................................................................................................................... 3

NRS 41.0349 ................................................................................................................ 72

NRS 41.910 .................................................................................................................... 3

U.S. CONST. AMD. IV .................................................................................................... 46

U.S. CONST. AMD. VII .................................................................................................... 1

**<u>Other Authorities</u>**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,

    111 CAL. L. R. 201 (2023)......................................................................54

David B. Owens, *Violence Everywhere: How the Current Spectacle of Black Suffering, Police*

    *Violence, and the Violence of Judicial Interpretation Undermine the Rule of Law*, 17 STAN.

    J. C.R. & C.L. 495, 504-05 (2022)......................................................54

Joanna C. Schwartz, *The Case Against Qualified Immunity*,

    93 NOTRE DAME L. REV. 1797 (2018) ...............................................54

William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45 (2018) .........................54

**INTRODUCTION**

This civil-rights action concerns the wrongful arrest, prosecution, and imprisonment of Paul Lewis Browning for a robbery and murder that he did not commit but nonetheless spent more than 30 years of his life on death row. Shortly after his release from prison, Browning suddenly died. The plaintiff in this case is now his mother, Betty Browning, who is over 90 years old and has spent nearly 40 years seeking justice for her late son. Despite his innocence, and despite the Ninth Circuit already finding a clearly established—and egregious—violation of Browning's right to due process, Defendants now claim the record is so bare that no reasonable jury could find for Plaintiff and that they are entitled to judgment on nearly every claim in the case.[1]

They are wrong. Instead, while Defendants should not be permitted from taking positions contrary to the Ninth Circuit's findings regarding the *Brady* issues in the case, the Ninth Circuit's decision amply demonstrates that a reasonable jury can easily Defendants' violated Browning's clearly established constitutional rights, and that LVMPD caused this to happen through its policies and practices. In contending otherwise, Defendants fail to adhere to the basic standard at summary judgment, refusing construe the record in the light most favorable the Plaintiff, as they must. Defendants must accept, for example, that Browning is innocent; that he did not murder Hugo Elsen; and that he was *mis*identified by witnesses following the crime as a result of unduly suggestive identification procedures. Defendants' failure to do so is fatal to their motion. In the end, and at minimum, pervasive factual disputes preclude judgment as a matter of law and require a trial to resolve. The motion should be denied.

**GOVERNING LEGAL STANDARDS**

The constitution proscribes a right to a jury trial. *See* U.S. CONST. AMD. VII. As a result, in our system, it is the jury that decides factual disputes, not judges. A limited exception to this

---

[1] Defendants do not address Plaintiff's contention that the officers violated due process by generating unreliable misidentifications through suggestive procedures, and that LVMPD is liable for this claim, too. These contentions have always been part of this case. *See* Dkt. 1 (Compl.) ¶¶ 83-101, 130, 164; Dkt. 43 (First Amd. Compl.), ¶¶ 81-107, 135, 169; *see also* Dkt. 81-22 (Ex. M) at 6-7. Failure to address it is forfeiture; parties cannot raise new arguments in reply briefs. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990); *Meggs v. Boulevard Ventures, LLC*, 2016 WL 1259390, at *4 (D. Nev. Mar. 30, 2016).

background rule is set forth in Rule 56, which permits summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Where "'evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" a genuine issue of material fact exists. *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). In making this determination, the evidence must be construed "'in the light most favorable to the opposing party,'" and the court must also "draw inferences in favor of the nonmovant." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *accord. Holley v. Techtronic Indus. N. Am.*, 812 F. App'x 517, 517 (9th Cir. 2020). As a result, every reasonable factual inference must be drawn in favor of the party opposing the motion for summary judgment," which includes "both direct and circumstantial evidence." *Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005); *cf. Baker v. Roman Catholic Archdiocese*, 725 F. App'x 531, 532 (9th Cir. 2018) (failure to "properly consider various pieces of circumstantial evidence" warrants reversal).

In addition, the Ninth Circuit has emphasized that where the civil plaintiff has passed away, "cannot 'simply accept what may be a self-serving account by the police officer.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Though this rule has been applied primarily in police violence cases, the same operative principle holds here: the Court must examine the evidence in the light most favorable to the plaintiff and bear in mind that the officers' account—portions of which involve actions between the deceased plaintiff and the officers alone—must be scrutinized. Indeed, perhaps far more than in an excessive force case, lawsuits involving wrongful convictions "nearly always require[] a jury to sift through disputed factual contentions, and to draw inferences therefrom*," Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*en banc*), meaning summary judgment "should be granted sparingly." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (*en banc*).

**MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT**

The facts are set out in the light most favorable to Browning, including some (but not all) reasonable inferences made in Browning's favor, and referred to by paragraph as Statement of Facts ("SOF") in Argument section of this brief.

**A. The Wrongful Conviction Of Paul Lewis Browning**

1.      On November 8, 1985, Hugo Elsen was robbed and killed in Las Vegas, Nevada. Dkt. 81-7 at 10 (LVMPD 9).

2.      Paul Lewis Browning was not involved in that crime in any way and was innocent of it entirely. Ex. 1 (Browning Aff.).[2]

3.      Nonetheless, Browning was wrongfully convicted of crimes he did not commit and spent more than three decades on Nevada's death row, separated from his friends, family, and other loved ones always under the specter of being slowly and deliberately killed by the State of Nevada. *See* Dkt. 81-22 at 10 (Answer to Interrog. No. 10); *Browning v. Baker*, 875 F.3d 444, 449 (9th Cir. 2017) (*Browning II*).[3]

---

[2] Defendants state that Browning has "never been found innocent of the death of Hugo Elsen." Dkt. 81 at 2. This is a complete *non-sequitur*. For one, at the time Browning was convicted and through his entire post-conviction proceedings both federal and Nevada post-conviction proceedings there is no freestanding claim of "actual innocence," and thus post-conviction courts are not typically in the business of declaring criminal defendants "innocent." *See* 28 U.S.C. § 2254 ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is *in custody in violation of the Constitution or laws or treaties of the United States*.") (emphasis added); *Herrera v. Collins*, 506 U .S. 390 (1993) (freestanding claim of "actual innocence" does not provide grounds for federal habeas relief); *Berry v. State*, 131 Nev. 957, 967 n.3, 363 P.3d 1148, 1154 n.3 (2015) (noting the Nevada Supreme Court "has yet to address whether and, if so, when a free-standing actual innocence claim exists"). It was not until 2019, the Nevada Legislature passed a post-conviction statute that would have permitted Browning to seek this form of relief, NRS 34.900 *et seq.* Browning also passed away before having the opportunity to seek a certificate of innocence pursuant to NRS 41.910 (and that statute includes no provision for carrying forward such claims following the death of a wrongfully convicted person). At any rate, on summary judgment, Defendants must accept Browning is innocent. Any argument to the contrary is for trial.

[3] Plaintiff refers to the operative decision as *Browning II* because the panel's original decision, *Browning v. Baker*, 871 F.3d 942 (9th Cir. 2017), was withdrawn from bound volume, opinion amended and superseded on denial of rehearing.

**B.  A Black Cuban Man Nicknamed "Willy" Robbed And Killed Hugo Elsen**

4.      In November 1985, Paul Browning was traveling from California back to North Carolina to be near his mother. He did not live in Las Vegas and was just staying in town for a few days on his long way home. Ex. 1 ¶ 1; Dkt. 81-16 (Evid. Hrg., Browning) at 17-18.[4]

5.      During this stay, Paul Browning was staying at the Normandy Hotel at the time Hugo Elsen was murdered. Dkt. 81-16 at 18; Ex. 1 ¶ 1. At the time, the Normandy was a vintage hotel with "apartment"-like units. Dkt. 81-11 (Trial Tr., R. Wolfe) at 29.

6.      Browning had a friend named Marsha Gaylord, known as Taytay. Dkt. 81-16 at 18-19. On the morning of November 8, 1985, Gaylord told Browning that she left her purse at her friend's apartment, which was downtown. Ex. 1 ¶ 3. Browning told Gaylord that he would meet her there later that afternoon after he got some sleep, because he had been out late the night before. Dkt. 81-16 at 22-23. Browning went back to sleep; shortly before 4:00 p.m., he woke up, took a shower, and left the hotel around 4:15 p.m. *Id.* at 23-24.

7.      Browning had only recently met Vanessa and Randy Wolfe, as they were staying at the same hotel. Dkt. 81-16 at 21. Browning often saw Randy with a Cuban with shoulder-length Jheri curl-type hair. Ex. 1 ¶ 2; *see also* Dkt. 81-11 at 123-24 (Trial Tr., Hager).

8.      Browning treated the Wolfes kindly, though, unbeknownst to him, they were serial criminals who would angle to pin their own serious crime on him. For example, Browning loaned Randy ten dollars. Dkt. 81-16 at 25. Randy had also asked to borrow a coat, and Gaylord gave him a tan-colored coat. *Id.* This coat was admitted into evidence as at the trial. *Id.* at 26; Ex. 1 ¶ 2.

9.      Browning left the hotel after 4:00 p.m. on November 8, he was walking north on Las Vegas Boulevard when he encountered Randy in a yellow Datsun with Virgnia tags. Dkt. 81-16 at 24, 26; Ex. 1 ¶ 4. Browning walked toward Randy's car to ask him for a ride downtown. Dkt. 81-16 at 28; Dkt. 81-15 (Evid. Hrg., Ross) at 13. As Browning approached the car, the Black

---

[4] Citations to Defendants' brief, depositions, and expert reports are to the page number of the deposition transcript. Citations to other docket filings to are to the pagination of the pdf, reflected in the file-stamp at the top of the page.

Cuban guy came, pushed Browning out of the way, got in the car, and they drove off. Dkt. 81-16 at 28. The Cuban man had the tan coat and a blue hat on. *Id.* at 29; Dkt. 81-15 at 9-10.

10.     The same blue hat was later admitted into evidence at Browning's trial. Dkt. 81-16 at 29-30. The coat and the hat did not fit Browning; they were too small. *Id.* at 51-53.

11.     Browning did not see where the Cuban man came from. Dkt. 81-16 at 29. Another witness, Frederick Ross, saw the Cuban man get out of Randy Wolfe's car and go into a jewelry shop. Dkt. 81-15 at 12, 16. Ross saw the Cuban man hurry back to the car with a paper bag. *Id.* at 13. Ross saw the Cuban man go in the store and come out with jewelry. *Id.* at 23. The Cuban man told Randy to "get the fuck out of here," and also said, "Let's get out of here. I think I hurt the guy." *Id.* at 14-15; Ex. 10 (Ross Aff.) ¶ 6. Later, Ross saw the same car Wolfe was driving at the Normandy Hotel. Dkt. 81-15 at 16-17.

12.     The Black Cuban man with Randy Wolfe was a couple of shades darker than Browning, and had hair that was shoulder length, loosely curled, and wet. Dkt. 81-16 at 88; Dkt. 81-15 at 9-10; Ex. 10 ¶ 10. The Cuban man had a street name of "Willy." Dkt. 81-15 at 55.

13.     At the time, Browning's hair was puffy, largely straight, and dry—he had an afro. Dkt. 81-16 at 94; Dkt. 81-15 at 12; Dkt. 81-7 at 105 (LVMPD 104); Dkt. 81-8 at 16-18 (LVMPD 452-54); Dkt. 81-4 (Branon Dep.) at 73-74; Ex. 10 ¶ 5; Dkt. 81-2 (Jolley Dep.) at 59.

14.     Randy Wolfe told Browning to meet him back at his hotel room. Dkt. 81-16 at 30; Ex. 1 ¶ 4. Randy drove off, back towards the hotel. Browning went back there to meet Randy because he still was hoping to get a ride downtown. Dkt. 81-16 at 31. There, Randy and the Cuban guy got into a "cursing match" and the Cuban guy left on a bike. *Id.* at 32-33. *See also* Ex. 1 ¶ 5.

15.     Browning went up to the Wolfes' hotel room/apartment. Dkt. 81-16 at 33. Randy opened the door. Browning could see a lot of jewelry on the bed. *Id.* The jewelry still had tags on it. Vanessa was cutting the tags off and putting the jewelry into a milk carton. *Id.*; Ex. 1 ¶ 5.

16.     Browning asked Randy for a ride downtown, and Randy said he had to go but would take Browning when he got back. Dkt. 81-16 at 34. Randy and Vanessa went into the bathroom and talked in there for a few minutes. *Id.* When Randy came out, he put most of the jewelry in a

paper bag and left. *Id.* There were a couple of watches left on the floor next to the bed, but Randy had taken nearly all the jewelry with him. *Id.*; Ex. 4 (photos of hotel room) at LVMPD 406, 417, 428-29, 440-43; Dkt. 81-5 (Radcliffe Dep.) at 92. Vanessa stayed for a bit but then left. Dkt. 81-16 at 35. *See also* Ex. 1 ¶¶ 5-6. Browning stayed there, watching t.v. and waiting for Randy to return so he could get a ride downtown. Ex. 1 ¶ 7.

**C.  Witnesses Did Not See Browning**

17.     After the suspect fled, Ms. Elsen ran next door to the Southern Nevada Publishing Company and contacted Debra Coe, who returned to the store with her. Dkt. 81-7 (Leonard Report) at 32 (LVMPD 31). Coe had likely seen the perpetrator run down the street, though she initially described the suspect as White. Ex. 14 (Davis Report) at 20; Dkt. 81-7 at 137 (LVMPD 138); *Browning*, 875 F.3d at 451. However, she later changed her identification to a Black man.

18.     According to Detective Leonard's report, Coe told him that she:

> ran to the front window area of the store, which is a tinted-type window, so that you were able to look out alright, however, persons could not look in, very readily, and observed a Negro Male subject with a blue baseball cap on, and very bushy hair hanging out the back, run southbound from the area of the jewelry store, down the sidewalk immediately in front of her. She related that she was only approximately 3 to 5 feet away from the subject when he came running past and she was able to get a fairly good look at him.

Dkt. 81-7 at 32 (LVMPD 31). In her statement, Coe said that she saw "a man come running by" when she was inside the store, but "[i]t looked like he must've ran past it. It's hard for me to see how he could've come out the door and was running at the angles he was at." Dkt. 81-7 (Coe statement) at 135-36 (LVMPD 134-35).

19.     However, Defendant Radcliffe falsely wrote in the arrest warrant affidavit that he was told by Leonard that Coe identified Browning, stating, "I think it is the same guy. If he had that hat on I would be positive." Dkt. 81-7 (Arrest Aff.) at 83 (LVMPD 82).

20.     Defendant Leonard interviewed Charles Woods on November 8, 1985. According to Leonard's report, Woods was standing in front of a different nearby jewelry store and "observed a Negro male suddenly come from unknown places and began running down the sidewalk towards them as though he were jogging. He related that it was a Negro Male with a blue cap of some type

on, and with very bushy hair hanging out around the cap." Dkt. 81-7 (Leonard Report) at 32 (LVMPD 31). At his interview at the station, Woods described the hat as a cap, with a flat top and no brim (not a baseball hat). Dkt. 81-7 (Woods statement) at 147-48 (LVMPD 146-47).

21.     Woods did not see the person come out of the jewelry store; his identification was of someone on the street close to the time of the robbery, not the perpetrator of the crime. He reported that the person he saw had no blood on him and nothing in his hands. Dkt. 81-10 (Trial Tr., Woods) at 170-71.

22.     When Detective Leonard spoke to Brad Hoffman at the scene, Hoffman stated that he works at Hoffman's Sporting Goods and lives upstairs. Dkt. 81-7 (Leonard Report) at 32 (LVMPD 31). Hoffman told Leonard that, "shortly prior to the incident, he observed whom he knew to be a Cuban Male Adult, in his early 20's, with a light moustache, approximately 5-7", and slim build, wearing a blue baseball-type cap, walking down Las Vegas Boulevard." *Id.* The subject did not appear to be concerned about anything, and he was "quite sure" "that the subject was a Cuban Male, and not a black male, as reported by other witnesses." *Id.*

**D. The Wolfes Provide Obviously False Accusations Against Browning, which Defendants Supported by Fabricating Evidence Instead of Admitting The Wolfes Were Unreliable And Had Falsely Implicated An Innocent Person They Hardly Knew**

23.     Defendants knew that Vanessa and Randy Wolfe had extensive criminal histories; Randy was a known drug addict and Vanessa was a prostitute. Dkt. 81-5 at 60.

24.     As Radcliffe stood outside the jewelry store guarding the scene, Randy Wolfe approached him just minutes after the crime occurred. Dkt. 81-7 (Radcliffe Report) at 15 (LVMPD 14). According to Radcliffe, Randy Wolfe told him that a "negro male" had come to his apartment at the Normandy Hotel, #12, and told him and his girlfriend Vanessa that he had "just robbed someone and had hurt them bad." *Id.* Randy told Radcliffe that Vanessa was still in the apartment with the suspect. *Id. See* Dkt. 81-5 at 66.

25.     The officers went to the hotel. They did not go to Browning's room. They went to the Wolfes' room. There, it was Vanessa Wolfe who led the officers to the majority of the jewelry

officers found, which was in the Wolfes' room in a plastic cup under the kitchen sink. Dkt. 81-7 (Bunker Report) at 45 (LVMPD 44); Dkt. 81-3 (Bunker Dep.) at 34, 41-42, 59-60; Dkt. 81-11 at 50-51 (Trial Tr., Randy Wolfe), 106 (Trial Tr., Vanessa Wolfe); Dkt. 81-7 (Evidence Impound Report) at 176; Ex. 4 at LVMPD 451. Vanessa also claimed she "found" the blue baseball cap for the officers and even directed them to a dumpster with a knife in it. Dkt. 81-3 at 44, 47, 56-57, 59-60; Ex. 4 at LVMPD 446 (dumpster with blue hat in it); Dkt. 81-5 at 74. *See also* Dkt. 81-7 (V. Wolfe statement) at 124-25 (LVMPD 123-24).

26.      All of this would have been obviously suspect to a reasonably trained officer. Reasonable and well-trained officers would have understood, and accounted for, the obvious credibility problems with Randall and Vanessa Wolfe, particularly as informants. Ex. 15 (Scott Report) at 16-17. The Wolfes were known criminals among LVMPD members, and all of the alleged physical evidence associated with the robbery/homicide was found in *their own* apartment/hotel room, but no physical evidence was found in Browning's apartment. *Id.* at 17-18.

27.      The only source of information accusing Browning of being involved with the Elsen murder was the obviously unreliable Wolfes. Dkt. 81-5 at 69. Radcliffe wrote the arrest affidavit for Browning based on this information. Dkt. 81-5 at 76-77. This information included the following, all of which would have been farcical to a reasonably trained officer: (1) that a Black male he barely knew called to Randy Wolfe from Wolfe's own room at the hotel; (2) the at-most acquaintance confessed to robbing and killing someone for jewelry; (3) instead of going to examine the jewelry (or hide the knife or his clothing) in his own room, the man went to the Wolfes' room and gave the Wolfes the murder-related proceeds (stolen jewelry); (4) the Wolfes then put the majority of the jewelry into a plastic cup and hid it under the sink; (5) he gave the Wolfes the  murder weapon (knife) to the Wolfes to dispose of for him; (6) he took off his jacket and shirt, supposedly worn during the commission of the offense, and threw them into the Wolfes' closet; (7) gave the Wolfes a baseball cap to throw in a dumpster; and then (8) gave Vanessa a ring for helping him. Dkt. 81-7 (Arrest Aff.) at 84-85 (LVMPD 83-84).

28.     Radcliffe falsely wrote in the affidavit that he "was able to observe a large number of watches and other jewelry items laying on the floor next to the bed." Dkt. 81-7 at 83 (LVMPD 82). The only items visible in the room when the police entered the room were a few watches on the floor. Ex. 4 (photos of hotel room) at LVMPD 406, 417, 428-29, 440-43; Dkt. 81-5 at 92.

29.     Given the Wolfes' obvious unreliability, both in general and in making these allegations, Radcliffe wrote in his report, "Randy frequently has given me information over the last 5 1/2 years that has turned out to be quite correct. … Vanessa … also has given us good information in the past." Dkt. 81-7 at 15 (LVMPD 14). There was no evidence of this, and it was contrary to the facts that: the Wolfes "admitted that they used heroin and cocaine, that Vanessa was a prostitute, and that Randy stole property"; Randy had prior convictions, including a recent conviction for which he would soon be sentenced; Randy admitted to keeping some of the stolen jewelry; and Vanessa used to "bilk people out of their money." *Browning II*, 875 F.3d at 466. Radcliffe dictated this report on November 8, 1985, at 6:07 p.m., after Browning's arrest. *See id.*

30.     The Wolfes were wearing new jewelry a couple days after the robbery. Dkt. 81-11 (Trial Tr., Hager) at 122. The Wolfes admitted keeping some of the jewelry. Dkt. 81-11 (Trial Tr., V. Wolfe) at 111. They also admitted they had stolen things and spent money on drugs. Randy admitted that Vanessa was a prostitute. Dkt. 81-11 (Trial Tr., R. & V. Wolfe) at 29-31, 79-80.

**E.  Defendants Arrest Browning and Conduct Show-ups with Coe, Woods, and Hoffman**

31.     Shortly after Vanessa left her and Randy's hotel room (#12), Defendants Bunker and Radcliffe came and kicked in the door. Dkt. 81-7 (Bunker Report) at 45 (LVMPD 44); Dkt. 81-7 (Radcliffe Report) at 14 (LVMPD 13). Though there was no probable cause to suspect Browning (as opposed to the Wolfes), Browning was placed under arrest. Dkt. 81-16 (Evid. Hrg., Browning) at 35; Dkt. 81-3 (Bunker Dep.) at 35; Dkt. 81-7 at 44-45. Browning was not told why he was arrested. Dkt. 81-16 at 43.

32.     Browning was sitting in a chair watching t.v. and wearing a long-sleeved flannel shirt, Levis and black loafers. Dkt. 81-16 at 36, 39; Ex. 2 (photo of Levis and shoes); Ex. 1 ¶ 7.

Nonetheless, Radcliffe falsely wrote in the arrest affidavit that Browning was sitting on the bed without a shirt. Dkt. 81-7 (Arrest Aff.) at 83 (LVMPD 82).

33.     The officers took off Browning's shirt "to look for any marks" and he was left shirtless. Ex. 1 ¶ 7. Contrary to what Defendant Bunker wrote in his report (Dkt. 81-7 at 45 (LVMPD 44)) and what Radcliffe wrote in the arrest affidavit, Browning was not sitting there with his shirt off when they kicked down the door. Ex. 1 ¶ 7.

34.     The officers put Browning in Radcliffe's car. Dkt. 81-16 at 36. Browning was not wearing a shirt in the patrol car. Browning was not wearing a hat that day. *Id.* at 36-37. Ex. 3 (screenshot of news video of Browning in patrol car); Ex. 1 ¶ 8.

35.     Browning told Bunker that he did not want to talk to him and wanted to talk to a lawyer. Dkt. 81-16 at 37.

36.     Defendants Radcliffe and Leonard conducted a series of suggestive, and unnecessarily gratuitous, show-up with Browning behind being taken back to the Elsen's jewelry store, sitting there shirtless, in handcuffs, and obviously "the accused." Ex. 1 ¶ 8; Dkt. 81-16 at 37-38; Dkt. 61-11 at 14 (Trial Tr., Radcliffe); Dkt. 81-11 at 129-30 (Trial Tr., Leonard); Dkt. 81-5 at 71, 77-78, 80; Dkt. 81-3 at 74-75; *see also* Dkt. 81-7 (Leonard Report) at 33-34 (LVMPD 32-33). The officers did not even take Browning out of the car; Radcliffe admitted that witnesses viewed him while he was sitting inside the patrol car. Dkt. 81-11 (Trial Tr., Radcliffe) at 15.

37.     Just before the show-up, Browning asked the detectives for a coat to put on. They asked if he had one in his motel room and he said he did. The Detectives told Browning that if he signed the consent to search, he would get the coat. Browning signed the consent to search form. Dkt. 81-16 at 38; Dkt. 81-7 (consent to search form) at 227 (LVMPD 225).

38.     The search of *Browning's* room (#15) turned up nothing related to the Elsen homicide; no jewelry, not blood stains in the sink or bathtub; no bloody clothes; no large sums of money—nothing. There is no evidence in the homicide file of anything found in Browning's room. *See generally* Dkt. 81-7. Nor did the officers even take any photos of Browning's room. The only hotel photos are of the Wolfes' room and items the Wolfes pointed out to the officers. *See* Ex. 4.

39.     A reasonable officer would have recognized at that point and soon before it that the Wolfes were obviously lying, suspected the Wolfes' involvement, and recognized Browning—who had just let them search his room—had not just committed a murder. Ex. 15 at 16-18.

40.     Back in the car, at the unduly suggestive show-ups, Browning had no shirt on and was handcuffed behind his back. Dkt. 81-16 at 40. Browning was wearing Levis and dark shoes, but no shirt, jacket, or baseball cap. Dkt. 81-7 (Leonard Report) at 34 (LVMPD 33).

41.     Defendants conducted the show-up with all three witnesses (Coe, Hoffman, and Woods) at the same time, failing to even separate them. Dkt. 81-7 at 34 (LVMPD 33).

42.     There, Brad Hoffman told Leonard and Radcliffe that this was not the subject he had seen. The person he saw was "definitely a Cuban male," and not a Black male. Dkt. 81-7 (Leonard Report) at 34 (LVMPD 33).

43.     As to Coe, before she was shown someone, she was told she would be asked to "identify the man they had picked up." *Browning II*, 875 F.3d at 543; Dkt. 81-11 (Trial Tr., Leonard) at 132. When they pulled up with Browning, the officers did not take him out of the car. Dkt. 81-10 (Trial Tr., Coe) at 123. Even then, she did not identify Browning as the perpetrator—a fact that is unsurprising given her poor vantage point and the fact Browning is innocent. Instead, Coe said that Browning (who was shown to her during the show-up) "resembled" the "man that ran across the front window," and that she was not positive and "won't point a finger at him because I can't be positive…." *Id.* at 139 (LVMPD 138). Coe also stated that she would never be able to be "more sure" in her mind that it was "the man" or not than "tonight when [she] first saw him," and that when she sees Black people, "they all look the same" to her. *Id.* at 140 (LVMPD 139). In addition, when she was interviewed at the station, Coe said that she looked out the window when Ms. Elsen came over and saw a man running by, who she described as "Black, medium color, not real dark and not light," with a '[m]oustache," "[a] blue baseball hat," "blue jacket," "[b]luejeans. Hair just past the ears and curly." Dkt. 81-7 (Coe statement) at 136 (LVMPD 135).

44.     Coe's statement that she thought Black people look the same clearly reflected a racial prejudice which made her identification of Browning unreliable. Ex. 15 at 20.

45.     Woods was also shown Browning and claimed he could positively identify him."
*Browning II*, 875 F.3d at 543; Dkt. 81-7 (Leonard Report) at 34 (LVMPD 33). As with Coe, the
police told Woods they had a suspect, and presented Browning shirtless and arrested. Dkt. 81-11
(Trial Tr., Leonard) at 130. When Woods was interviewed about the show-up, he said, "I'm sure
he was the same fellow that passed me within three feet on the street, a short while before." Dkt.
81-7 (Woods statement) at 34, 151. Woods did not see the guy carrying anything in his hands, Dkt.
81-7 at 148 (LVMPD 147), and he had no blood on him. Dkt. 81-10 (Trial Tr., Woods) at 170-71.

### F.     Browning Was Taken to the Police Station

46.     After the show-up, Browning was taken to the detective bureau. Dkt. 81-16 at 41.
He was handcuffed in a room. *Id.* at 42. Radcliffe was in the room at times and told him that once
he had been arrested for murder, it was over, and he should go ahead and confess in order to escape
the death penalty. *Id.* at 44. This was "pretty frightening" to Browning. *Id.* Because he was scared,
he knew he had not committed any crime, and could not take sitting under the air conditioner in
the room shirtless for several hours, Browning opened the handcuff that was not double locked,
removed his cuffs from the metal bar, and left the room. *Id.* at 46; Ex. 1 ¶ 9. Browning encountered
Bunker on the stairs and he was taken back to the room without incident. Dkt. 81-16 at 47.

47.     After that, Detective Levos asked Browning whether he wanted to make a
statement. Browning said that he did and recounted what happened. Levos wrote this down. Then
Levos balled the paper up and said, "you want to try it again." At that point, Browning said he
wanted a lawyer. Dkt. 81-16 at 49. *See also* Ex. 1 ¶ 11.

48.     Before Browning was even fingerprinted, Levos told Browning that the victim's
wife had supposedly identified him and that his fingerprints were found in the store. Ex. 1 ¶ 12.

49.     This was a lie. Levos wrote in his own report that Josy Elsen could not describe the
Black male suspect. All she could remember was that he had on a blue cap. Dkt. 81-7 (Levos
Report) at 26 (LVMPD 25). In addition, Ms. Elsen's view of the suspect was obstructed by a
showcase between her and the perpetrator standing over her husband on the floor. Ex. 14 at 7.

50.     When Defendant Leonard showed Ms. Elsen two photo arrays on December 4, 1985, she "immediately explained" "that she did not think that she would be able to identify the subject, that she only saw him for a slight moment from the side … [she] never saw him full face and did not think she would be able to pick him out." Dkt. 81-7 (Leonard Report) at 55 (LVMPD 54). Browning's photo was in the first folder. *Id.* It was "quite apparent" to Leonard that Elsen could not identify the individual. *Id.*

51.     Subsequent to Browning's arrest, LVMPD generated additional reports that include false information about Plaintiff Betty Browning, claiming she called the LVMPD and reported additionally inculpatory information. She did not call the LVMPD, as claimed in the report. Dkt. 81-22 at 9 (Answer to Interrog. No. 6); Dkt. 81-7 (Leonard Report) at 36-37 (LVMPD 35-36).

### G.     No Reliable Evidence Connected Browning to the Crime

52.     Browning's fingerprints were not found on any of the jewelry. Dkt. 81-6 (Horn Dep.) at 75. Browning's print was only on a worn Casio watch with a missing band that was in the Wolfes' room—that was *his* watch, not stolen contraband. Dkt. 81-16 at 72-74; Dkt. 81-17 (Evid. Hrg., Browning) at 101; Dkt. 81-7 (Evidence Impound Report) at 175 (LVMPD 174). This watch was introduced at the trial. Dkt. 81-16 at 72-74; *see* Ex. 4 at LVMPD 436; Dkt. 81-11 at 164-66.

53.     Browning had been in the jewelry store with Gaylord a few days before the crime was committed. Dkt. 81-16 (Evid. Hrg., Browning) at 59; Ex. 1 ¶ 3. That is why his prints were found on the customer side of a display case and a glass fragment on the floor. Dkt. 81-17 (Evid. Hrg., Sweedo) at 101-02; Dkt. 81-6 at 52, 54, 56; Dkt. 81-7 (Report of Laboratory Examination) at 212 (LVMPD 211). As he testified, Browning had leaned on the jewelry case with his palms protruding over the side, onto the vendor's side of the case. Dkt. 81-17 at 104-05; Dkt. 81-16 at 59-60. In addition to leaning on the case, one of the cases was open at one point, and Browning stuck his hand in and took a chain. Dkt. 81-16 at 61. He may have touched the case. *Id.*

54.     As print identification expert Michael Sweedo testified at the post-conviction evidentiary hearing, there was nothing in any of the reports indicating whether the print that was found on the glass fragment came from the mirrored or front side of the piece of glass from the

door. Dkt. 81-17 at 105-07. Horn admitted the same. Dkt. 81-6 at 56. Horn did not document which side of the glass the print was on. *Id.* at 71-73, 80-81; Ex. 5 (Latent print cards) at BPH19326; Ex. 6 (photos of scene) at LVMPD 339, 351, 360-61; Ex. 7 at LVMPD 4599. The latent print card simply said, "Print location: Large glass fragment on floor." Dkt. 81-6 at 80; Ex. 5 at BPH19326. The first time that Horn ever testified that the fingerprint came from the mirrored side of the glass was in his deposition as a defendant in this lawsuit, 37 years later. Dkt. 81-6 at 81.

55.        Browning never confessed to committing the crime to the Wolfes. Dkt. 81-16 at 95. The Wolfes lied to the police and again at trial. *Id.*

56.        Within a month after the murder, Randy Wolfe offered Frederick Ross a ring in exchange for cocaine. Dkt. 81-15 at 17. Vanessa Wolfe also offered him jewelry in exchange for drugs. *Id.* at 20. Ross did not take the contraband. *Id.*

57.        Gaylord's tan jacket that Browning had let Randy Wolfe borrow did not have Hugo Elsen's blood on it. Ex. 8 (Cellmark report).

**H. Defendants Suppressed the Fact Bloody Shoeprints at the Crime Scene Were Made by the Murderer (and Those Prints Were Not Browning's)**

58.        Branon was the first officer to arrive at the jewelry store. Dkt. 81-18 (Evid. Hrg., Branon) at 158. He was dispatched there at approximately 4:25 p.m. on November 8, 1985. Dkt. 81-7 (Branon Report) at 19 (LVMPD 18). Only the Elsens were there at the time, and the doors were locked. Dkt. 81-18 at 158; Dkt. 81-4 at 20-21. Radcliffe and Robertson arrived at approximately the same time. Dkt. 81-7 at 19 (LVMPD 18). Branon entered the store with Robertson. Dkt. 81-18 at 157; Dkt. 81-4 at 17-18.

59.        Branon, Robertson, and Radcliffe saw bloody shoeprints that appeared to be made by sneakers near Hugh Elsen when they got there. Dkt. 81-18 at 158; Dkt. 81-8 (photos of bloody shoeprints) at 3, 7; Ex. 6 at LVMPD 328, 330-31, 334-37, 343, 348-49, 352, 364, 383-86; Dkt. 81-4 at 36. Both Horn and Branon knew the shoeprints led away from Mr. Elsen to the front door. Dkt. 81-7 (Horn Report) at 213 (LVMPD 211A) (noting that bloody shoeprints "started from the Northeast corner of the store leading towards the front door which faces to the East. The Northeast

corner of the store is where Hugo Elsen was found."); Dkt. 81-4 at 18-19; *see also* Dkt. 81-7 (diagram of store) at 274 (LVMPD 272); Dkt. 81-6 at 26-28; Ex. 6 at LVMPD 366-67, 370, 373; Dkt. 81-10 at 46 (Trial Tr., Horn). (Elsen was laying where the large pool of blood is in the photos. Dkt. 81-5 at 45; Ex. 6 at LVMPD 329).

60.      The bloody shoeprints were not made by Josy Elsen or Debra Coe. Dkt. 81-4 at 21, 63; Dkt. 81-6 at 42-44; Ex. 11 (Osterman Decl.).

61.      The shoeprints were not made by Browning (who is innocent), *supra* ¶¶2, and Defendants knew the bloody shoeprints were not made by Browning. Dkt. 81-10 at 47 (Trial Tr., Horn); Dkt. 81-17 (Evid. Hrg., Sweedo) at 121-22.

62.      Branon and Horn knew that the bloody shoeprints were made by tennis shoes and that they did not match Browning's shoes, which were black loafers with no tread. Dkt. 81-17 at 123-24; Dkt. 81-7 (Horn Report) at 215 (LVMPD 213); Dkt. 81-18 (Evid. Hrg., Branon) at 158; Dkt. 81-6 at 35-36, 46-47; Dkt. 81-4 at 69; Dkt. 81-7 (Property Report) at 181 (LVMPD 180).

63.      Even though Branon knew the shoeprints were important, he did not put anything in his report about the bloody shoeprints or them being there when he arrived. Dkt. 81-18 at 173; Dkt. 81-4 at 20, 22-23, 28; Dkt. 81-7 (Branon Report) at 19-21 (LVMPD 18-20). Radcliffe also knew the shoeprints were an important piece of evidence that should have been documented in a report. Dkt. 81-5 at 46-50. Branon and Radcliffe knew the bloody shoeprints were not made by any paramedics because the paramedics arrived after them, and the prints were already there. Dkt. 81-18 at 174-75; Dkt. 81-4 at 19; Dkt. 81-6 at 42.

64.      Branon mentioned that the bloody shoeprints were already there when he arrived to Horn and the detectives, who arrived after him. Dkt. 81-18 at 173.  The detectives and criminalist specialists were doing reports. *Id.* It would have been a "normal thing" for Branon to mention it to Horn. Dkt. 81-4 at 27. The detectives who arrived after Branon included Defendants Bunker, Leonard, and Jolley. Dkt. 81-7 at 20 (LVMPD 19) (Bunker, Jolley, Horn, Levos, Leonard, and Jergovic arrived at the scene, in that order), 43; Dkt. 81-3 (Bunker Dep.) at 22-23; Dkt. 81-7 (Levos Report) at 25 (LVMPD 24).

65.     Although Branon told Horn about the bloody shoeprints being there when he arrived, Horn did not document in his report that the shoeprints were there when the first officers arrived. Dkt. 81-6 at 45-46.

66.     Branon thought it was a distinct possibility that the shoeprints were that of the killer. Dkt. 81-4 at 21, 28. Horn admitted that if the shoeprints were there when Branon arrived, then they were not made by any paramedics. And if they were bigger than Josy Elsen or Debra Coe's shoeprints, then they were likely the murderer's shoeprints. Dkt. 81-6 at 42-44.

67.     The detectives, including Levos and Leonard, also knew about the bloody shoeprints and their importance. Not only did Branon tell them that the shoeprints were there before he arrived, but Levos or Leonard asked Horn to check Browning's shoes to see if they matched. Dkt. 81-6 at 60, 62; Dkt. 81-7 at 246 (LVMPD 244) (Request for Laboratory Examination).

68.     These internal discussions, among defendants, indicating that they knew the shoeprints were there before the paramedics arrived were not memorialized in any report and were not otherwise disclosed to the prosecution or the defense in anyway. *See Browning II*, 875 F.3d at 461; Dkt. 81-7 (police reports in homicide file).

**I.     Defendants Suppressed the Fact that Hugo Elsen Gave a Description of the Perpetrator that Was Not Browning**

69.     When Branon entered the store, Ms. Elsen told them that her husband had been stabbed by the suspect. Dkt. 81-4 at 18.

70.     Mr. Elsen was still alive and lucid. Dkt. 81-4 at 48; Dkt. 81-18 (Evid. Hrg., Branon) at 160. Branon, Robertson, and Radcliffe requested medical assistance. Dkt. 81-4 at 19-20.

71.     Branon engaged Mr. Elsen in meticulous questioning about the description and hairstyle of the suspect. Dkt. 81-4 at 48. Branon asked Mr. Elsen about the hair type, color, and length. Mr. Elsen said the suspect was a Black male. *Id.* at 43-44. Branon asked if the suspect had a puffy afro with tight curls, and Mr. Elsen said no, it was shoulder length loose curls. *Id.* at 43-44. Mr. Elsen described the hair as wet-looking. *Id.* at 44. *See also* Dkt. 81-18 at 169. Thus, Mr.

16

Elsen himself described the perpetrator's hair as being shoulder-length, wet, loosely-curled. Mr.

Elsen did not say the hair was a "Jheri curl." Dkt. 81-4 at 44-45.

72.     These facts were not disclosed by Branon at the time.  Instead, Branon wrote in his

report:

> Between the two of them, Mr. and Mrs. Elsen, I was able to obtain a partial suspect description, and with the help of a white female adult witness, who observed the suspect flee the area, I was able to get a rather complete description of the suspect, who was described as a black male adult in his late 20's, medium complexion, wearing a blue baseball cap, a blue windbreaker type jacket, blue levis, bearing a mustache and, what was described as shoulder length geri curled type hair.

Dkt. 81-7 (Branon Report) at 19 (LVMPD 18). Branon did not write in his report that it was *Mr.*

*Elsen* who gave the description of the suspect, or that Mr. Elsen said the hair was shoulder length,

wet-looking, and loosely curled. Dkt. 81-4 at 51-52. Although Mr. Elsen was the one who gave

him the description of the hair, Branon lumped in three witnesses into his description, Mr. Elsen,

Ms. Elsen, and the "white female adult witness" (Debra Coe), and the report reads that it was really

the third witness—Coe—who was able to make the "partial suspect" description "rather complete"

and not the input of Mr. Elsen himself. Dkt. 81-4 at 46. *See also* Dkt. 81-18 at 161-62.

73.     The description that Branon gave over the radio was that the suspect was a Negro

male adult with shoulder-length curly Jheri curl-type hair and a baseball cap. Dkt. 81-11 (Trial Tr.,

Leonard) at 150; Dkt. 81-18 (Evid. Hrg., Branon) at 172.

74.     Branon knew this person was not Browning, because Browning had an afro. Dkt.

81-18 (Evid. Hrg., Branon) at 169 (Branon was surprised when he learned Browning was arrested).

**J.  Defendants Tainted and Contaminated Witness Memories and Tainted Testimony about Eyewitness Observations**

75.     Given the poor conditions under which Debra Coe had to observe the suspect, she

did not get a "long look at the person or much of a full face view…." Ex. 14 at 8. The person she

saw was wearing a hat, and he was of a different race, "making identification accuracy less likely."

*Id.* As Plaintiff's eyewitness identification and memory expert, Dr. Deborah Davis, explains,

"Altogether, it is highly unlikely that Coe ever formed a solid memory of the person's face

sufficient to support any identification." *Id.* at 8-9.

76.     At most, Charles Woods had a brief opportunity to view the person he saw, but the person's face was obscured by a hat and he was of a different race. Ex. 14 at 9.

77.     All witnesses in this case experienced influences known to decrease identification accuracy, including some or all of the following: weapons focus, brief exposure, lack or diversion of attention to the perpetrator's face, a cross racial target, trauma/stress, and the presence of a hat. Ex. 14 at 14. The "witnessing conditions" were poor. *Id.* at 29.

78.     Defendants contaminated witnesses' memories were contaminated after the event. Ex. 14 at 16-17, 30. For example, Josy Elsen and Debra Coe were questioned together immediately after the robbery by Defendant Branon. *Id.* at 17. Charles Woods and Coe also had the opportunity to discuss what they saw with each other after the event. *Id.* at 20.

79.     Josy Elsen was unable to identify any suspect when she was interviewed on the day of the robbery, and could not identify anyone in the photo lineups conducted a month after the robbery. *See Browning II*, 875 F.3d at 451. Yet, by the time of trial 14 months later, she claimed she was able to identify Browning. Ex. 14 at 19. As a matter of science, "[t]his can only be the result of … post-event influences," including seeing Browning's photo in the lineup. *Id.* at 19-20. Ms. Elsen had also seen Browning at more than a dozen preliminary hearings where he was presented as the accused prior to her trial testimony. *Id.* at 20. In-court identifications are inherently suggestive, and they are not probative when they differ from earlier reports. *Id.* at 28, 31.

80.     Debra Coe's misidentification of Browning at trial was also the result of post-event contamination. Ex. 14 at 20.

**K.     Police Used Unduly Suggestive Identification Procedures**

81.     The identification procedures used with Browning were not conducted consistent with generally accepted police practices, and reasonable and well-trained officers would have known that the identifications were flawed and unreliable. Ex. 15 at 15.

82.     The show-up conducted by Radcliffe and Leonard was unduly suggestive and tainted. Ex. 14 at 25-26, 31; Ex. 15 at 18 ("[t]he show-up procedures used by the members of the LVMPD were highly suggestive and created a substantial risk for mistaken identification. These

actions were contrary to well-established police practices and procedures."). This was true even in 1985. Ex. 15 at 18-22. "Show-ups have been repeatedly criticized for their suggestive nature, and research has shown that a given innocent suspect is more than twice as likely to be misidentified in a show-up procedure as in a lineup." Ex. 14 at 26.

83.     Having three witnesses view the show-up simultaneously was contrary to generally accepted police practices and procedures in 1985. Ex. 15 at 19. Defendants knew at the time of the importance of separating witnesses. Dkt. 81-5 at 95.

84.     Coe testified at trial that the police told her that they had a suspect they wanted her to look at and that they took off his clothing so she "wouldn't be impressed"—meaning that she wouldn't pick him out based on clothing. Dkt. 81-10 (Trial Tr., Coe) at118. This instruction could have had the effect of suggesting that Browning was wearing clothing that fit the description of the suspect, and they took it off. This would suggest to her that he was the correct suspect. Ex. 14 at 26. These statements by Radcliffe to Coe were unduly suggestive. *Id.* at 31.

85.     Woods was also told before the show-up that the police "had a suspect in this murder and would I take a look at the man they had." Dkt. 81-10 (Trial Tr., Woods) at 128. This was also unduly suggestive. Ex. 14 at 26-27, 31.

86.     No original identification of Browning was made under nonsuggestive circumstances. Ex. 14 at 29.

**L.  Criminal Proceedings Against Browning Result in His Wrongful Conviction**

87.     When Browning was charged, the entirety of evidence against him did not establish probable cause, as it included documents (such as Radcliffe's arrest affidavit) containing false statements, was based upon unreliable "identifications" resulting from undue suggestion, and because the Defendants did not reveal the full extent of exculpatory information known to them.

88.     The matter proceeded to trial where (1) Ms. Elsen, Debra Coe, and Charles Woods misidentified Browning (despite his innocence and contrary to their prior statements that they could not make an identification of Browning (Ms. Elsen), they could not identify anyone at all (Coe), and that they did not see the perpetrator (Woods); (2) where the Wolfes testified against

Browning; and (3) numerous police officers testified against Browning without disclosing the false statements in their reports, the exculpatory information they knew, the entirety of their interactions to generate the misidentifications, and without ever admitting they knew Browning was not the perpetrator. At Browning's trial, Branon testified that he received a description of the suspect at the scene as sporting a "shoulder length Jeri-type curl." Dkt. 81-12 at 21 (Trial Tr., Branon).

89.     Due to Branon's withholding of the fact that Mr. Elsen gave him the description of the suspect's hair as shoulder length, wet-looking, and loosely curled, the prosecution argued in closing that whoever gave the description "Jeri-curl" to Branon did not know the difference between the hairstyles of Black people; *i.e.*, the difference between a Jheri curl and an afro. *Browning II*, 875 F.3d at 463; Dkt. 81-13 at 54 (Prosecution's closing).

90.     At trial, another aspect of Browning's defense also involved arguing the shoes at the crime scene pointed to an alternative suspect, as they did not match his own shoes. Defendant Horn, knowing full well that the shoeprints were there before the paramedics arrived, testified that paramedics and off-duty detectives often wear tennis shoes at crime scenes, misleadingly suggesting that the shoeprints came from them. *Browning II*, 875 F.3d at 461; Dkt. 81-10 (Trial Tr., Horn) at 48-49.

91.     Browning was wrongfully convicted and challenged his conviction and sentence through all available avenues. Browning filed a Nevada *habeas corpus* petition that, among other things, led to an evidentiary hearing in 1999. *See* Dkt. 81-15 to 81-19.

92.     It was not until this 1999 hearing that significant exculpatory information was revealed to Browning. For example, Branon did not reveal that Elsen was the one who made a description of the perpetrator's hair being shoulder length, loosely curled, and wet until that hearing. Dkt. 81-4 at 16, 52-53, 89; Dkt. 81-5 at 100; Dkt. 81-6 at 7-8; *see* Dkt. 81-18 at 161-62, 175. Nor did Branon (or any other defendant) reveal that the bloody shoeprints were likely from the perpetrator, as discussed by Branon, Horn, and others. Nor did Branon reveal that he knew Browning was not the perpetrator (a fair inference given his "surprise" at Browning's arrest).

93.     In addition, it was not until the state habeas hearing that Branon first disclosed the fact that "he and Officer Robertson were the first responders at the store, before the paramedics or other officers, and that the shoeprints were there when he arrived;" and Branon's observation of the shoeprints was directly contrary to Horn's suggestion that paramedics or other officers left the prints." *Browning II*, 875 F.3d at 461 *see* Dkt. 81-18 (Evid. Hrg., Branon) at 173-75.

94.     Aside from a post-trial allegation concerning a deal to Randy Wolfe, there is no evidence showing that the prosecution knew of the exculpatory information suppressed by Branon, Horn, Radcliffe, Robertson, Detective Leonard, or other officers (like Bunker and Levos) during their investigation before trial. Instead, as Defendants admit, the prosecutor, Dan Seaton, would have "done the right thing at all times" and disclosed exculpatory evidence he knew about. Dkt. 81-4 at 89; Dkt. 81-5 at 102-03; Dkt. 81-6 at 8.

95.     According to Seaton, the prosecutor gave the entirety of their file, absent work product, to the defense attorney. The prosecutor's office turned over *Brady* material of which it was aware. Dkt. 81-18 (Evid. Hrg., Seaton) at 131-32.

**M. Browning's Conviction Is Overturned After the Ninth Circuit Found the Identifications Were Unduly Suggestive and Exculpatory Evidence Was Withheld**

96.     Following the denial of Browning's *habeas* petition in state court, he exhausted his remedies in federal court, having to satisfy the exacting standards of the Antiterrorism and Effective Death Penalty Act along the way. 28 U.S.C. § 2254. These rules do not simply permit relief if someone's constitutional rights were violated. Instead, federal courts will leave a constitutional violation undisturbed and may grant *habeas* relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

97.     Here, the Ninth Circuit found that these exacting standards were met in *Browning II*; *i.e.*, not only that Browning's rights had been violated and that the Nevada courts were incorrect

21

in failing to acknowledge the rights violation; but that the violation was so egregious the denial of his *habeas* petition "was an unreasonable application of United States Supreme Court precedent." 875 F.3d at 459.

98.     In reaching this conclusion, among other things, the Ninth Circuit held: "The identifications presented at trial were significantly flawed. Two of the three original positive identifications were equivocal at best, and the officers' presentation procedures were textbook examples of suggestive techniques." *Browning II*, 875 F.3d at 468 (citing *United States v. Wade*, 388 U.S. 218, 228 (1967)).

99.     With respect to Debra Coe's misidentification, the Ninth Circuit found:

> An officer presented Coe with Browning—who was shirtless and handcuffed—and said, "We think we have a suspect. Is this him?" At this point, Browning's appearance, the officer's question, and the form of the show-up rendered the procedures highly suggestive and any resulting identification of little evidentiary value.

*Id.* (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Woods's identification was also of little value because the police used the same suggestive procedure with him as with Coe. *Id.*

100.     In reversing the district court's denial of Browning's federal *habeas* petition, the Ninth Circuit held that Branon's observation of the bloody shoeprints when he arrived at the scene was exculpatory because Browning could have used that information to bolster his contention that the shoeprints were left by the real killer. *Browning*, 875 F.3d at 461. The Ninth Circuit observed that at the criminal trial, Horn misleadingly testified that the shoeprints could have been left by paramedics or first responders, but that Branon's undisclosed observations made this untrue. *Id.*; Dkt. 81-10 (Trial Tr., Horn) at 48. The Ninth Circuit also held, "there is no evidence suggesting that the prosecution knew that Horn misrepresented the truth," and "[t]he record before the Supreme Court of Nevada does not suggest that the prosecution knew that Horn's testimony was false or misleading." *Browning*, 875 F.3d at 461; *see also id.* at 463.

101.     With respect to Hugo Elsen's description of the killer's hair, the Ninth Circuit held: "Neither 'Jheri Curl" nor "shoulder length," "loosely curled," and "wet" are descriptions of an Afro. But only "Jheri Curl" is susceptible to the argument that the speaker could have seen an Afro

22

and used the wrong term because he was unfamiliar with African American hairstyles." *Id.* at 463. Had Branon disclosed the exact terms used by Hugo Elsen to describe the killer's hair, "Browning could have easily refuted the prosecution's argument. This makes the exact words Hugo used to describe his assailant evidence favorable to the defense under *Brady*." *Id.*

102.    The Ninth Circuit held that these pieces of exculpatory evidence were material, and that the Nevada Supreme Court's conclusions otherwise were objectively unreasonable applications of Supreme Court precedent. *Id.* at 464-71.

103.    The Ninth Circuit concluded:

> In sum, the jewelry, the knife, and the tan jacket all failed to tie Browning to the murder. The identifications were flawed and mostly equivocal. There were endless reasons to distrust the Wolfes. When arrested, Browning was not wearing any clothing described by the eyewitnesses, and there was no evidence that Browning had any blood on him. All the prosecution had left was the fingerprints. But even with those, there was no evidence about how long the prints had been present, and no evidence that the other prints from the scene did not match either of the Wolfes or their Cuban friend. The upshot is that the prosecution presented a fundamentally weak case.

*Id.* at 470. "We conclude that there is a reasonable probability that had the concealed evidence not been withheld, the jury would have reached a different result. *Id.*

104.    Defendant Branon testified under oath at the evidentiary hearing which resulted in the Ninth Circuit opinion. Dkt. 81-18 at 154.

105.    The habeas proceedings were adversarial, and the State adequately represented the Defendants' interests by vigorously cross-examining the witnesses and defending the conviction. *See* Dkts. 81-15 to 81-19. And, the State continued to present those interests for years by opposing Browning's state *habeas* petition; opposing Browning's *federal* habeas petition in the District Court and on appeal to the Ninth Circuit; and by seeking a writ of certiorari to the United States Supreme Court after *Browning II* was issued.

### N.    LVMPD's Woefully Deficient Policies, Practices, and Failure to Train

106.    LVMPD policies and procedures were generalized and provided inadequate direction to its officers. Ex. 15 at 23.

107.     Defendants were not familiar with their obligations to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). Dkt. 81-4 at 31-32; Dkt. 81-6 at 66.

108.     This is not surprising, because the 1985 LVMPD Manual contained a single sentence on officers' *Brady* obligations: "A member shall not fabricate, withhold, or destroy evidence of any kind." Ex. 13 (1985 LVMPD Manual) at LVMPD 6499 ("Withholding Evidence"). Defendants did not recall any other policies on this topic. Dkt. 81-5 at 20-22.

109.     The LVMPD policy on withholding evidence provided "little and unclear direction for its members" about the importance of documenting and disclosing all exculpatory or impeaching evidence. Ex. 15 at 13.

110.     Defendants did not receive any training on this policy or their responsibility to disclose exculpatory evidence. Dkt. 81-4 at 35, 37; Dkt. 81-5 at 11-12; Dkt. 81-6 at 14, 65-67; Dkt. 81-3 at 21-22, 91-92. If Branon had told Horn that the bloody shoeprints were on the floor when he arrived, there is no policy or procedure that would have required Horn to document that. Dkt. 81-6 at 66.

111.     Branon's report was written in a manner consistent with the (lack of) training he had received from the LVMPD about how to write police reports. Dkt. 81-4 at 65.

112.     LVMPD has been on notice of the *Brady* issues in this case, including the findings in *Browning II*, for years. Rather than disavowing the actions of the Defendants, LVMPD has sanctioned their conduct, defending them in this case with the same counsel that represents the municipality and by admitting that the officers did not violate any LVMPD policies during this case but instead acted consistently with LVMPD policies and procedures. Dkt. 81-6 at 66-67.

113.     Reasonable and well-trained officers would have documented each witness's description of the suspect separately instead of combining the descriptions as Defendant Branon did in his report. Ex. 15 at 15.

114.     The LVMPD Manual contained no policies on how to conduct witness identification procedures or show-ups. Ex. 13. There were no policies or even practices on this topic.  Dkt. 81-5 at 26-27; Dkt. 81-3 at 71-72. The LVMPD allowed officers to do show-ups. *Id.*

at 27-28. *See also* Dkt. 81-3 at 78. The LVMPD Manual was inconsistent with generally accepted policies and practices at the time. *See* Ex. 15 at 24-25.

115.     Defendants did not receive any training on how to conduct show-ups. Dk. 81-4 at 92; Dkt. 81-5 at 12.

116.     Horn and Radcliffe kept contemporaneous notes during the investigation which they destroyed. Dkt. 81-5 at 39-40, 88-89; Dkt. 81-6 at 64-65.

117.     LVMPD policy did not require officers to retain their notes. Dkt. 81-5 at 40; Dkt. 81-6 at 65.

## ARGUMENT

Defendants' motion is improperly premised on construing the record in their own favor, which is fatal. The Ninth Circuit's decision in *Browning II* should be given preclusive effect on issues decided adversely to Defendants' position here; it is a valid, extant, and final judgment finding that Browning's constitutional rights were violated and that describes the evidence in the case. Even putting estoppel aside, Defendants suggestion no reasonable jury could possibly find they violated Browning's constitutional right to due process by suppressing evidence—effectively overruling the Ninth Circuit's decision and doing so in a posture where the facts must be construed in Browning's favor—is as untenable as it sounds. The case must proceed to trial. [5]

## I.   DEFENDANTS ARE COLLATERALLY ESTOPPED FROM CLAIMING MATERIAL EVIDENCE WAS NOT SUPPRESSED AND CAUSED BROWNING PREJUDICE

Under the general heading of "res judicata" are two types of preclusion (1) claim preclusion, which prevents litigation of entire causes even if certain arguments were not made that could have been made, and (2) the narrower doctrine of issue preclusion (also called collateral estoppel) which prevents relitigating specific issues previously decided in a prior case). *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020). The Ninth Circuit recently described some rules related to issue preclusion in *Love v. Villacana*, No. 20-

---

[5] Plaintiff has dismissed Defendant Lt. Jolley from this case. So, the motion is moot with respect to him.

56003, __ F.4th __, 2023 WL 4443287, at *2 (9th Cir. July 11, 2023), explaining that the doctrine

applies "when '(1) the *issue* at stake was identical in both proceedings; (2) the *issue* was actually

litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate

the *issue*; and (4) the *issue* was necessary to decide the merits.'" *Id.* (quoting *Janjua v. Neufeld*,

933 F.3d 1061, 1065 (9th Cir. 2019)) (emphasis added). The doctrine is practical and common

sense, and so when assessing "the preclusive effect of an earlier decision, courts review the

judgment's 'natural reading.'" *Id.* (quoting *Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 824

F.3d 1161, 1167 (9th Cir. 2016).[6]

Here, though Defendants (correctly) frame the applicable res judicata doctrine regarding

*Browning II* as one of issue preclusion, they have applied a mistaken categorial view more akin to

claim preclusion than issue preclusion. In particular, Defendants miss that the relevant question is

whether there are particular *issues*—not claims or ultimate liability—that cannot be relitigated here

in this suit. Plaintiff does not contend that Defendants' *liability* is established by collateral estoppel

(else Plaintiff would have filed a motion for summary judgment), but instead the law provides that

certain issues cannot be relitigated here. When properly presented, it is clear that collateral estoppel

is warranted, at minimum, for the following issues:

- **Information regarding the bloody shoeprints—known to Branon, Radcliffe, Horn, Bunker, and Leonard—was exculpatory, material, and suppressed**. *See Browning II*, 875 F.3d at 461 ("Branon's observation of the shoeprints was directly contrary to Horn's suggestion that paramedics or other officers left the prints. Had Branon's observation been disclosed, Browning could have used that evidence to bolster his contention that the shoeprints were left by the real killer. This makes Branon's observation exculpatory under *Brady*."); *id.* at 464 ("Officer Branon's undisclosed shoeprint observation disproves the prosecution's primary rebuttal against Browning's strongest piece of evidence that someone else killed Hugo."); *see also id.* at 466 (discussing materiality).

---

[6] Defendants seem to imply the Ninth Circuit decision is worth less impact because there was a dissent and because it was a "panel decision" rather than an *en banc* adjudication. Br. at 18. The suggestion (to the extent intended) fails. For one, the State sought Supreme Court review of the Ninth Circuit's decision, which was denied. *Filson v. Browning*, 138 S. Ct. 2608 (2018). In addition, though not applicable here, a "final judgment is afforded preclusive effect even if erroneous." *Love*, 2023 WL 4443287, at *2 (citing *Curlott v. Campbell*, 598 F.2d 1175, 1178 (9th Cir. 1979) ("If the [judgment] was appealable but unappealed, the issues contained therein are res judicata, whether the decision was right or wrong."), and *B&B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 157 (2015) ("Issue preclusion prevent[s] relitigation of wrong decisions just as much as right ones." (internal citations and quotations omitted))).

- **Information regarding Hugo Elsen's description of the killer's hair—known to Branon—was exculpatory, material, and suppressed**. *See id.* at 463. ("Neither "Jheri Curl" nor "shoulder length," "loosely curled," and "wet" are descriptions of an Afro. But only "Jheri Curl" is susceptible to the argument that the speaker could have seen an Afro and used the wrong term because he was unfamiliar with African American hairstyles. Had the prosecution disclosed before trial that victim Hugo Elsen's description of his assailant's hair was not a "shoulder length J[h]eri-type curl," but "shoulder length," "loosely curled," and "wet," Browning could have easily refuted the prosecution's argument. This makes the exact words Hugo used to describe his assailant evidence favorable to the defense under *Brady*."); *id.* at 464 ("And the undisclosed evidence of Hugo's exact dying words defeats the prosecution's central argument against its probativeness."); *see id.* at 466-67 (discussing materiality).

- **Relevant to materiality, and contrary to Defendants' contentions otherwise, "the evidence at trial was remarkably weak," including because the case "relied on flawed identifications and the Wolfes' unreliable testimony."** *Id.* This issue—decided already by the Ninth Circuit but relied upon by Defendants here to the contrary—specifically includes that the Wolfe's testimony was "unreliable." *Id.*

- **The misidentifications of Browning were flawed and unreliable**. *Id.* at 467 ("The identifications presented at trial were significantly flawed. Two of the three original positive identifications were equivocal at best, and the officers' presentation procedures were textbook examples of suggestive techniques.").

Here, each element of issue preclusion on these issues is easily satisfied. First, the issue at stake—whether Defendants suppressed material evidence—is the same. Indeed, despite the findings of the Ninth Circuit, Defendants' brief is littered with claims challenging many aspects of the *Brady* findings already adversely decided by the Ninth Circuit, including: that Branon did not suppress that it was the victim (Hugo Elsen) himself who made statements about the hairstyle, including arguing the evidence was not even "suppressed," Br. at 28, reasoning instead that Browning's defense team should have "easily deduced" the fact known to the officers but not disclosed by them. Defendants claim, contrary to the Ninth Circuit's finding otherwise, that the "hair evidence was not material or exculpatory." *Id.* Defendants claim, contrary to the Ninth Circuit's finding that the source of the bloody shoeprints being the perpetrator (not first responders), was not "conclusively exculpatory" and that it is "not material." *Id.* at 31. Issue preclusion serves important public purposes, including "preserving the judicial system's integrity" and "promoting judicial economy." *Matter of Spielbauer*, 785 F. App'x 369, 372 (9th Cir. 2019). It would be contrary to these core principles to fail to recognize the issues in this case are identical from those in the Ninth Circuit's decision in *Browning II.*

Second, as explained, the issues for which Plaintiff seeks estoppel were actually litigated, and decided, by the Ninth Circuit. There appears to be no dispute about these elements.[7]

Instead, Defendants argue that there was no full and fair opportunity to litigate these issues in the state-court proceedings because (1) they were not parties to the *habeas* proceedings and (2) because federal *habeas* review has different standards than § 1983 liability under current law. Br. at 21-22. Both arguments fail.

First, the police defendants in this suit had a full and fair opportunity to present all of the exculpatory information they had for decades. The Defendants are all police officers, sworn to uphold the constitution, who knew (or should have known) of their obligation to produce material evidence to Browning during the course of the original prosecution in 1985. That is the core holding of *Brady*, decided in 1963, and other cases in the same line that followed, such as *Giglio v. United States*, 405 U.S. 150 (1972), and established law that well proceeded it, such as *Mooney v. Holohan*, 294 U.S. 103, (1935). Indeed, it was clearly established in the 1970s and 1980s that police cannot withhold from prosecutors materially exculpatory information. *See, e.g.*, *Carrillo v. Cnty. of Los Angeles,* 798 F.3d 1210, 1219 (9th Cir. 2015) (finding it clearly established by 1978 that police officers were bound to disclose material, exculpatory evidence (citing, among other authorities, *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir.1964), *United States v. Butler*, 567 F.2d

---

[7] Defendants seem to suggest, without saying directly, that estoppel is less available here or "unfair" because they are defendants and plaintiff is engaged in an "offensive" form of estoppel Br. at 21. This suggestion is mistaken, as it relies upon a distinction between "offensive" and "defensive" collateral estoppel, discussed in cases like *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979), in applicable here. As *Parklane Hosiery* explained, "offensive use of collateral estoppel" occurs where "a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against *another plaintiff. Id.* (emphasis added). There, the Court discussed incentives a repeat-play plaintiff may have in suing a defendant in multiple actions, and vice-versa. The criminal context is entirely different. For one, Browning was a criminal defendant—he did not choose to be prosecuted though he was innocent—in the prior proceedings and the plaintiff here. He was not "another plaintiff." In addition, the Supreme Court's concern about "unfairness" concerns circumstances where the value of a prior suit might have been low, providing "little incentive" to defend vigorously; or where there may be dozens of suits by plaintiff against a corporate defendant (e.g., the 50 plaintiffs sue a railroad company, the first 25 lose and the 26th wins, making it unfair to estop the train company in suits 27-50), etc. At the end of the day, given the police defendants' notice and opportunity to participate in the criminal proceedings, and the necessity of their involvement to create the criminal proceedings, the "offensive"-"defensive" estoppel distinction in business cases is irrelevant here.

885, 891 (9th Cir.1978); *Jackson v. City of Cleveland*, 925 F.3d 793, 823-25 (6th Cir. 2019) (pointing to case law going back to the 1950s illustrating the police officers who withhold exculpatory evidence violate due process and concluding the *Brady* obligations were clearly established in 1975); *Newsome v. McCabe*, 256 F.3d 747, 749, 752 (7th Cir.2001) (under *Brady* it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information); *Hilliard v. Williams,* 516 F.2d 1344, 1349–50 (6th Cir. 1975), vacated in part on other grounds, 424 U.S. 961 (1976) (holding that investigating officer who falsely testified at a defendant's trial and withheld exculpatory evidence violated due process could be liable in a § 1983 suit).

These cases also establish that Defendants' attempt to paint themselves—police officers with an obligation to produce exculpatory information and who are state actors—as mere "witnesses" by references to out-of-circuit inapposite dicta fails.[8] Indeed, the Ninth Circuit's 1978 *Butler* decision made clear *Brady* applies to police because the "investigative officers are part of the prosecution" *Butler*, 567 F.2d at 891 (citing *Barbee*, 331 F.2d at 846). As the Ninth Circuit later confirmed, *Butler* "thus made unmistakably clear that police officers and prosecutors alike share an obligation to disclose "pertinent material evidence favorable to the defense." *Carrillo*, 798 F.3d at 1220 (internal citations and quotes omitted). In sum, *Butler* "undisputably put police officers on notice that their failure to disclose *Brady* information would constitute a violation the defendant's constitutional rights," and it '"taught police officers how to conform their conduct to the law," and "[a] police officer acting after the issuance of th[is] decision [ ] ... could not have

---

[8] None of the cases cited by defendants are controlling or persuasive here. First, while *Davis v. Eide*, 439 F.2d 1077, 1078 (9th Cir. 1971), did reject estoppel on "privity" grounds, "privity" is not the correct question—it is whether there was a *fair* opportunity. And, unlike here, the question is one of federal preclusion doctrine between federal courts not incorporation of California law in a federal case. None of the cases involve the finding of a *Brady* violation following extensive in post-conviction proceedings where at least one of the officers testified. *E.g.*, *Smith v. Kelly*, 2013 WL 5770344, at *8 (W.D. Wash. May 2, 2013) (probable cause determination). In addition, as defendants themselves not, the question of preclusion is entrusted to this Court's discretion. Put differently, this is a case-by-case basis determination. The unique facts here warrant preclusion.

thought that the suppression of material exculpatory evidence would pass constitutional muster.'"
*Id.* (quoting *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 400 (4th Cir. 2014)).

The upshot here is that Defendants had a "full and fair" opportunity to disclose material evidence under their constitutionally-proscribed duty in the original criminal prosecution and that did not abate simply because they managed to hide material evidence—particularly from Horn and Branon—until Paul Browning was wrongfully convicted.

In addition, though the foregoing is sufficient, it is worth emphasizing that Horn and Branon both testified in the original criminal proceedings where, in addition to violating Browning's constitutional rights, they were subject to potential criminal prosecution if they did not provide truthful testimony—they knew, and should have known, that their investigative work would be tested through the criminal process, whether through pretrial motions, at trial, and in post-conviction litigation. Indeed, the writ of *habeas corpus* available in Nevada was codified at least by 1862. *See* NRS 34.360 *et seq.* Defendants have provided no reason—and there is none—why they lacked the opportunity to disclose the entirety of the exculpatory information they actually had decades before the evidentiary hearing and knew would be subject to challenge if Browning was convicted.  They were well and truly parties—part of the State of Nevada—that prosecuted Browning.

There is also no reason why their interests would not be adequately protected by the prosecutors for the State of Nevada—the Attorney General's office. This office is obviously  not inadequate.

Second, the differences between federal habeas and § 1983 are immaterial to the application of *issue* preclusion. The issues identified above were litigated and decided by the Ninth Circuit, that is all that is required. *Janjua*, 933 F.3d at 1065. As a result, Defendants' citation to *dicta* in a New York District Court decision that "Federal courts have therefore always independently evaluated the appropriateness of § 1983 claims against individual or municipal defendants, even if a state post-conviction court has held that the State had violated Brady in obtaining a criminal conviction" *Fraser v. City of New York*, 2021 WL 1338795, at *4 (S.D.N.Y.

Apr. 9, 2021) is inapposite. Plaintiff's contention is not that the officers are *liable* in this case because of collateral estoppel only that certain issues cannot be relitigated against them. This is not about claim preclusion; it is about issue preclusion. Put differently, the question of whether, under cases like *Tennison v. City and Cty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009), there are separate state-of-mind requirements to show personal liability is irrelevant to the fact that certain underlying issues concerning their suppression of evidence have already been decided, and should not be relitigated here. To hold otherwise would improperly conflate issue and claim preclusion; an invitation this court should decline.

*   *   *

At minimum, the fact that the Ninth Circuit found in favor of Browning on these issues means that this Court cannot reach the extreme opposite conclusion not only that there was no constitutional rights violation but that no reasonable jury could decide in Plaintiff's favor.

## II.   BROWNING'S DUE PROCESS CLAIMS MUST PROCEED TO TRIAL

Plaintiff's Due Process Claims include at least three theories: (1) the suppression of material evidence, (2) the fabrication of evidence in the form of reports, and (3) the use of unduly and impermissibly suggestive techniques to generate unreliable evidence. *See* Dkt. 43 (First. Amd. Compl.) ¶¶ 133-35. Because Defendants barely discuss category (2) and do not address category (3) whatsoever, those issues are discussed together following the *Brady* claim.

### A. A Reasonable Jury Can Easily Conclude Defendants Suppressed Material Information In Violation Of Due Process

#### 1. The Constitution Imposes An Affirmative Obligation To Disclose Material Information

The Due Process Clause requires police to affirmatively produce material information—*i.e.*, exculpatory and impeachment information—to the accused. *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady* and its progeny, the prosecution's suppression of evidence favorable to the defense violates due process where that evidence is material either to guilt or to punishment *regardless* of the good faith or bad faith of the prosecution. 373 U.S. 83 (1963); *Youngblood v. West Virginia*, 547 U.S. 867 (2006) (*per curiam*); *Giglio v. United States*, 405 U.S. 150 (1972).

Due Process requires disclosure of impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667 (1976); *cf. Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."). Due process also requires disclosure of evidence that would illustrate police misconduct. *Atkins v. Cty. of Riverside*, 151 F. App'x 501, 505 (9th Cir. 2005) (*Brady* violation for suppressing evidence that "would have cast a shadow across" the police investigation).

Under established law, the elements of a civil *Brady/Giglio* claim against a police officer are: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer "'acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors.'" *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (quoting *Tennison*, 570 F.3d at 1087, 1089).[9]

### 2.  Defendants Suppressed Material Evidence That Harmed Browning

Properly construed, the record illustrates that Plaintiff has a broad *Brady* claim involving several categories of evidence, including but not limited to:

- The fact that Hugo Elsen himself gave a description of the perpetrator as having hair that was "shoulder length," "loosely curled," and "wet," which could not have been Browning, and that Elsen not use the phrase "Jheri curl." SOF ¶¶ 71-72.

- That the bloody footprints, which were not Browning's shoes, were there when the first-arriving officers arrived, countering the contention that they were not the perpetrator's. SOF ¶¶ 56-68.

- Evidence that Defendants knew about the Wolfes unreliability, and tried to vouch for their incredible story falsely implicating Browning. SOF ¶¶ 23-30.

---

[9] The parties have both cited *Mellen* and *Tennison*, and those are the lead (though certainly not only) civil *Brady* cases involving § 1983 claims. Defendants spend considerable space discussing the facts of these cases, Br. at 24-26, and one from the 11th Circuit, *Porter v. White*, 483 F.3d 1294 (11th Cir. 2007). Though plaintiff disagrees with some of the characterizations made by the facts, and the applicability of *Porter*, because it is unclear what argument Defendants intent to show by this discussion, Plaintiff does not discuss these cases further. What is worth noting, however, is that *Mellen* reversed the entry of summary judgment on a *Brady* claim against police officers, and *Tennison* affirmed the denial of summary judgment on a *Brady* claim to different inspectors. The result—a trial on the *Brady* claims—should be the same here.

- Defendants' own misconduct in fabricating evidence and material omissions in their reports that bolstered their fabrications. SOF ¶¶ 19, 28, 32, 51, 87-88.

- The full extent of the tactics taken to obtain the misidentifications of Browning that were introduced at trial. SOF ¶¶ 36-45.

It is undisputed that the evidence above was not disclosed to Browning before his criminal trial. In fact, as Defendants seem to concede, the evidence about the hairstyle and bloody shoeprints did not come out until 1999—during the post-conviction proceedings. For reasons discussed below, that disclosure was far too late and Browning was not supposed to know what information was being unconstitutionally hidden from him. And, some of this evidence—like the full efforts it took to obtain misidentifications from witnesses who previously said they could not identify someone or that the person they saw was not Browning—have never been fully disclosed.

There should be no dispute the evidence above was favorable, either as exculpatory material or for impeaching the officers. The hairstyle and shoeprint evidence showed that Browning did not commit the crime and enabled him to point to an alternative suspect; *i.e.*, the Black Cuban named Willy. This is "classic *Brady* material." *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010); *see Carillo v. County of Los Angeles*, 798 F.2d 1210, 1219-25 (9th Cir. 2015) (holding law in 1984, and as far back as 1978, clearly established that police officers were bound to disclose material exculpatory evidence, including that of an alternative suspect). The other categories—impeaching the Wolfes and the officers themselves—is material evidence under *Giglio*, 405 U.S. at 154, and that would allow the defendant to "attack on the integrity of the investigation" is obviously favorable to the accused. *Kyles*, 514 U.S. at 449.

The second element—that the suppression harmed the plaintiff—concerns materiality. *Mellen*, 900 F.3d at 1096-97. Suppressed evidence is material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Materiality also turns on the strength of the evidence against the accused. *See United States v. Agurs*, 427 U.S. 97, 113 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). When multiple pieces of information or evidence are at issue, the

question of materiality must be considered cumulatively, rather than with each piece in isolation. *See Wearry v. Cain*, 577 U.S. 385, 394, 136 (2016); *Kyles*, 514 U.S. at 438. Put differently, in assessing materiality, the trier of fact "must imagine that every piece of suppressed evidence had been disclosed, and then ask whether, assuming those disclosures, there is a reasonable probability that the jury would have reached a different result." *Browning II*, 875 F.3d at 464.

Here, as the Ninth Circuit has explained, "the prosecution presented a fundamentally weak case." *Browning II*, 875 F.3d at 470. And, the Ninth Circuit has already held that some of the evidence at issue is material. *Id.*

Defendants nonetheless contend that the "hair evidence was not material or exculpatory," Br. at 28, and that the "bloody shoeprint evidence is not material," *id.* at 31. Defendants then spend significant time discussing *their* interpretation of the trial evidence, and essentially suggest that a jury would not have been *required* to acquit Browning at trial based upon speculation about the jury's own deliberations. *See, e.g.*, Br. at 28, 31. These arguments deserve little attention for several reasons. First, these arguments cannot be made at this juncture because they rest on construing the record—and ambiguities or omissions in the record—*against* Browning.

Second, Defendants ask the Court to answer the wrong question. The question is not—as it might be in a post-conviction hearing or under AEDPA—to construe the evidence in the light most favorable to the prior conviction and ask whether the result *must* be different; the Court must construe the evidence in the light most favorable to Browning and ask whether a reasonable jury could find the evidence material. The answer to that is "yes." *See* SOF ¶¶ 58-74, 100-03.

Third, and related, Defendants apply too high a legal standard for assessing materiality in the *Brady* context. Plaintiff need not prove beyond metaphysical doubt he would necessarily be acquitted to state a *Brady* claim, she must only present evidence of a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

The record overwhelmingly makes clear that a reasonable jury could find the evidence material. With the now-disclosed evidence, Browning would have been able to point out that the

first-arriving officer obtained a description *from the perpetrator* that could not have been Browning and then was "surprised" when Browning was arrested. *Cf. Bailey v. Rae*, 339 F.3d 1107, 1116 (9th Cir. 2003) ("Independent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses.") (quoting *Boss v. Pierce*, 263 F.3d 734, 735 (7th Cir. 2001)). Browning would have been able to point out that the bloody shoeprints were there before paramedics arrived, allowing him to attribute them to the perpetrator and use Branon, Radcliffe, Robertson, and Horn as defense witnesses. Browning would have been able to point out that, with evidence that Browning could not have been the perpetrator, the detectives nonetheless targeted him anyway, casting doubt on their entire prosecution, raising new questions as to why the Wolfes were not ever charged with the crimes, and undermining the ability of the officers to attempt to explain away discrepancies (or lies) in their reports. *Atkins*, 151 F. App'x at 505. Browning would have been able to point out that Branon, Horn, and others destroyed their contemporaneous notes from the day of the crime. SOF ¶ 116.

All of this is more than enough for a reasonable jury to find that the suppression harmed Browning. *See, e.g.*, *Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material."); *Wearry*, 136 S. Ct. at 1006 (evidence impeaching one witness sufficient to be material); *Newsome*, 319 F.3d at 302-05 (evidence of manipulation one witness was material). Indeed, as in *Mellen*, the "possibility for the defense to use statements from" Hugo Elsen (the victim of the crime), several police officers, and other information "unaffiliated with the drug culture . . . 'would have provided the defense with a new and different ground of impeachment.'" 900 F.3d at 1098 (quoting *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002).

Indeed, though Plaintiff's claims involve more than just the bloody shoeprints and the hair evidence, the Ninth Circuit's analysis at minimum forecloses the notion that no reasonable jury could find the evidence exculpatory and material. As to its exculpatory nature, s*ee Browning II*, 875 F.3d at 463 ("Had the prosecution disclosed before trial that victim Hugo Elsen's description of his assailant's hair was not a "shoulder length J[h]eri-type curl," but "shoulder length," "loosely

curled," and "wet," Browning could have easily refuted the prosecution's argument. This makes the exact words Hugo used to describe his assailant evidence favorable to the defense under *Brady*."); *id.* at 461 ("Had Branon's observation been disclosed, Browning could have used that evidence to bolster his contention that the shoeprints were left by the real killer. This makes Branon's observation exculpatory under *Brady*."). As to materiality for the shoeprints, the Ninth Circuit explained: "Had the prosecution disclosed Branon's observation about the shoeprints, the source of several bloody shoeprints would remain a mystery. *This means the jury would have been left with powerful evidence that Browning was not the killer*." *Id.* at 464 (emphasis added). As to materiality for the hairstyle, the Ninth Circuit explained:

> Had the prosecution disclosed the precise words Hugo used to describe his assailant's hair, the prosecution's argument that the source of the description must not have known the difference between a Jheri Curl and an Afro would have failed, leaving the jury with no reason to disregard Hugo's description. Hugo's precise description—wet, shoulder length, and loosely curled—significantly undermines the case against Browning. The description was markedly different from Browning's hair on the day of the murder—an Afro—and, according to Branon, Hugo was lucid when he gave it. Moreover, it was unlikely that Hugo was mistaken about his description in light of Branon's "meticulous" questioning. Hugo also had the closest and most accurate view of the assailant's hair, while, as discussed below, every other eyewitness identification was seriously flawed. Hugo's vivid description of a hairstyle so different from Browning's presented substantial reason to doubt that Browning was the one who stabbed Hugo. If the jury no longer had reason to reject that description, and the jury knew that the description came from the victim, it would have raised grave doubt about the prosecution's theory of the case.

*Id.* at 466-67. In the end, putting aside any issue about collateral estoppel, the fact that Defendants' arguments (at summary judgment no less) involve requiring this court to reconsider the evidence addressed by the Ninth Circuit and reach a diametrically opposite conclusion and find no reasonable jury can agree with the appellate court demonstrates that the motion fails.

### 3. A Reasonable Jury Can Find Defendants Acted With Deliberate Indifference Or Reckless Disregard For Browning's Rights

The Defendants are right about one thing: the Ninth Circuit's decision does not address their own *mens rea* requisite to establish their own personal liability under § 1983, which is required under current law. That requirement involves pointing to evidence the officer "'acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in

withholding evidence from prosecutors. *Mellen*, 900 F.3d at, 1096. To meet this standard, "Plaintiffs are not required to establish that the [police officers] acted in bad faith in withholding the evidence." *Tennison*, 570 F.3d at 1090. This is not a high bar at summary judgment, as whether an officer "acted with deliberate indifference or reckless disregard 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Mellen*, 900 F.3d at 1101 (quoting *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)). It is surprising that Defendants put so many eggs in this basket, as summary cannot be granted unless the district court concludes that "no reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014).

This argument is one for the jury for several reasons.

First, on Plaintiff's facts, a reasonable jury can easily find that each one of the Defendants, in one way or another had the relevant mental state. As discussed below, Plaintiff's conspiracy and failure to intervene claims make them liable for the acts of other defendants. Indeed, a reasonable jury could conclude that the officers agreed to pursue Browning but that, a decade and a half later, Branon broke the agreement by telling the truth in an evidentiary hearing and exposing their misconduct they had all agreed to attempt to secrete. Even putting that to the side, there is evidence of indifference or recklessness for each defendant personally as well. For one, Defendants collectively discussed the bloody shoeprints issues the day this happened, including not only Branon and Horn, whose liability is obvious, but with Radcliffe, Leonard, and Bunker as well—each of whom were on scene very early in the case and part of the shoeprint discussion. SOF ¶¶ 58-68. The disputed facts about what Horn knew or didn't know, and about what he has said since being sued only confirm that these factual issues cannot be decided prematurely. In addition, as it relates to Hugo Elsen being the one who made the description, Branon cannot escape liability on this claim, for which he is the lead. SOF ¶¶ 58-59. In addition, a reasonable jury could easily conclude that Detective Leonard, a lead detective, knew about this information but other evidence related to Leonard alone (*i.e.*, his failure to disclose his own fabrications) obviously constitutes

indifference or reckless disregard for Browning's rights. SOF ¶¶ 64, 67. A similar conclusion holds with respect to Radcliffe, discussed further below. Plaintiff's contention—from a *Brady* perspective—is that Radcliffe's misleading reports were written in a way to obscure and mislead, a fact he did not (and still has not) disclosed. SOF ¶ 27.

Despite all of this, Defendants claim a reasonable jury cannot find Branon was reckless or indifferent, because *some* information made it into his report. But, the Ninth Circuit has already rejected such a claim in *Mellen*. He was required to disclose *all* exculpatory information, not just his interpretive gloss on the information. And, Branon did not tell others when Browning was arrested and when he sat there in open court and knowingly testified against him. If, as he now contends, Branon was "surprised" when Browning was arrested in part because he knew Browning's hair meant he could not be the perpetrator, he could and should have said something; he did not. In fact, the incomplete report is *part* of the reason why the *Brady* violation can be ruled reckless or deliberately indifferent. That report failed to mention the actual description and where it came from, a glaring omission that misleads more than it discloses (and that separately shows Plaintiff has a claim for fabrication). *Cf. Lobato v. Las Vegas Metro. Police Dep't,* 2022 WL 4017055, at *7 (D. Nev. Sept. 1, 2022) (recognizing material omissions in police reports, couple with other evidence, support claim of evidence fabrication); *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (recognizing fabrication can be established either through "material false statements or material omissions."); *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) ("information may be 'false' if material omissions render an otherwise true statement false."); *United States v. DeLeon*, 979 F.2d 761, 763 (9th Cir. 1992) (discussing the material omissions that result in a warrant being falsified under *Franks v. Delaware*, 438 U.S. 154 (1978)); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021) (similar); *Kaady v. Shiferaw*, 2023 WL 4163094, at *6 (D. Or. May 11, 2023), report and recommendation adopted, 2023 WL 4156931 (D. Or. June 23, 2023) (material omissions made report misrepresentative and supported due process claim). The same is true with respect to the shoeprints and reports from Branon and Horn on these topics—the omissions mislead more than they help and constitute gross departures from

basic policing standards. SOF ¶¶ 63-65. That is sufficient to permit a reasonable jury to find the actions were more than negligent.

Finally, it is well established that mental state is not an appropriate basis for summary judgment where, as here, the facts are hotly disputed. S*ee Vucinich v. Paine, Webber, Jackson & Curtis, Inc*., 739 F.2d 1434, 1436 (9th Cir. 1984) ("Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim."; *cf. Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted). Mental state is a quintessential jury question; summary judgment cannot be granted on this basis.

### 4.  Any Suggestions Browning Should Have Found What Defendants Were Hiding Fail

In their motion, Defendants suggest that there was no due process violation because Browning's defense counsel should have tried harder in various respects to learn of the exculpatory evidence not included in the officer's reports or could have asked the officers, on the fly, about the suppressed material at trial. *See, e.g.*, Br. at 28 (arguing that the defense team should "easily deduced" that Hugo Elsen had provided a description of the perpetrator's hair, or that Browning's counsel could have "easily learned" additional exculpatory information by interviewing Branon or even during trial by asking questions during cross-examination); *id.* at 30 (suggesting that Browning's defense attorney could have learned more about the shoeprint evidence, again *during trial*, by asking questions of Horn but "purposefully and strategically left the shoeprint evidence unexplored"); *id.* at 15, 17, 27 (pointing out that defense counsel "never asked" about shoeprints or who provided the hairstyle description).

These insinuations turn *Brady* upside down and seeks to input some requirement for the defense to find what the police are hiding. Fortunately, that is not the law. Defendants were not permitted "to turn over some evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs" *Barton v. Warden, Southern Ohio Correctional Facility*, 786 F.3d 450, 468 (6th Cir. 2016), and the defense was not required to "repeatedly to scavenge for facts that the

prosecution is unconstitutionally hiding from him." *Jefferson v. United States*, 730 F.3d 537, 541 (6th Cir. 2013). Instead, under *Brady* the state has an "an *affirmative obligation* to disclose material exculpatory evidence, whether for substantive or for impeachment purposes." *United States v. Cloud*, 590 F. Supp. 3d 1364, 1369 (E.D. Wash. 2022) (emphasis added). This affirmative obligation is self-executing and does not require a request by the defense. *See Bagley*, 473 U.S. at 676, 682; *Paradis v. Arave*, 240 F.3d 1169, 1176 (9th Cir. 2001).

As the Ninth Circuit explained in a § 1983 suit, in reversing summary judgment on a *Brady* claim: "[T]he government cannot satisfy its Brady obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. Rather, the government is obligated to disclose *all* material information casting a shadow on a government witness's credibility.'" *Mellen*, 900 F.3d 1085, 1097-98 (9th Cir. 2018) (quoting *Carriger v. Stewart*, 132 F.3d 463, 481-82 (9th Cir. 1997) (*en banc*) (emphasis in original). As a result, "defense counsel may rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce." *Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014), and the State's disclosure "obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Id.*

Indeed, no reasonable defense attorney would think they should investigate whether the Defendants hid information not included in their reports exculpating Browning, because the information should have been disclosed in the first place. *See Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that police may not play hide and seek with the evidence, as such a rule is "not tenable in a system constitutionally bound to accord defendants due process"); *Benn v. Lambert*, 283 F.3d 1040, 1062 (9th Cir. 2002) ("A defendant furnished with such inculpatory evidence by the state is not required to assume that the state has concealed material information and has thereby obligated him to ascertain the Brady material on his own."). It was reasonable for counsel to expect that Defendants would not hide evidence; [o]rdnarily, we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 908 (1997); *see also Banks*, 540 U.S. at 694 (reasonable for defense to rely upon representation of full disclosure);

*Bagley,* 473 U.S. at 682-83 (reasonable for defense attorneys to rely on responses to discovery, especially where responses indicate no exculpatory evidence exists); *Starns v. Andrews*, 524 F.3d 612, 619 (5th Cir. 2008) (*Brady* imposes "no requirement [defendant] act diligently to investigate further assuming the state could not be taken at its word").

Moreover, and related, the government's affirmative obligation to produce material confirms why material omissions in the officers' reports matter—the reports suggest that is all the information that exists. *see also Floyd v. Vannoy,* 894 F.3d 143, 162-63 (5th Cir. 2018) ("The State does not demonstrate compliance with *Brady's* disclosure requirement by asserting a possibility Floyd could deduce that, based on the general evidence provided to him, additional evidence likely existed. To the contrary, the State's nondisclosure may have reasonably led the defense to conclude no additional evidence existed.").[10]

## B. A Reasonable Jury Can Easily Conclude Defendants Fabricated Evidence In Violation Of Due Process

Plaintiff's Due Process Claim includes several types of fabricated, misleading and/or unreliable evidence, including: (1) Defendants' own reports, and (2) the misidentification evidence of Browning as the perpetrator. These claims must go to trial.

### 1.   The Constitution Prohibits Police From Generating False Or Unreliable Evidence

There is a clearly established due process right not to be subjected to criminal charges on the basis of false evidence that was fabricated by the government; the "proposition is virtually self-evident." *Devereaux v. Abbe*y, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). Evidence can be fabricated myriad ways. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Direct fabrication can occur where reports or documents include things that are simply false; where reports or

---

[10] The notion that questioning at trial somehow provides an opportunity for a *Brady* disclosure to be made—by surprise—is inconsistent with the law as well. The Due Process obligation *requires* the state to produce evidence to ensure a fair trial. *See Bagley*, 473 U.S. at 678 ("[S]uppression of evidence amounts to a constitutional violation ... if it deprives the defendant of a fair trial."). And, while it is the case that Due Process does not set a specific time for a disclosure to be made, the disclosure must be made in time for "its effective use at trial, *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001), not during the trial itself. *See LaMere v. Risley*, 827 F.2d 622, 625 (9th Cir. 1987).

documents, for example, "contain[] evidence" that does not exist or purport to record statements that were "never made" *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010). Direct fabrication also occurs where officials "deliberately mischaracterize[]" evidence. *Spencer*, 857 F.3d at 798; *see also Costanich*, 627 F.3d at 1112 ("an interviewer who deliberately mischaracterizes witness statements in her investigative report … commits a constitutional violation"). Under the direct method, the investigator's knowledge or reason to know of the plaintiff's innocence is irrelevant, because the Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Spencer*, 857 F.3d at 800. Put differently, "motive evidence is never *required*." *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022) (emphasis in original).

Fabrication can also be proven circumstantially, including by evidence showing that "(1) [d]efendants continued their investigation . . . despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (quoting *Devereaux*, 263 F.3d at 1076); *see Spencer*, 857 F.3d at 799. As to the route involving knowledge of innocence, if "an investigator knows that a person is innocent, yet continues the investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence." *Id*. Or, as *Costanich* put it, this test "envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence." 627 F.3d at 1111.

Here, in addition to the misidentifications (addressed below), Plaintiff's fabrication of evidence theories include, but are not limited to: (1) the Arrest Warrant Affidavit, authored by Radcliffe, which includes false statements that were never made and falsely describes the Wolfe's room and what Browning was wearing when he was arrested, SOF ¶¶ 19, 27-28, 32-33; (2) documents purporting to say that the Wolfes' were reliable informants, SOF ¶ 29, (3) documents

claiming Betty Browning made inculpatory statements about her son, Paul, SOF ¶ 51; (4) Branon's report (omitting the actual description of the perpetrator made by Elsen before he died, calling the description a "Jheri curl" while also attributing it to three witnesses (Mr. Elsen, Ms. Elsen, and Ms. Coe), SOF ¶ 72; (5) reports by Bunker and Radcliffe claiming that Browning was unclothed when they arrested Browning, SOF ¶ 33, and (6) reports/documentation from officers, including Horn, concerning the bloody shoeprints, SOF ¶ 65.[11]

Because Defendants have failed to address the bulk of these issues, their motion must fail. In addition, their motion fails with respect to the one issue single item they have addressed—the report Radcliffe wrote attempting to falsely bolster the Wolfes' credibility and account. Br. at 23, 26, 31-32.[12] The basic argument is that the report was not fabricated because some bad information about the Wolfes was disclosed to Browning. There are several problems with this contention. For one, the argument construes the evidence in Defendants' favor and ignores a wealth of information, including the obvious falsity of the Wolfe's account as the officers were learning it; the beyond far-fetched account of the Wolfes. In Defendants' telling, they had no reason to doubt the word of known serial criminals, who happened to walk by the jewelry store just minutes after the crime to ask what was going on and were able to offer up the alleged perpetrator, stolen goods, and knife right then and there. Defendants claim that they believed the incredible story that the people producing proceeds from a crime and the murder weapon were simply given these items by an acquaintance who spontaneously confessed to them. SOF ¶¶ 23-30. This defies credulity. Viewing what Radcliffe put in his report must be evaluated with this evidence in mind, and in light of the summary judgment standard, which belies any notion that the inaccuracies in the documents are "trivial." *See Caldwell*, 889 F.3d at 1115 (concluding that "the potential 'errors' are not obviously the product of carelessness and that there is a triable issue as to whether [the defendant]

---

[11] *See supra* at p. 39 (citing cases for material omissions in reports supports a claim they are fabricated).

[12] Defendants' motion oscillates between discussing this issue as one of suppression versus fabrication of evidence. To clarify: Plaintiff's claim is that Radcliffe failed to disclose he knew the Wolfes' were unreliable, both generally and with respect to the specific allegations they made about Browning, and that he wrote false information in his report about the Wolfes. The report itself is fabricated evidence, the failure to disclose the underlying misconduct constitutes material information subject to disclosure under *Brady/Giglio*.

intentionally fabricated his notes"); *Costanich*, 627 F.3d at 1113 (rejecting claim that errors were merely of "tone," given the record and requirement to construe the evidence in the manner favorable to the non-movant at summary judgment).

A reasonable jury could also find Radcliffe put information in his reports that was blatantly inaccurate or that involved words that were not said. SOF ¶ 29. This claim must proceed. *Cf. Spencer*, 857 F.3d at 799-800 ("[A]n interviewer who deliberately mischaracterizes witness statements in her investigative reports … commits a constitutional violation." (quoting *Costanich*, 627 F.3d at 1111)).

### 2. A Reasonable Jury Can Find Defendants Generated False or Unreliable Evidence

Plaintiff has also advanced a due process claim related to the generation of the misidentifications of Browning that were admitted against him at trial. *See supra* n. 1. There is no reasonable dispute this is in the case, either as *Browning II* described the issue as well: "The identifications presented at trial were significantly flawed. Two of the three original positive identifications were equivocal at best, and the officers' presentation procedures were textbook examples of suggestive techniques.", 875 F.3d at 467 (citing *United States v. Wade*, 388 U.S. 218, 228 (1967) ("A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.").The claims are well established. *See Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Manson v. Braithwaite*, 432 U.S. 98 (1977); *Caldwell*, 889 F.3d at 1114 (addressing § 1983 claim involving alleged police-created show-up); *Wilson v. City of Los Angeles*, No. CV 18-5775-KS, 2020 WL 8211451, at *24 (C.D. Cal. Dec. 23, 2020) (addressing § 1983 claim involving undue suggestive identification procedures). *Johnson v. Rollins*, 2006 WL 2546807, *6 (E.D. Mo. Aug. 31, 2006) (collecting cases and noting that "[c]ourts have recognized allegations of suggestive identification procedures as constitutional tort claims.").

Plaintiff's evidence undoubtedly encompasses this claim as well. SOF ¶¶ 36-45, 81-86, 97-99.

Yet, Defendants have said nothing about this issue. Defendants have thus forfeited any request for summary judgment on this theory and it must go to trial. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (quoting *Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988)); *Meggs v. Boulevard Ventures, LLC*, Case No. 2:14-cv-1535, 2016 WL 1259390, at *4 (D. Nev. March 30, 2016). Even without forfeiture, in seeking judgment *as a matter of law*, the moving party bears the initial burden of "identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact." *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party is required to show "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Summary judgment should be denied. *Cf. TCB Remarketing LLC v. Metro Auto Auction LLC*, 2022 WL 16640665, at *1 (D. Ariz. Oct. 27, 2022) (denying motion for summary judgment and emphasizing that "the initial burden remains on the moving party to establish a 'complete failure of proof concerning an essential element of the nonmoving party's case'" (quoting *Celotex*, 477 at 322-23)).

### C.  At A Minimum, Material Disputes Of Fact Preclude Summary Judgment

As explained above, the many contentions by Defendants about their lack of "recklessness" or deliberate indifference are not the sorts of arguments that can be resolved summary judgment. Who knew or disclosed what, when, where, and how is hotly disputed in this case. Defendants claim that Branon did not know he was withholding exculpatory evidence about the hair; and that Branon and Horn did not know they were withholding exculpatory evidence about the shoeprints; and that Radcliffe was not actually trying to bolster the Wolfes' lack of credibility. Plaintiff contends otherwise, and there is a record of evidence from which a jury could reach the opposite conclusion. SOF ¶¶ 23-30, 58-74. Summary judgment is unavailable. *Tolan*, 572 U.S. at 655-56.

### III.   BROWNING'S FOURTH AMENDMENT CLAIM MUST PROCEED TO TRIAL

The Fourth Amendment protects individuals from pretrial detention absent probable cause. This right is implicated both before and after the onset of criminal proceedings. *Manuel v. City of Joliet*, 137 S. Ct. 911, 918-19 (2017). In order to proceed on this claim, then, Plaintiff need only

demonstrate: (1) that her detention was made in the absence of probable cause, and (2) that Defendants proximately caused the unlawful detention; and (3) favorable termination of the criminal proceedings. *Thompson v. Clark*, 142 S. Ct. 1332 (2022).

Contrary to some cases decided before *Manuel* and *Thompson*, malice is not part of this claim. Instead, while nomenclature about the claim may involve "malicious prosecution" or "unreasonable seizure through legal process," *Manuel* and *Thompson* unequivocally establish the constitutional claim at issue derives from the Fourth Amendment, and not the Due Process Clause of the Fourteenth Amendment. As a result, as *Graham v. Connor* held when rejecting application of subjective standards under the Fourteenth Amendment in an excessive force case, and ever since, subjective concepts are not part of Fourth Amendment analysis which focuses on *unreasonable* searches and seizures. *See* U.S. CONST. AMD. IV; *Graham v. Connor*, 490 U.S. 386, 399 (1989) ("The Fourth Amendment inquiry is one of "objective reasonableness" under the circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry."); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021) ("[T]he appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context."). The exceptions to this rule are limited and not applicable here. *See Ashcroft v. al-Kidd,* 563 U.S. 731, 736, (2011) (special-needs and administrative-search cases are the exceptions to the rule that motivations do not matter, as the court has almost "uniformly rejected invitations to probe subjective intent").[13]

Turning to the elements Plaintiff must prove here, a reasonable jury can find for Browning on each one.

---

[13] Even if "malice" were an element, it provides no basis for summary judgment here, as "[malice is usually a question of fact for the jury to determine." *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008; *See, e.g., Truelove v. D'Amico*, 2018 WL 1070899, at *8 (N.D. Cal. Feb. 27, 2018); *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091, 1128 (D. Ariz. 2013). (noting that "malice is generally a question of fact for the jury," which "may be inferred from a lack of probable cause").

**First**, concerning the existence of probable cause, tainted proceedings do not establish probable cause. *See Manuel*, 137 S. Ct. at 920 n.8 ("[I]f the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights."); *Scafidi v. LVMPD*, 966 F.3d 960, 963-64 (9th Cir. 2020) (the *prima facie* evidence of probable cause that emerges from a preliminary hearing probable cause determination is overcome by a showing that an officer lied in his report or at the probable cause hearing); *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (probable cause never existed because the prosecutor and other defendants "concocted the essential facts"; namely, fabricated statements from a witness); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (holding that a court's decision to hold plaintiff after a preliminary hearing does not prevent a Fourth Amendment claim where plaintiff alleges "the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct"). Moreover, unduly suggestive identification procedures may also undermine probable cause, *see Cameron v. Brown*, 721 F. App'x 612, 613-14 (9th Cir. 2017) (holding that an "identification cannot support probable cause if it is 'so impermissibly suggestive as to give rise to a substantial likelihood of misidentification'" and lacks 'sufficient indicia of reliability' otherwise to support the integrity of that identification." (quoting *Grant v. City of Long Beach*, 315 F.3d 1081, 1086 (9th Cir. 2002), opinion amended on denial of reh'g, 334 F.3d 795 (9th Cir. 2003)).

Here, shortly after participating in the crime or at least obtaining the proceeds, the Wolfes attempted to blame Browning. No reasonable officer would have thought the story had any weight, and so the officers put false information into their reports about what happened that day. SOF ¶¶ 23-30. This is not probable cause. In addition, Defendant Radcliffe and Leonard engaged in extremely suggestive show-up procedures that lacked any semblance of reliability. SOF ¶¶ 36-45. This, too, did not create probable cause, particularly where Elsen and Coe made no identification of Browning and Woods did not see the perpetrator. In fact, in addition to Coe's non-identification, the officers learned of evidence exculpating Browning—they knew he could not have been the

perpetrator because his hair was not shoulder length, loosely curled, and wet. SOF ¶¶ 69-74. They found no evidence of a recently committed brutal stabbing on Browning or in his hotel room (which he let them search). So, Defendants Radcliffe and Lonard went ahead and influenced witnesses (Elsen and Coe), to misidentify Browning and enable his prosecution. SOF ¶¶ 75-80. This, still, was not probable cause, or anything close to it.

Defendants' arguments rest entirely on construing the evidence in their favor. They point to (1) unreliable evidence (from the Wolfes' bogus attempt to implicate Browning), including that the officers knew or should have known was obviously fake, and (2) the misidentification of Browning by Coe and Woods *as a result of their highly suggestive unreliable procedures*. Br. at 34. But, as explained, properly understood, these facts show Defendants' liability, not probable cause. SOF ¶¶ 23-30, 36-45, 75-86. The other facts Defendants purport to rely upon—like a fake name or trying to escape—have nothing to do with probable cause for a serious murder.[14] As Paul Browning knew, a Black man suspected of a crime he did not commit may do well to seek safety from someone *other than the police* when arrested. *Commonwealth v. Warren*, 475 Mass. 530 (2016) (Black man fleeing from the police cannot be considered inherently suspicious or criminal due to over policing and killing of Black men). The only non-fabricated or tainted facts possibly relevant to probable cause were (1) the fingerprints in a place of accommodation, and (2) Browning's alleged criminal history. While those certainly could have given suspicion to any person with a criminal history who had been in the Elsen's jewelry shop around the time of the murders, it was not anywhere close to probable cause to arrest him (or other people in the area with criminal histories who had been in the shop)for the murder. While the standard is not high, the government must rely on "reasonably trustworthy information sufficient to warrant a prudent person in believing" that an individual has committed an offense. *Rohde v. City of Roseburg*, 137

---

[14] For the same reason, the fact that there was probable cause to suspect and prosecute Browning for escape is irrelevant. Instead, the question is whether there was probable cause to hold and charge him with murder. Browning would not have been in that position but-for the officers' conduct. And, more important, to the extent that Browning might have been convicted of escape anyways, that could only impact the question of damages, not liability.

F.3d 1142, 1144 (9th Cir. 1998) (citation omitted). Simply being a Black man who had a criminal history and had recently been in the store obviously comes nowhere near this standard. Instead, the Supreme Court has explained, that the "'substance of all the definitions of probable cause is a reasonable ground for belief of guilt," and that the belief of guilt *must be particularized with respect to the person to be searched or seized*." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983), and citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). In short, without the tainted evidence, there is no probable cause based upon particularized evidence related to Paul Browning whatsoever.

At minimum, this is a jury question as "the existence of probable cause is a question for the jury" in civil cases like this one. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984). The court cannot grant summary judgment "when there is a genuine dispute as to 'the facts and circumstances within an arresting officer's knowledge' or 'what the officer and claimant did or failed to do.'" *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009); *Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017) (district court "improperly invaded the province of the jury when, at the summary judgment stage, it resolved factual disputes material to the question of probable cause").

**Second**, a reasonable jury can easily find that the Defendants caused Browning to be arrested and prosecuted for a crime he did not commit. The officers: (1) arrested Browning, ( 2) forced him into a show-up that they used to generate unreliable misidentifications from witnesses (including from a witness who said she could not make an identification), (3) wrote police reports and other documents that omitted materially exculpatory information (including that Browning did not match the description of the perpetrator provided by the victim himself, (4) fabricated other reports concerning Browning's arrest, interactions with Browning's mother, and regarding the reliability of the Wolfes, (5) never took any steps to prevent the ongoing prosecution of an innocent person. SOF ¶¶ 23-45, 58-74, 81-95.

Defendants make no serious argument about causation, though thy sprinkle throughout their brief hints that they may want to argue that the chain of causation was broken by the

presumption of prosecutorial independence. Br. at 33-34. Though the argument is undeveloped, Plaintiff will simply respond as follows: First, a § 1983 defendant is liable for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 430 (9th Cir.2010) (internal quotation marks omitted); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) (noting that officers who submit false reports "to the prosecutor may be held liable for damages incurred as a proximate result of those reports."). Here, the entire point of investigating, arresting, and writing reports about Browning was to prosecute him for murder. The police cannot complain that the natural and foreseeable consequences of these quintessential policing duties had the natural and foreseeable impact—Browning was prosecuted and wrongfully convicted.

Second, it is well established that "the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings."*Awabdy*, 368 F.3d at 1067; *see Caldwell,* 889 F.3d at 1116 ("Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independent. . . . [I]f a plaintiff establishes that officers either presented false evidence to or withheld crucial information from the prosecutor, the plaintiff overcomes the presumption of prosecutorial independence and the analysis reverts back to a normal causation question."). Here, as shown above, Defendants concealed and fabricated evidence, and no causal chain was broken on Plaintiff's facts. To hold otherwise, would be to improperly construe the facts against Plaintiff, something doubly improper on a quintessential jury question like causation. *See Pac. Shores Properties, LLC v. City of Newport Beach,* 730 F.3d 1142, 1168 (9th Cir. 2013) (explaining that causation "is an intensely factual question that should typically be resolved by a jury.").

**Third**, and finally, there is no dispute that the criminal proceedings terminated in

Browning's favor. Dkt. 81-21 (2019 Order dismissing charges).

Finally, to the extent Defendants with the conclusion were otherwise, their arguments are premised on disputed facts that cannot be resolved at summary judgment. Either way, the motion must be denied.

## IV.   DEFENDANTS ARE LIABLE FOR AGREEING TO FRAME BROWNING AND FAILING TO INTERVENE TO STOP HIS WRONGFUL IMPRISONMENT

### A.  A Reasonable Jury Can Find A Conspiracy To Prosecute Browning[15]

A § 1983 conspiracy involves showing "show an agreement or 'meeting of the minds' to violate [the plaintiff's] constitutional rights." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983). Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement"; a plaintiff need only point to some "facts probative of a conspiracy." *Id.*; *see also Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999). An agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants" meaning, for example, a showing that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement' may allow a jury to infer the existence of a conspiracy. *Mendocino*, 192 F.3d at 1301-02 (quoting *Kunik v. Racine County,* 946 F.2d 1574, 1580 (7th Cir. 1991)). In addition, while each participant must "share the common objective[,] … each participant in the conspiracy need not know the exact details of the plan." *Franklin v. Fox*, 312 F.3d 423, 441 (9th. Cir. 2002); *see United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1541 (9th Cir.1989) (en banc) (same).

As a consequence, the existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." *Mendocino Environmental Center*, 192 F.3d at 1301-02 (quoting *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.1979)). Likewise, to

---

[15] The analysis here forecloses summary judgment on Plaintiff's Nevada civil conspiracy claim, too, and is incorporated by reference in response to Defendants' arguments to the contrary.

the extent there is an issue of a defendant's intention or state of mind, such a question is also a factual issue "'inappropriate for resolution by summary judgment." *Mendocino Environmental Center*, 192 F.3d at 102 (quoting *Braxton-Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985)).

An important principle from these cases is that a defendant need not be physically or directly involved in every aspect of the conspiracy to be liable for their agreement. Defendants have not admitted to their conspiracy; most never do. Indeed, the Ninth Circuit has cautioned: "'Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.'" *Mendocino*, 192 F.3d at 102; *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999) ("A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." (citation omitted)).

Here, the entirety of Defendants' arguments on this point rely on contested facts and in construing the facts and inferences in a self-serving fashion, rather than in Plaintiff's favor. Br. 36-37 (arguing, at most, they were merely negligent). The record in this case is indicative of an agreement to prosecute Browning despite his innocence, and includes overlapping mutually-reinforcing facts that suggest a group effort, not stochastic acts of individualized misconduct. The officers on the scene learned that Elsen described the perpetrator in a manner that could not have been Browning and shared this with others but *no one* disclosed that fact; instead, the reports obscure the information. SOF ¶¶ 69-74. Radcliffe and Leonard, seeking so shore-up obvious flaws with the Wolfes, generated unreliable misidentifications that were not complete even with a show-up but required additional follow-up, conducted by and in conjunction with other officers. SOF ¶¶ 23-30, 36-45, 75-80, 81-86. Moreover, there are additional acts of suppression or fabrication by officers who are now deceased (like Robertson or Levos) that provide circumstantial evidence of an agreement—among the team—to target Browning rather than conduct an honest investigation. SOF ¶¶ 47-49, 58-59. The mosaic of evidence in the record is beyond sufficient for a reasonable jury to find for Plaintiff. *Cf. United States v. Gardner*, 475 F.2d 1273, 1277 (9th Cir. 1973)

("Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable."); *United States v. Nelson*, 419 F.2d 1237, 1240 (9th Cir. 1969) ("But since under some conditions circumstantial evidence may be equally or more reliable than direct evidence, it would be wholly irrational to impose an absolute bar upon the use of circumstantial evidence to prove any fact, including a fact from which another fact is to be inferred.").

## B. Defendants Can Be Liable For Failing To Intervene To Stop Browning's Wrongful Conviction

The Ninth Circuit has made clear that the constitutional obligation to intervene to prevent the rights of a civilian being violated applies in the context of *any* constitutional violation committed by another officer which the officer had the opportunity to prevent. Thus, as *Cunningham v. Gates*, 229 F.3d 1271, 1289-6390 (9th Cir. 2000), framed the constitutional question, "'[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen'" and "they ha[ve] an opportunity to intercede." (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), rev'd on other grounds, 518 U.S. 81 (1996)).

In *Tobias v. Arteaga*, 996 F.3d 571, 583–84 (9th Cir. 2021), the Ninth Circuit recently applied its failure-to-intercede doctrine to the wrongful conviction case involving an interrogation and stopped for no moment to suggest that the law in the area was limited to excessive force claims (not at the time of that decision or ever). Instead, the Court explained that it has been long clearly established that "'police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen.'" *Id.* (quoting *Cunningham*, 229 F.3d at 1289 (quoting *Koon*, 34 F.3d at 1447 n.25). As a result, where "an officer fails to intercede, 'the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who' performed the offending action." *Id.* (quoting *Koon*, 34 F.3d at 1447 n.25). Consistent with this broad language, the Ninth Circuit has repeatedly found the obligation to intercede is not limited to the excessive force context, as Defendants seem to contend. *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1029-30 (9th Cir. 2002) (acknowledging an officer can

be held liable for failing to intercede in an unconstitutional search); *Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004), rev'd on other grounds, 432 F.3d 1072 (9th Cir. 2005) (denying summary judgment regarding a claim defendants failed to intercede in harassment during a search); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally).[16]

Here, properly construed, the records shows that a reasonable jury can find that each Defendant had the opportunity to intercede but failed to do so in a number of ways, particularly since they worked together on the investigation; they prosecuted Browning; they testified against Browning; they submitted their reports; etc. None of the Defendants can claim, for example, that they did not know Browning was being tried for capital murder as a result of their work. The process took time, yet they all sat idly by and let an innocent man be convicted. SOF ¶¶ 96-105.

## V.   QUALIFIED IMMUNITY IS UNAVAILABLE

In their motion, Defendants make passing reference to the doctrine of qualified immunity. Br. at 20.[17] As the law above shows, there is no reasonable question that Plaintiff's due process

---

[16] Given Defendants' counsel's familiarity with these cases, including *Tobias* in particular, it is difficult to understand the claim the "Ninth Circuit has only recognized a claim for failing to intervene in the excessive force context." Br. at 35. Plaintiff's counsel assumes that this is simply a mistaken statement of the law, perhaps based on a prior filing, not an intentional misrepresentation.

[17] Qualified immunity lacks a lawful basis and should not be applied to any claim. For one, the text in the U.S. code makes no mention of immunity or an exception to the mandatory use of the words "shall be liable" in that text. *See* 42 U.S.C. § 1983; David B. Owens, *Violence Everywhere: How the Current Spectacle of Black Suffering, Police Violence, and the Violence of Judicial Interpretation Undermine the Rule of Law*, 17 STAN. J. C.R. & C.L. 495, 504–05 (2022) (arguing that the plain language of the code version of § 1983 precludes adoption of an immunity defense). The advent of qualified immunity is also inconsistent with the text of the statute as originally passed by the 1871 Congress, which specifically provides that officials shall be liable "notwithstanding" other common law immunities or rules like qualified immunity. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. R. 201 (2023). As a result, "the modern immunity jurisprudence is not just *a*textual but *counter*textual" because qualified immunity "does not merely *complement* the text—it brazenly *contradicts* it," *Rogers v. Jarrett*, 63 F.4th 971, 981 (5th Cir. 2023) (Willett, J., concurring). (citing); *cf. Jackson v. City of Cleveland, et al.*, 920 F.3d 340, 367 (6th Cir. 2019) ("Qualified immunity has outgrown its original justifications, which were 'rooted in historical analogy' and 'based on the existence of common-law rules in 1871.'") (quoting *Wyatt v. Cole*, 504 U.S. 158, 170 (1992)); William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and

1   and Fourth Amendment claims involve constitutional rights that were clearly established in 1985.

2   Defendants have (correctly) not made any argument to the contrary and thus have forfeited the

3   issue with respect to Plaintiff's substantive federal claims. *See Christian Legal Soc'y Chapter of*

4   *Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (refusing to consider an issue raised

5   summarily and without supporting argument); *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4

6   (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."); *Oracle USA,*

7   *Inc. v. Rimini Street, Inc*., 2016 WL 6208254, at *2 (D. Nev. Oct. 24, 2016) ("to the extent that a

8   party raises a new  argument or proffers new evidence and information in a reply brief, that

9   argument or evidence is improper because the opposing party is deprived of an opportunity to

10   respond"); *United States v. Patterson*, 230 F.3d 1168, 1172 (9th Cir. 2000) (new arguments and

11   evidence presented first time in reply are waived).

12         Instead, in this case, the only actual arguments about qualified immunity concern Plaintiff's

13   claims for (1) conspiracy and (2) failure to intervene against the individual defendants. *See* Br. at

14   36 (failure to intervene); *id.* at 38 (conspiracy). And, specifically, defendants claim that neither of

15   these constitutional violations was clearly established at the time of the investigation; *i.e.*, 1985.

16   Defendants are mistaken.

17         As a general matter, in reviewing a request for qualified immunity at summary judgment,

18   this Court asks whether the record—properly construed in plaintiff's favor—illustrates that (1) a

19   constitutional violation, and (2) that the right in question was "clearly established" at the time of

20   the conduct. *Tolan*, 572 U.S. at655-56. As just noted, this case involves only the second inquiry.

21         Regarding whether a right was "clearly established," the core issue is notice; *i.e.,* the

22   "'salient question …  is whether the state of the law' at the time of an incident provided 'fair

23   warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id*. at 656 (quoting

24   *Hope v. Pelzer,* 536 U.S. 730 (2002). Analysis of whether a right was "clearly established" must

25   occur in the context of a particular case, not in the abstract or at too high a level of generality.

26   _____

27   concurring in the judgment) (suggesting that, in an appropriate case, qualified immunity should be
    reconsidered). Plaintiff specifically preserves this argument for potential future adjudication.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987). On the flipside, the Supreme Court has consistently rejected the notion that qualified immunity is confined to determining whether there is a case exactly on point; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)) *see Ziglar*, 137 S. Ct. at 1866-67 ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.' That is, an officer might lose qualified immunity even if there is no reported case "directly on point."" (quoting, respectively, *Anderson*, 483 U.S. at 640, and *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). Accordingly, qualified immunity is unavailable in the "obvious case," *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam), and where the application of pre-existing law is "apparent" even where there is no case "directly on point." *Ziglar*, 137 S. Ct. at 1866. Otherwise, qualified immunity would become near-absolute immunity. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.2011) (*en banc*) ("If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations" of the constitution).

Defendants are not entitled to qualified immunity on either the conspiracy or failure to intervene claims, as both claims were clearly established in 1985.

## A. The Conspiracy Claims Are Clearly Established

As to conspiracy, defendants make the bold claim that questions about whether the intracorporate conspiracy doctrine applies in § 1983 cases entitles them to immunity. The tactic should fail, as myriad cases illustrate that police officer defendants can be liable for conspiring with one another. Raising a question about immunity does not automatically translate into a lack of clear establishment because the officers certainly had notice that agreeing to frame someone for a crime they did not commit violates the constitution. But the Ninth Circuit has never applied that doctrine to § 1983 conspiracy claims and in in fact has repeatedly allowed § 1983 claims alleging conspiracies against individuals from the same corporate entity to go forward. *See*, *e.g.*, *Dirks v. Martinez,* 414 F. App'x 961, 963 (9th Cir. 2011) (denying qualified immunity on conspiracy claim against three Los Angeles County sheriff deputies); *Cameron v. Craig*, 713 F.3d 1012, 1023 (9th

Cir. 2013) (reversing grant of summary judgment with regard to claim that officers from the same law enforcement agency conspired to abuse their power as law enforcement officers and violate her constitutional rights); *Baldwin v. Placer Cty.*, 418 F.3d 966, 970-71 (9th Cir. 2005) (upholding denial of summary judgment with regard to conspiracy claim against officers of the same entity); *Gilbrook v. Cit of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999) (upholding jury verdict finding unlawful conspiracy to violate constitutional rights against a group of officers and employees of the City); *cf. Harris v. Roderick*, 126 F.3d 1189, 1195-96 (9th Cir. 1997) (upholding denial of motion to dismiss and qualified immunity on *Bivens* conspiracy claim against federal law enforcement agents). The cases cited above, and others, laying out the requirements for a § 1983 conspiracy remain good law. *See, also Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (plaintiff alleging a § 1983 conspiracy must show "an agreement or meeting of the minds to violate constitutional rights" (citation and internal quotation marks omitted)); *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (same); *Woodrum v. Woodward County, Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989) (§ 1983 conspiracy requires more than conclusory allegations); *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010) (elements of a § 1983 conspiracy claim); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (liability under § 1983 requires showing of personal participation in the alleged rights deprivation). None of this law is compatible with the notion that the intracoproate conspiracy doctrine applies to § 1983 cases.

In fact, neither is the law about the intracorporate conspiracy doctrine either. The doctrine originated in the antitrust context and derived from the unique nature of conspiracies in that context. *See Ziglar*, 137 S.Ct. at 1868; *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1325-28 (N.D. Cal. 1988) (noting that the doctrine "derived from the special nature of antitrust law," that antitrust conspiracies "are a unique breed", and explaining in detail why the rationale behind the doctrine does not fit with civil rights cases and should not be extended to conspiracy claims in the civil rights context). The doctrine provides that "an agreement between or among agents of the same legal entity, when the agents act in their *official capacities*, is not an unlawful conspiracy" because "[w]hen two agents of the same legal entity make an agreement in the course

of their *official duties*, . . . as a practical and legal matter their acts are *attributed to their principal*." *Ziglar*, 137 S.Ct. at 1867 (emphasis added). This means there are not the required two or more separate persons to form a conspiracy. *Id.*

The nature of § 1983 claims precludes application of the doctrine to those claims. As the Supreme Court noted in *Ziglar*, the logical foundation of the intracorporate conspiracy doctrine is that agents of a corporate entity act on behalf of their principal, and their individual actions will be imputed to the corporate entity. That premise does not apply in the context of § 1983 claims, where *Monell* and subsequent jurisprudence conclusively hold that actions of municipal employees *cannot* be imputed to the municipality. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). In other words, the fundamental premise of the intracorporate conspiracy doctrine—that the actions of the agent are imputed to the principal—cannot apply to §1983 actions. To conclude otherwise—that the intracorporate conspiracy doctrine shields the individual Defendants from liability—would be to hold, in effect, that LVMPD is vicariously responsible for their conduct. This result is impossible to square with *Monell* and logically forecloses applying the doctrine here.[18]

Defendants argue, at the very least, they "enjoy qualified immunity on the issue because the law is not clearly established as to whether such a claim exists." Br. at 39. Defendants cite *Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), but that case does not support their position. *Fazaga* and the case on which it relies, *Ziglar*, examine whether federal officials from the same federal entity would have known that they were engaging in an unlawful conspiracy under 1985(3) when

---

[18] Defendants cite several district court cases from the District of Arizona and the Northern District of Ohio, Br. at 38-39, but such decisions do not settle constitutional standards or bind courts even in the same district, *Camreta v. Greene*, 131 S. Ct. 2020, 2033 n. 7 (2011), and they cannot illustrate what clearly established law is for present purposes where, as here, the Ninth Circuit has already shown the law to be clearly established. *See Dirks v. Martinez*, 414 F. App'x 961, 963 (9th Cir. 2011); *Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013); *Baldwin v. Placer Cty.*, 418 F.3d 966, 970-71 (9th Cir. 2005); *Gilbrook v. Cit of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999).

they entered discussions and agreements among themselves or made policy decisions for that entity. *Fazaga*, 965 F.3d at 1060; *Ziglar*, 137 S. C.t at 1867-68. First, § 1985(3) and § 1983 are different statutes with different purposes and different elements. *See United Brotherhood Carpenters*, 463 U.S. at 840-41 ("Unlike § 1983, § 1985(3) does not provide a cause of action for the deprivation of independent rights 'secured by the Constitution and laws.' Instead, it prohibits private conspiracies intended to prevent persons or classes of persons from the equal exercise of any of their civil rights. No violation of an independent legal right is required; nor does § 1985(3) require state action or the involvement of the State in any other way.").

And the holding in both *Fazaga* and *Ziglar* is limited to agreements reached by federal officials in their official capacities. *Fazaga*, 965 F.3d at 1060; *Ziglar*, 137 S. Ct. at 1867-68. As *Ziglar* noted, "there are other sound reasons to conclude that conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under § 1985(3)," namely that such claims "implicate[] the substance of their official discussions" and "open discussion among federal officers is to be encouraged, so that they can reach consensus on the policies a department of the Federal Government should pursue." *Ziglar*, 137 S. Ct. at 1868. This concern does not exist here, where the Defendants are law enforcement officers working together to frame an innocent individual, not federal officials developing national policy. Indeed, local law enforcement officers have long known they can be held liable for engaging in a conspiracy with one another to violate an individual's constitutional rights under § 1983. *See Dirks v. Martinez,* 414 F. App'x 961, 963 (9th Cir. 2011); *Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013); *Baldwin v. Placer Cty.*, 418 F.3d 966, 970-71 (9th Cir. 2005); *Gilbrook v. Cit of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999).[19]

---

[19] Defendants' argument also runs contrary to the established principle that qualified immunity turns on what was clearly established at *the time of their conduct*. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (qualified immunity looks at the status of the law "at the time of the challenged conduct"); *Sampson v. Cty. of Los Angeles*, 974 F.3d 1012, 1018-19 (9th Cir. 2020) (same). The law in 2001 provided beyond ample notice that their agreement to violate Plaintiff's constitutional rights would subject them to liability and *Fazaga* cannot retroactively make the status of the law *at that time* "unsettled."

**B.  The General Duty To Intervene (Or Intercede) Was Clearly Established In 1985**

As to the failure to intervene, Defendants claim—without citation to *any authority whatsoever*—that there is no general duty to intervene outside the excessive force context. Br. 36. But, the Defendants are completely mistaken. As the *Tobias* decision illustrates, the Ninth Circuit has never confined its failure-to-intercede doctrine to excessive cases. The distinction is one made up by the police officer trying to escape liability for their own failures simply because Courts had not had occasion to comment on this extremely obvious principle. The obviousness of failing to intervene cannot reasonably be doubted. Indeed, courts have long recognized a duty to intercede and have not limited their claims to excessive force cases. *See, e.g., O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (collecting cases back to 1972, *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972), which did not limit its language to excessive force*). Others have also involved other contexts, like false arrest. For example, in *Whirl v. Kern*, 407 F.2d 781, 788-91 (5th Cir. 1968), the Fifth Circuit described a false imprisonment claim that the found closest to a "situation where the jailer keeps a prisoner beyond the lawful term of his sentence," and permitted liability for the failure of the jailer to release the prisoner because he was obligated to do so. *See also Nesmith v. Alford,* 318 F.2d 110, 119 (5th Cir. 1963) (all three officers liable for false arrest even though only one officer made the arrest); *Smith v. Ross*, 482 F.2d 33, 36 (6th Cir. 1973) (failure to act to protect the constitutional rights of another is actionable under § 1983). To be sure, cases across the circuits concur, holding that failure to intervene to prevent a non-excessive force constitutional violation is actionable, including prior to the events at issue in this case. *See, e.g., Smith v. Ross*, 482 F.2d 33, 36 (6th Cir. 1973) (failure to act to protect the constitutional rights of another is actionable under § 1983); *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001) (holding, in false arrest case, that "officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights") (citing *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982)); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982) (failure to intervene to prevent unlawful arrest violates plaintiff's constitutional rights).

Accordingly, even if the most common cases are in the context of excessive force, it should

be obvious and apparent that police officers must intercede without a case on point. *Ziglar*, 137 S. Ct. at 1866. Indeed, and taking a step back, established law provides that §1983 liability should be read against the background of tort liability, *see, e.g., Monroe v. Pape*, 365 U.S. 167, 187 (1961), which includes refusal to act where someone has a duty to do so. *See O'Neill*, 839 F.2d at 10.

**VI.    A REASONABLE JURY CAN EASILY CONCLUDE THE LVMPD HAD DEFICIENT POLICES, PRACTICES, AND CUSTOMS THAT WERE THE MOVING FORCE BEHIND THE VIOLATION OF BROWNING'S CONSTITUTIONAL RIGHTS**

The LVMPD is a municipality for present purposes. Under current law, municipalities cannot be liable under a *respondeat superior* theory, but they may be liable where employees are "acting pursuant to an expressly adopted official policy," or pursuant to a "longstanding practice or custom." *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). A "policy" is "'a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Long v. Cnty. of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006). Policies, practices, and customs can involve affirmative action or refusing to act; *i.e.*, inaction. A policy "of inaction or omission may be based on failure to implement **procedural safeguards** to prevent constitutional violations." *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1143 (9th Cir. 2012) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)). In addition to failing to adopt adequate procedural safeguards, a policy of omission can involve failing to adequately train police officers, where the municipality has "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." *Tsao*, 698 F.3d at 1143 (9th Cir. 2012). Municipalities are also liable where they ratify the unconstitutional actions of their employees or where an official policymaker has directed the constitutional violation. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) ("[A] local government may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making

authority or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it." (internal quotes and citation omitted)).

 "Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992). To establish causation, "Plaintiff need only demonstrate that 'the identified deficiency ... [is] closely related to the ultimate injury.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 391(1989)).

Here, Plaintiff's *Monell* claim at trial will address the LVMPD's policies and practices with respect to (1) the preservation, production, and suppression of material evidence under *Brady* and other cases, and (2) its policies and practices concerning the generation of unreliable identification evidence.  In other words, Plaintiff's *Monell* claim does not pertain to the fabrication of evidence or prosecution without probable cause claims addressed above.

### A.  A Reasonable Jury Can Find LVMPD Liable For The *Brady* Violations

The Ninth Circuit's finding that there was a *Brady* violation related to the police investigation of the case—*i.e.*, related to the bloody shoeprints and the hairstyle of the perpetrator—presents strong evidence that a reasonable jury can easily conclude its policies and practices caused an egregious violation of Browning's rights.

Notably, while it is true that a jury must find Plaintiff's constitutional rights were *violated* in order for LVMPD to be liable, it need not find *a particular officer* responsible in order to reach such a conclusion to hold LVMPD liable. *See, e.g.*, *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983."); *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 574 (9th Cir. 2022) (same); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 n.12 (9th Cir. 2016) (same). The LVMPD is simply wrong, then, when it asserts that if one of the defendant officers was not liable then the claim fails as a matter of law under *City of Los Angeles v. Heller,* 475 U.S. 796 (1986) (per curiam). Br. at 40. Instead, there is a difference between *liability*, on one hand, and a constitutional violation, on the other. In an

excessive force context (like *Heller*), those differences frequently merge. Not so here. Instead, binding on this Court, the Ninth Circuit just explained that *Brady* claim concerning the suppression of evidence is precisely the type of *Monell* theory that is "not premised on a theory of liability that first requires a finding of liability on the part of the individual officers." *Richards*, 39 F.4th 574; *cf. Vargas v. City of Los Angeles,* No. 19-55967, 2021 WL 2012592 (9th Cir. May 20, 2021) (rejecting application of *Heller* to *Monell* claim in a wrongful conviction case). In situations like those here, a municipality may be liable "'whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof.'" *Richards*, 39 F.4th at 574 (quoting *Fairley*, 281 F.3d at 917 n.4).

Here, there are several theories under which a reasonable jury could find that LVMPD's policies, practices, and customs (or lack of them) caused a violation of Browning's constitutional rights.

**First**, LVMPD had no meaningful policies, where such policies were obviously required. Liability occurs in "a situation that demands a policy," where the failure to implement a policy "ignored a plainly obvious danger." *Armstrong v. Squadrito*, 152 F.3d 564, 577–78 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("In situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); *Brady* obligations obviously meet this standard. *Jackson*, 925 F.3d at 837, *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) (both failure to train concerning *Brady* obligations and failure to train concerning adequate identifications); *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) (failure to train re *Brady*).

Put in terms of the Defendants' motion, myriad authorities—including the *Brady* line of cases itself—put the LVMPD on "actual *and* constructive" notice it needed policies concerning *Brady* disclosure requirements, as *Gregory*, *Moldowan*, and *Jackson* illustrate.[20] As *Gregory*

---

[20] Outside of the recent *Richards* decision, the Ninth Circuit has not addressed *Brady* allegations under a *Monell* rubric in significant detail in a published wrongful conviction case. By contrast, the Sixth Circuit has addressed three similar cases involving *Monell* claims against cities for failure to adopt policies or training on officers' *Brady* obligations, and the Court has concluded *each time* that such cases are

explained, "[i]n their investigative capacities, police officers regularly uncover exculpatory materials" and the Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials." *Gregory,* 444 F.3d at 753 (citing *Brady*, 373 U.S. at 87). Given those rules: "Widespread officer ignorance on the proper handling of exculpatory materials would have the "highly predictable consequence" of due process violations." *Id.*

Despite that, the evidence in the record shows that LMPD officers were not familiar with their *Brady* obligations, and the only "policy" on this issue was a single sentence about not "withholding" evidence but that provided no guidance to officers about (1) the importance of the *Brady* obligation or *how to carry it out*. SOF ¶ 108. Moreover, the LVMPD police permitted officers to destroy their contemporaneous, handwritten notes rather than preserving them and producing them to the prosecution or the defense. In addition to the notes taken by Horn and Radcliffe (which may have revealed the information they suppressed at the time rather than in 1999), Levos destroyed his notes from what Browning originally told him about that day (which was entirely exculpatory) pursuant to these practices. SOF ¶ 117; *see* Dkt. 81-7 (homicide file). Secreting, suppressing, misrepresenting, or destroying this evidence was obviously deficient and unconstitutional. *See, e.g.*, *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (explaining that "the maintenance of the 'street files,' police files withheld from the state's attorney and therefore unavailable as a source of exculpatory information" violates due process, and "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated"); *Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757, at *7 (N.D. Ill. July 25, 2017) (similar); *cf. Caldwell*, 889 F.3d at 1115 (concluding that "the potential 'errors' are not obviously the product of carelessness and that there is a triable issue as to whether [the defendant] intentionally fabricated his notes").

Second, the flipside of LVMPD's inadequate one-sentence policy is a blatant failure to institute adequate procedural safeguards to ensure the preservation and production of material

---

inappropriate for summary disposition—a jury must decide whether the failures create liability. *Jackson*, 925 F.3d at 837; *Gregory*, 444 F.3d at 753-54; *Moldowan*, 578 F.3d at 351. The same is true here.

information that must be affirmatively disclosed by the police. *See Tsao*, 698 F.3d at 1143. A single-line in a manual is not self-executing and LVMPD has identified exactly *zero* procedural rules or practices designed to implement the *Brady* rule. At the time of this investigation, 1985, *Brady* had been on the books for more than two decades; *Giglio* (requiring production of impeachment material) had been on the book for some 13 years; and *Bagley* was decided just months before the Elsen murder, again confirming the obligation to preserve and produce material information. But, LVMPD had absolutely no procedural mechanisms for ensuring material was preserved or produce, a far departure from any well-accepted policy. SOF ¶¶ 106-13. This is sufficient for a reasonable jury to find LVMPD's policies were deficient.

**Third**, a reasonable jury can find that the LVMPD's training on *Brady* obligations and production—which was zero—was constitutionally deficient. Given these obvious constitutional obligations, LMPD had an obligation to provide training to its officers in these areas. *See, e.g.*, *Moldowan,* 578 F.3d at 387. Indeed, a City's failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim. *Gregory*, 444 F.3d at 754; *see, e.g.*, *Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933, 967 (C.D. Cal. 2018) (denying summary judgment on *Monell* claim where the need for training was "patently obvious").

Plaintiff acknowledges that deliberate indifference is required for the failure to train theory. A reasonable jury can easily find it here. One way to make this showing is by pointing to the "likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," which can "justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409-10 (1997). In addition, the "high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Id.* at 410. There is no doubt that police officers obtain evidence to prosecute

criminal defendants, such that a "'custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the [municipality]' for a deliberate-indifference claim." *Jackson*, 925 F.3d at 836 (quoting *Gregory*, 444 F.3d at 753–54). Where, as here, there is *no* evidence of any sort of *Brady* training, the *Monell* claim must go to the jury. *See id.* ("Plaintiffs have provided testimony sufficient for a jury to find that Cleveland did not in fact train its officers in their disclosure obligations. Gregory therefore controls, and there is sufficient evidence for a reasonable jury to find that Cleveland was deliberately indifferent to the risk of Brady violations.").[21]

**Fourth**, the record would permit a reasonable jury to easily conclude that LVMPD ratified the unconstitutional actions of Branon, Horn, and others in suppressing evidence. Despite the testimony at the evidentiary hearing in 1999, despite the finding in *Browning II,* despite this lawsuit, and despite the evidence generated in this lawsuit, LVMPD has expressly admitted that it is aware of no action Branon or Horn (or others) took inconsistent with its own policies, and admits the officers acted consistent with municipal policy and practice. Even if the City's claim that it had no reason to believe that Browning's rights were violated until 2017 is to be credited, *see* Br. at 41, the LVMPD has not taken any step *since that time* to distance itself from the officers' actions. Instead, as noted, the LVMPD maintains that the officers acted in accordance with its policies, and has not taken any step to do anything but defend the officers (including with the same counsel in this case). All of this is sufficient for a reasonable jury to conclude the LVMPD thus ratified this conduct because that is how things operate at LVMPD. SOF ¶¶ 111-12. *Cf. Larson v. Napier*, 700 F. App'x 609, 611 (9th Cir. 2017) (affirming judgment against municipality where, among other things, there was "an admission by the Sheriff that the deputies

---

[21] Additionally, whether "a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992). Defendants tellingly cite no authority that the only way to obtain evidence of municipal training is via a Rule 30(b)(6) deposition. Br. at 42. They have not produced any evidence of training, and the record includes sworn, admissible testimony about the lack of training provided to LVMPD officers. While it is too late for LVMPD to dispute that evidence (and it may not do so at summary judgment anyway), any contrary evidence is for the trier of fact to weigh, not a court to decide summarily.

complied with the department's policy;" chief testified that "he would expect deputies to do the same thing;" and the deputies actions were "taught and accepted as the department approach.").

**B. The LVMPD's Deficient Policies Concerning Unreliable Identifications Must Also Be Tried**

As noted, the LVMPD has not addressed Plaintiff's claims concerning the unduly suggestive identifications, either for purposes of individual liability or *Monell*. Given the forfeiture and failure to satisfy the initial burden under Rule 56, the claim must proceed to trial.

And, as a result, Plaintiff does not offer a fulsome discussion here. Suffice to say that same rationale that applies to the duty to preserve and produce material evidence applies with equal force to the conduct of lineups. For decades before the Elsen investigation, the Supreme Court recognized that the manner in which police conduct identifications may "cause witnesses to err in identifying criminals." *Simmons v. United States*, 390 U.S. 377, 383, 88 (1968).  Indeed, the Court has recognized that the "vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"; and that the "identification of strangers is proverbially untrustworthy." *Wade*, 388 U.S. at 228–29.  "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *Id*. "Eyewitness identifications are recurring situations in criminal investigations." *Gregory,* 444 F.3d at 756. Accordingly, given these and other authorities, there should be no doubt that LVMPD should have adopted written directives concerning the importance of avoiding suggestive identification tactics—both before and *after* a show-up—and further instated actual training for their officers that would have account for the obvious issues of eyewitness unreliability. *See also id.* (*Monell* claim concerning identifications). LVMPD failed in this regard. SOF ¶¶ 114-15.

## VII.  PLAINTIFF'S NEVADA CONSTITUTIONAL AND COMMON LAW CLAIMS MUST PROCEED TO TRIAL

### A.  A Reasonable Jury Can Find Defendants Violated The Nevada Constitution's Due Process Clause

Defendants point out that in *Brandon v. HDSP Med. Unit*, 2020 WL 6876201, at *5 (D. Nev. Nov. 20, 2020), the Court explained—in a prisoner's litigation suit without the benefit of attorney-prepared briefing—the Court noted the "Nevada Constitution is coextensive with the Due Process Clause of the Fourteenth Amendment, so the same legal requirements would apply to any state law due process claim." (citing *Wyman v. State*, 217 P.3d 572, 578 (2009), and *Williams v. State*, 2015 WL 4712111, at *4 (Nev. App. July 31, 2015)).

Plaintiff reserves the right, at trial, to argue that the Due Process Clause of the Nevada Constitution provides even more protection than the minimum standards set in federal law. For present purposes, however, any difference is immaterial—the facts set forth above, and those found by the Ninth Circuit, amply show that a reasonable jury can conclude Defendants violated due process. So, for the same reason the motion must be denied with respect to Plaintiff's federal claims, it must be denied with respect to Plaintiff's Nevada Due Process claims as well.

### B.  Plaintiff's Nevada Malicious Prosecution Claim Must Proceed to Trial

Citing *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009), Defendants assert that the "standard for a state law claim is the same as federal law malicious prosecution claim." Br. at 42. Plaintiff disagrees with this statement. For one, *Lassiter* said nothing about Nevada law, as the portion cited referred to law from Washington State.

In addition, as explained above, the federal claim at issues arises under the Fourth Amendment, discussed in *Manuel*, 137 S. Ct. at 918 and other cases. By contrast, under a Nevada claim for malicious prosecution has traditionally arisen as common-law intentional tort, not a constitutional claim. *See, e.g.*, *LaMantia v. Redisi*, 38 P.3d 877, 879-80 (Nev. 2002); *Chapman v. City of Reno*, 85 Nev. 365, 369 (1969); *Lester v. Buchanen*, 112 Nev. 1426, 1428 (1996); *Bonamy v. Zenoff*, 362 P.2d 445, 446 (Nev. 1961). Though *Mack v. Williams*, 138 Nev. Adv. Op. 86, 522 P.3d 434 (2022), could certainly change the calculus, that has not happened yet. As a result, though

68

the claims bear some similarity, there is no authority for the equation of a Fourth Amendment claim for prosecution without probable cause and one under state common law.

At any rate, an individual is liable for malicious prosecution if they "initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff" without probable cause and with malice. *LaMantia*, 38 P.3d at 879-80. "[M]alice may be inferred from proof of want of probable cause." *Bonamy*, 362 P.2d at 446. Under Nevada law, malicious prosecution claims can be brought against police officers who cause criminal proceedings to be initiated against a person without probable cause. *See Catrone v. 105 Casino Corp.*, 414 P.2d 106, 108 (Nev. 1966); *Frank v. City of Henderson*, 2015 WL 5562582, at *4 (D. Nev. Sept. 21, 2015); *Aziz v. Eldorado Resorts, LLC*, 72 F. Supp. 3d 1143, 1152 (D. Nev. 2014).

The elements of a malicious prosecution claim in Nevada are (1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damage. *LaMantia*, 118 Nev. at 30 (quoting *Jordan v. Bailey*, 113 Nev. 1038, 1047 (1997)).

Here, a reasonable jury can find for Plaintiff on each of these elements. First, because the entirety of the purported "evidence" supporting probable cause was obviously unreliable (like the Wolfes claims),unreliably generated or fabricated/manufactured by the Defendants (like the identifications), and was based upon the suppression of exculpatory information, a reasonable jury could conclude probable cause was lacking. *Cf. Chapman*, 85 Nev. at 369 (probable cause not inferred where there is "evidence of fraud, perjury or other corrupt means") *Ricord v. C.P.R.R. Co*., 15 Nev. 167, 180 (1880) (recognizing that, in a malicious prosecution case, the commitment and indictment of a defendant constitutes prima facie evidence that probable cause for criminal prosecution existed but noting that the prima facie evidence could be rebutted with a relevant showing of false testimony or suppressed facts); *Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 121 Nev. 44, 70, 110 P.3d 30, 49 (2005), partially abrogated on other grounds by *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 181 P.3d 670 (2008) (finding material disputes about whether probable cause was based on perjury, material omissions in an officer's report, etc.

precluded summary judgment). *See* SOF ¶¶ 31, 87.

Indeed, the only evidence linking Browning to the Elsen's shop was his fingerprints at the store—a place he had recently visited. SOF ¶ 53. Certainly, someone's undated fingerprints alone at a place of public accommodation are insufficient to constitute probable cause.

Second, as noted, malice can be inferred from a lack of probable cause. *Bonamy v. Zenoff*, 362 P.2d 445, 446 (Nev. 1961). So, the foregoing precludes judgment as a matter of law. What's more, there is evidence that Defendants suppressed exculpatory information and then prepared reports with intentionally (or at the very least, recklessly) false statements bolstered by the omission of exculpatory information. SOF ¶¶ 58-74. This is more than sufficient evidence of malice. *See Rowland v. Lepire,* 313 P.2d 1332, 1335 (Nev. 1983). There is no dispute that the criminal proceedings terminated in Browning's favor when the charges were dismissed with prejudice, Dkt. 81-21, and that spending more than three decades on death row as an innocent person constitute damage. Because the "factual determinations that underlie Plaintiff's" due process "claim will bear on the resolution of Plaintiff's malicious prosecution claim," summary judgment must be denied. *Lobato*, 2022 WL 4017055, at *14 (D. Nev. Sept. 1, 2022).

### C.  A Reasonable Jury Can Find Defendants Abused Legal Process

In Nevada, an abuse of process claim involves a showing that the defendant (1) had an ulterior purpose abusing the process other than resolving the dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. *Land Baron Inv. v. Bonnie Springs Family LP*, 131 Nev. 686, 698 (2015) (citing *LaMantia v. Redisi*, 118 Nev. 27, 31 (2002), and *Posadas v. City of Reno*, 109 Nev. 448, 457 (1993)).

Defendants' argument—which is too cursory to really warrant a response—is simply that there is no evidence they acted with an "ulterior purpose." Br. at 43. However, and yet again, the Defendants have improperly misconstrued the record in their favor: the evidence shows that, among other things, Branon Radcliffe, Horn, Leonard, and Bunker deliberately suppressed exculpatory material and/or fabricated evidence (all willful acts) against Browning to bring about his wrongful conviction for a crime he did not commit (an ulterior motive). *See generally* SOF ¶¶

23-30, 36-45, 58-95. There can be no doubt that intentionally suppressing or fabricating evidence that is used to (a) secure an arrest, (b) then used to support a criminal complaint, and (c) then used during the criminal prosecution is an absolute abuse of the Nevada Courts. And, while "merely filing a complaint and proceeding to properly litigate the case does not meet" the abuse of process requirement, *Land Baron*, 131 Nev. at 698, intentionally suppressing exculpatory information and/or fabricating evidence vastly exceeds this requirement. *See Lobato v. Las Vegas Metro. Police Dep't,* No. 219CV01273RFBEJY, 2022 WL 4017055, at *14 (D. Nev. Sept. 1, 2022).

### D. Prosecuting An Innocent Person Constitutes Intentional Infliction of Emotional Distress

There is no reasonable dispute that prosecuting an innocent person for a crime they did not commit and could be subject to life imprisonment or, as here, the death penalty, is outrageous behavior, that causes severe or extreme emotional distress and thus states an intentional infliction of emotional distress claim under Nevada Law. *Rivera v. Corr. Corp of Am.*, 999 F.3d 647, 655 (9th Cir. 2021) (citing *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000)). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community" and "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138, 1142 (D. Nev. 2014) (internal citations omitted).

As a result, courts routinely deny motions for summary judgment in wrongful prosecution cases, like this one, where a reasonable jury can conclude that the officers caused the wrongful imprisonment of an innocent person. *E.g.*, *Woods v. City of Reno*, 2020 WL 4194844, at *1-2, 16 (D. Nev. July 21, 2020) (denying summary judgment on IIED claim where there was at least a material factual dispute about whether defendants fabricated evidence against the plaintiff); *Lobato*, 2022 WL 4017055, at *15 (D. Nev. Sept. 1, 2022) (same); *Fatai v. Ramos*, 2023 WL 2392707, at *18 (D. Haw. Mar. 7, 2023) (same).

Properly construed, the record shows that Defendants' actions are in this vein. *See*

*generally SOF* ¶¶ 23-30, 36-45, 58-95. Defendants' only (cursory) argument on this claim rests upon asserting they did nothing wrong, and indeed were not even negligent. Br. at 43-44. But, those are not Plaintiff's facts,  and they cannot rest on a self-serving disputed version of events when seeking judgment as a matter of law. So, the motion must be denied.

### E.  Plaintiff's Indemnification Claim Should Not Be Dismissed

Though "indemnification" is not a stand alone claim, it is an important theory of recovery for Plaintiff in this case. And, there is no dispute that NRS 41.0349 sets forth a statutory right to indemnification. Should plaintiff prevail at trial, the Estate will be a judgment creditor with a strong interest in this right, as it is relevant to recovery. Accordingly, as in other wrongful conviction cases where the motion for summary judgment should be denied and the matter set over for trial, the motion to dismiss this claim should be denied. *See, e.g.*, *Woods v. City of Reno, Nevada*, 2020 WL 4194844, at *17 (D. Nev. July 21, 2020). The one case cited, *Sims v. City of Columbus*, 2013 WL 3394001, n.2 (S.D. Ohio July 8, 2013), includes merely an assertion and is in no way persuasive.).[22]

### CONCLUSION

Defendants' motion for summary judgment must be denied.

Respectfully Submitted,

/s/ David B. Owens
*One of Plaintiffs' Attorneys*

Luke Busby
NV Bar# 10319
316 California Ave., #82
Reno, NV 89509
O: 775.453.0112

_____

[22] Defendants do not make the argument that an "indemnification" claim is premature, which was addressed in other cases, *e.g.*, *Lobato v. Las Vegas Metro. Police Dep't*, No. 219CV01273RFBEJY, 2022 WL 4017055, at *15 (D. Nev. Sept. 1, 2022). Having forfeited the argument by failing to raise the issue, *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (quoting *Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988)); *Meggs v. Boulevard Ventures, LLC*, No. 2:14-cv-1535, 2016 WL 1259390, at *4 (D. Nev. March 30, 2016), Plaintiff does not address *Lobato* on this point and asks this Court follow *Woods*. Additionally, unlike *Lobato*, Defendants do not address the fact LVMPD is liable under the doctrine of *respondeat superior* for the state-law torts committed by the defendant officers. They of course cannot do so for the first time in reply, distinguishing matters further on this point.

luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff*

Elizabeth Wang*
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*admitted *pro hac vice*

David B. Owens*
Loevy & Loevy c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110
Seattle, WA 98145-1110
david@loevy.com

## <u>CERTIFICATE OF SERVICE</u>

I, David B. Owens, an attorney, hereby certify that on August 3, 2023, I filed the foregoing response using the Court's CM/ECF system, which effectuated service on all counsel of record.

/s/ David B. Owens
*One of Plaintiff's Attorneys*

Luke Busby
NV Bar# 10319
316 California Ave., #82
Reno, NV 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff Kirstin Blaise Lobato*

Elizabeth Wang*
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*admitted *pro hac vice*

David B. Owens*
Loevy & Loevy c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110
Seattle, WA 98145-1110
david@loevy.com