UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

THE ESTATE OF PAUL LEWIS BROWNING, et al.,

Plaintiff,

v.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et al.,

Defendants.

Case No. 2:20-cv-01381-KJD-MDC

**ORDER – Granting Motion for Summary Judgment**

Presently before the Court is Defendants' Motion for Summary Judgment (#81). Plaintiff filed a response in opposition (#92) to which Defendants replied (#99). On March 18, 2024, the Court instructed Defendants to draft and submit an order in accordance with Local Rule 7-2(f). (#101). The Court has reviewed Defendants' proposed order and finds that it aligns with the Court's understanding of the facts and applicable law in this action. Therefore, for the reasons outlined below, Defendants' motion for summary judgment is granted.

I.      **Factual and Procedural Background**

A.  **Pretrial Background**

Paul Browning is now deceased. The Plaintiff in this case is his mother, Betty Browning, in her capacity as the Administrator of the Browning's Estate. Betty is a resident of North Carolina. The Second Amended Complaint ("SAC") names seventeen (17) defendants, however, several of the defendants have been dismissed. (See, e.g., #53/93). The remaining defendants are Las Vegas Metropolitan Police Department ("LVMPD"), Det. Robert Leonard ("Det. Leonard") Sgt. Michael Bunker ("Sgt. Bunker"), Ofc. Gregory Branon ("Ofc. Branon"), Ofc. David Radcliffe ("Ofc. Radcliffe"), and Crime Scene Identification Specialist David Horn ("CSI Horn"). The following summarizes each individually named Defendants' role in the murder investigation. Det. Leonard was one of the two lead detectives who handled the case. He drafted an Officer's Report detailing the murder investigation. Sgt. Bunker was a general assignment sergeant who

helped protect the crime scene until the homicide detectives arrived, assisted with the arrest of Browning, and later stopped Browning's escape attempt. Ofc. Branon was a patrol officer, and one of three patrol officers to respond to the initial call. He secured medical help for Hugo, interviewed eyewitnesses, and helped protect the crime scene. Ofc. Radcliffe was one of three patrol officers who responded to the initial call. He secured medical help for Hugo, interviewed eyewitnesses, and helped protect the crime scene. He also received information from citizen informants Randy and Vanessa Wolfe. Ofc. Radcliffe also assisted with the arrest of Browning. CSI Horn was one of the criminalists who processed the crime scene. He was responsible for documenting and photographing the evidence and taking fingerprints.

### B.  The Murder of Hugo Elsen

On November 8, 1985, between 4:00 p.m. and 4:30 p.m., Hugo Elsen ("Hugo") was stabbed inside his jewelry store, Elsen Jewelry. According to the evidence, the assailant was buzzed into the jewelry store where he attacked Hugo with a knife, stabbing him several times. The murderer also smashed a glass display case and fled with around 70 pieces of jewelry. Hugo's wife, Josy Elsen ("Josy"), heard the attack and went to the showroom where she saw Hugo being stabbed and briefly saw the assailant from the side. Josy ran to a nearby business and asked Debra Coe ("Coe") to call the police. Coe was able to look out of her window and saw a man running near the Elsen's store.

### C.  The Defendants' Investigation

####    i.    Crime Scene

LVMPD patrol officers Branon, Radcliffe, and Robertson responded to the 911 call. Josy told the officers that Hugo had been stabbed. The officers found Hugo in bad shape but still able to talk. Ofc. Radcliffe was able to speak with Hugo and learned "that a black man had robbed him and that the man was wearing a blue baseball hat." Ofc. Robertson also reported that Hugo stated a black male had stabbed him. Ofc. Branon spoke to Hugo, Josy, and Coe and obtained "a rather complete description of the suspect, who was described as a black male adult in his late 20's, medium complexion, wearing a blue baseball cap, a blue windbreaker type jacket, blue levis [sic], bearing a mustache and, what was described as shoulder length geri [sic] curled type hair."

- 2 -

Ofc. Branon's description was broadcast to all officers.

Paramedics arrived and transported Hugo to the hospital. The three officers then protected and preserved the crime scene until Lt. Greg Jolley and Sgt. Bunker arrived and took over. After the paramedics transported Hugo, CSI Horn arrived to process the scene.

ii.   <u>Eyewitnesses</u>

The officers interviewed several witnesses. Josy initially reported seeing a black male standing over Hugo with knife. She described the assailant as a black male with a blue cap. She "could not describe the black male." [About one month after the murder, on December 4, 1985, Josy participated in a photographic line-up and was unable to identify Browning.]. Debra Coe reported she ran to a window where she observed a black male "with a blue baseball cap on, and very bushy hair hanging out of the back, run southbound from the area of the jewelry store." Coe "was only approximately 3 to 5 feet away from the subject when he came running past and she was able to get a fairly good look at him" Coe also gave a voluntary statement in which she reiterated that when she looked out the window, she saw a man running past Elsen's jewelry store. However, the angle the man was running led her to believe he might not have come out of the store. Coe also wrote down the descriptors of the man she saw run by.

Brad Hoffman ("Hoffman") reported that around 4:00 p.m., he observed a small Cuban man wearing a blue baseball cap walking down Las Vegas Boulevard. The individual did not look suspicious.

Charles Woods ("Woods") told detectives that, as he was standing and talking on a sidewalk, a black male with a blue baseball cap with "very bushy hair hanging out around the cap" came running towards him. The man passed within three feet of him, and Woods felt confident he could identify him. Woods also gave a verbal and written statement to the police.

On the day of his arrest, Browning was photographed with Afro-style hair, not a Jheri curl style.

iii.   <u>Browning is Identified as a Suspect and Arrested</u>

About thirty minutes after the murder, Ofc. Radcliffe, Sgt. Bunker, and other officers were guarding the crime scene when they were approached by citizen Randy Wolfe ("Randy"). Randy

told the officers Browning had just arrived at the Normandy Motel and reported that he had just "robbed someone and hurt them bad." He told the officers that Browning was still inside the Wolfes' apartment with his wife, Vanessa, and believed that he (Randy) was out buying drugs. Randy said Browning had "displayed a large handful of jewelry items with tags attached" and was wearing "a tan coat and blue baseball cap."

Officers Radcliffe, Caldwell, and Bunker went to the Normandy Motel to investigate, where they encountered Vanessa outside the Wolfes' apartment. She told the officers she had just discarded, at Browning's request, a blue baseball cap, a knife and scabbard, numerous jewelry tags, and other items. The officers went to the Wolfes' apartment where Sgt. Bunker "kick[ed] the door down" and found a shirtless black male sitting in a chair. The officers arrested Browning and advised him of his Miranda rights. The officers saw evidence of the stolen jewelry. Browning falsely told the officers his name was "Robert Johnson."

Because Browning was arrested while witnesses Coe, Hoffman, and Woods were still at the crime scene, Browning was transported back to the jewelry store. Det. Leonard set up a "one-on-one confrontation, to see if [Browning] was the right suspect." The witnesses were told not to be influenced by the fact that the individual was in police custody and not to assume he was the suspect. The officers presented the witnesses with Browning who "was wearing a pair of Levis, and dark shoes, however, no shirt, no jacket, and no baseball cap." Browning did not have a Jheri Curl as his hair was a "long, Afro-style." Hoffman said Browning was not the Cuban man he had seen. Coe told Det. Leonard "she thinks it is the same guy, that she saw running past the front of the store, and that if he had a hat on, that she would then be positive." Woods stated Browning was "definitely the same person that had come running out of nowhere . . . ."

iv.   The Wolfes' Statements

The Wolfes also provided voluntary statements. According to Randy, a few days earlier, he had met Browning at the Normandy Motel. On the date of the murder, Browning summoned Randy up to the Wolfes' apartment and told him he "might have killed" a man while robbing a jewelry store. Browning had a lot of jewelry with him that still had tags. Randy wanted nothing to do with the crime and left the apartment to find the police. He told Browning he was leaving

to buy heroin. Randy gave the police permission to search his apartment.

Vanessa told detectives she was walking to her apartment when she ran into Randy. Randy told her Browning had robbed a jewelry store, and she needed to "humor" Browning while he went to the police. Vanessa entered the room to see Browning kneeling around a lot of jewelry. He was wearing a brown shirt (that he was taking off), Levi's, and a blue baseball cap with "Hollywood" written on it. Browning told her "I think I just killed somebody" and showed her a knife he had just washed off. Browning gave Vanessa the knife and a scabbard and told her to throw it on the roof of the building. Vanessa hid the knife in a box. She also put Browning's hat in the garbage and put some of the jewelry tags in an empty-milk container so she could show the police later.

v.   Physical Evidence

CSI Horn was in charge of processing the Elsen Jewelry Store crime scene. He was responsible for gathering all fingerprints and evidence. Upon entering the store, CSI Horn noted that "a series of footsteps bearing a tennis shoe pattern were observed on the floor." The crime scene was bloody, and showcase glass counters had been broken, leaving glass fragments on the floor. Horn fingerprinted the glass fragments and surrounding glass cases. CSI Horn compared the shoeprints to Browning and concluded Browning was not the source of the shoeprints.

CSI Horn found fingerprints on the shards of glass from the broken showcase. It was eventually determined that Browning's right index print was found on a piece of glass from the broken showcase on the vendor's side of the glass, and Browning's left palm print was left on the "top customer side of jewelry display (south case)."

Kathy Adkins was in charge of processing the Normandy Motel crime scene. At the scene, CSI impounded several pieces of jewelry that were eventually linked to the robbery. Browning's fingerprints were found "from face of watch 'Casio' brand." CSI Adkins also booked a "blue colored cap with 'Hollywood' printed on it" recovered from a dumpster and a brown leather knife sheath with a 4" knife that was recovered from a box under a stairwell. In 2019, DNA testing confirmed Hugo's blood was on the knife.

//

vi.   Miscellaneous Evidence

The detectives were able to obtain evidence Browning carried a knife similar to the one found at the crime scene. They also learned that Browning had convictions for armed robbery, grand larceny auto, and drug possession. At Browning's penalty phase, it was revealed that he had used a knife in committing his armed robberies.

vii.   Browning's Escape Attempt

Browning was transported to an LVMPD substation and placed in an interview room. Within five minutes of being placed in the room, Browning "managed to undo the handcuff that was attached to the security bar" and "managed to locate an exit out the rear door . . . and proceed[ed] down the stairwell in an attempt to flee from his lawful arrest." Sgt. Bunker happened to run into Browning and recaptured him.

**D.  The Criminal Trial**

Browning's criminal trial occurred on December 8, 1986, through December 12, 1986.

i.   Prosecution's Case

**a.  Eyewitness Trial Testimony**

Josy testified that, in the late afternoon of November 8, 1985, she was napping in a back room of the jewelry store when she heard commotion in the showroom. She found a black man with a knife kneeling over Hugo. Josy could see the side of the assailant's head and hair that "puffed" out of the back of his blue cap. Josy ran next door and asked the occupants to call the police. Debra Coe returned to the crime scene with Josy, where they found Hugo lying in a pool of blood. Josy identified the blue hat with the word "Hollywood" on it as the one the assailant was wearing. She identified Browning as the assailant.

Coe testified after being alerted by Josy, she ran to a window and saw "a black man" run by from the direction of the jewelry store. She watched the man for about 15 seconds. Coe accompanied Josy to the jewelry store, where she found Hugo lying in a puddle of blood. She testified she made Hugo comfortable by placing a pillow under his head and covered him with a blanket. Coe recalled paramedics arrived within "[t]wo or three minutes" of her arrival. Coe described the man as being about six-feet-tall, 27-years-old, black, with a mustache, wearing a

blue cap, Levi's, a jacket, with hair that stuck out about an inch over his ears underneath the cap. Coe positively identified a photograph of the blue cap found at the Normandy Hotel as the cap worn by the person she saw run by her front window.

Coe testified she was taken by police to a place for a show-up identification. Browning was the second black man that was presented to Coe for identification. The first being a black man who was actually wearing a blue cap, Coe stated was "definitely not" the person she had seen earlier. At trial, she positively identified Browning as the person she saw running by her window. On cross-examination, Coe acknowledged when she saw the man running, she felt the angle he was running at made it "hard . . . to see how he could have come" from the jewelry store. She also acknowledged that, on the night of the event, she stated Browning "resembled" the man she saw, but now, at trial she was positive because she "had time to think about it."

Woods testified he was standing in front of his store at the time of the murder. He testified he saw a man run by him with empty hands and no blood on him. He described the man as six-feet tall, slim, muscular, about 180 pounds, wearing dark pants, a light-colored shirt, and a "darker color" hat. When shown a picture of the "Hollywood" cap, Woods said it was not the same hat. Woods acknowledged that, during the show-up identification, he identified Browning as "very definitely" the man. He again identified Browning in court as the man that he saw.

Randy Wolfe testified he lived in the same motel as Browning. On November 8, 1985, between 4:00 pm and 4:30 pm, he was working on his landlady's car when Browning summoned him to the Wolfes' apartment. Randy found Browning sitting on his bed, wearing a tan windbreaker and the "Hollywood" hat. Jewelry was dumped on the bed. Browning confessed to the crime and said he intended to use the jewelry to get his girlfriend out of jail. Randy told Browning he was leaving to go get heroin, and Browning asked him to pick some up for him. As he was leaving, Randy ran into Vanessa, whom he instructed to keep Browning "cool" while he went to get the police. Randy then went to the crime scene and notified the police about Browning. After the police arrested Browning, he found a cup under his sink filled with additional jewelry. During his testimony, Randy admitted he and Vanessa were heroin and cocaine addicts, and he would steal to fund his habits. He testified to his prior convictions and

admitted to lying about jewelry that was found under the sink during Browning's preliminary hearing. Randy denied receiving any benefits from the State for his testimony.

Vanessa Wolfe testified she was friends with Browning's then-girlfriend, Marsha Gaylord. The two of them ran con games and "bilk[ed] people out of their money." Vanessa testified she was a prostitute. With respect to the murder, she agreed she met Randy as he was leaving the apartment. Vanessa claimed Randy warned her Browning would take her hostage if he knew Randy was talking to the police. She entered the apartment to find Browning surrounded by jewelry, shaking water off a knife, and that a tan windbreaker and the "Hollywood" hat were on the floor. Browning told Vanessa to throw the knife and hat on the roof of the building, but she elected to put the knife in a pizza box under the stairs and throw the hat in a dumpster. She assisted Browning with removing tags from the jewelry. Vanessa claimed Browning told her that "he wasn't going to go to jail and do life." The police arrived shortly after, and she directed them to the knife and hat.

### b.  Police Officers' Trial Testimony

CSI Horn testified he arrived on scene at around 4:45 p.m. with patrol officers already on scene. The paramedics had transported Hugo and left the scene. He noticed two spots of blood on the sidewalk in front of the store.

CSI Horn photographed the crime scene. He testified that three showcase counters had been "disturbed" and that the vendor side sliding glass of one of the showcases had been broken. Horn was able to lift "approximately twenty some odd" fingerprints from the scene. Browning's fingerprints were found on the top glass of one of the counters and another from a fragment of the counter's broken sliding-glass door. A different fingerprint examiner, Steven Scarborough ("Scarborough"), concluded the two prints matched Browning - one print was on a glass fragment and the other was on the vendor's side[1] of a display case fragment. Scarborough also found Browning's fingerprint on one of the stolen Casio watches.

CSI Horn also testified regarding the bloody shoeprints leading towards the front door. He compared the shoeprints to the loafers Browning was wearing when he was arrested and agreed

---

[1] Horn described the "vendor's side" as "the side that the management or the business owner would have stood in behind the display counters where generally a customer would have no reason to be."

they did not match. CSI Horn was prohibited from speculating as to how the shoeprint was made. In response to direct questioning, CSI Horn did testify that paramedics and off-duty officers often wear tennis shoes at crime scenes. He never offered any opinion as to who he believed left the shoeprints, only that Browning was not the source. On cross-examination, CSI Horn confirmed the shoeprints did not match Browning's shoes.

After CSI Horn, criminalist Minoru Aoki testified Hugo had Type B blood and that blood found on the tan jacket was Type B. Pathologist Giles Green testified the knife recovered from the pizza box under the stairs at the Normandy Motel was "consistent" with Hugo's wounds, but he could not say for certain that the knife caused the wounds.

Ofc. Radcliffe testified he arrived at the crime scene and found Hugo in "extremely serious" condition. Hugo told him a black man wearing a blue baseball cap stabbed him. While Ofc. Radcliffe was standing outside the store; he was approached by Randy Wolfe. He had known Randy for several years. Randy told Ofc. Radcliffe about his encounter with Browning. Randy then led Ofc. Radcliffe and several other officers to the Normandy Motel where they found Browning sitting on the bed with jewelry scattered along the floor on the opposite side of the room. On cross-examination, Ofc. Radcliffe acknowledged the Wolfes' known drug use.

Det. Leonard, the secondary homicide detective for the case, testified regarding his handling of the eyewitnesses, how he conducted photographic line-ups, and that Josy could not identify Browning during that procedure. On cross-examination, he agreed that if the Wolfes had kept some jewelry, it could be a crime.

ii.   Browning's Case

**a. Non-Police Witnesses**

Browning was represented by Randy Pike, Esq. Browning called witness Hoffman, who testified he was present with the officers when Randy arrived and told them about Browning. He also testified that about a half-hour prior to the murder, he saw a small Cuban man wearing jeans and a blue baseball cap walking towards the Elsen store. Hoffman agreed he participated in a show-up line-up and did not identify Browning as the "Cuban man." He also testified the "Hollywood" cap was not the one worn by the Cuban.

Browning called Martha Hager, the manager of the Normandy Motel. She testified that, after the subject event, the Wolfes began wearing jewelry she had never seen before.

Annie Yates ("Yates") testified to the difference between a Jheri curl hairstyle and an Afro hairstyle. Yates discussed the chemicals involved in a Jheri curl, and she agreed on the date of the murder, Browning was wearing an Afro – not a Jheri curl.

### b.  Ofc. Branon

The defense called Ofc. Branon. He testified he was "one of the first two officers" to arrive at the scene. He obtained a description of the suspect: a black male adult in his late twenties, wearing a blue baseball cap, blue windbreaker-type jacket, blue Levis, medium complexion, a mustache, and shoulder length Jheri curl hair. Attorney Pike never asked Ofc. Branon which witness provided the description. Attorney Pike never asked Ofc. Branon about the bloody shoeprints.

### iii.  Verdict

After closing arguments, the jury found Browning guilty on all counts and sentenced him to death. Browning directly appealed to the Supreme Court of Nevada, which affirmed. See, e.g., Browning v. State, 757 P.2d 351 (Nev. 1988).

### E.  Post-Verdict History

### i.  State Court Habeas Proceedings

Browning filed a petition for a writ of habeas corpus in Nevada state district court, arguing the State had withheld exculpatory evidence from the defense, and Pike provided ineffective assistance of counsel by failing to perform an adequate investigation before trial. The district court ordered an evidentiary hearing that was held on June 28, 1999. and November 8, 1999, through November 12, 1999. During the evidentiary hearing, Browning called 25 witnesses. Relevant to this litigation, the following individuals testified: (1) Browning, (2) expert Michael Sweedo, (3) Randy Pike, Esq., (4) District Attorney Daniel Seaton, Esq., and (5) Ofc. Branon.

Browning testified on the day of the murder, around 4:00 p.m., he was walking down the street when he saw Randy Wolfe and asked him for a ride downtown. As he was entering the car, a Cuban man pushed him out of the way and entered the car. The Cuban was wearing both the

"Hollywood" hat and the tan jacket found at the Wolfes' apartment. Randy told Browning to meet him back at the Wolfes' apartment and drove off. When Browning arrived at Randy's apartment, he saw "the Cuban" leaving the apartment. Browning entered the apartment, "and there was a lot of jewelry on the bed" with Vanessa cutting the tags off. Randy and Vanessa left the apartment to "cop" drugs, and Browning remained inside. The "next thing I know" the police "kicked in" the door.

Browning agreed that his fingerprints were found at the crime scene, but claimed he and his girlfriend, Marsha Gaylord, "were in the store a few days prior to the crime." He explained his print ended up on the vendor side of the display case because he "was leaning on the jewelry case with palms protruding over the side. . ." Michael Sweedo, a fingerprint examiner and crime scene analyst, confirmed Browning's fingerprints were located at the crime scene and on a stolen watch. He theorized Browning's fingerprint found on the vendor side of the glass could have been from a prior visit where Browning leaned over the case. Sweedo criticized the officers for not further investigating the source of the bloody shoeprints.

Browning's criminal trial attorney, Pike, testified. Pike testified Browning gave "approval" to present the defense used at trial. Browning's then-girlfriend, Marsha Gaylord, was not called at trial because she was "unavailable" due to disappearance. Pike represented Gaylord might have testified (1) that she and Browning had been in the jewelry store prior to November 8, 1985, and (2) the Wolfes had a male Cuban friend. Pike recalled Browning wanted to tell his story but was concerned about being "subjected to cross-examination" because he had committed other robberies involving a knife. Pike admitted he never interviewed the Wolfes because exploring whether they received any benefits for the testimony would have been "futile" because things were not documented in 1985. With respect to the bloody shoeprints, Pike testified he strategically did not investigate their source because he only wanted to establish that they were not Browning's shoes. Pike admitted he never asked Ofc. Branon if the bloody shoeprints were present when he first arrived on scene. He knew Browning had been excluded and was concerned if the source was determined to be a non-suspect, he would lose his ability to argue the shoeprints exculpated Browning. Pike testified Browning never provided a cogent

1    explanation of the events of the day in question.

2    Prosecutor Daniel Seaton, Esq. ("Seaton") testified that, after Browning's conviction, he

3    provided two benefits to Randy: (1) he helped him get a job, and (2) he helped him get a reduced

4    sentence on a possession of stolen property crime. Seaton testified these benefits were never

5    promised to Randy, and he decided to help Randy only after Browning was convicted. He did not

6    testify any of the officers were involved or knew about the benefits.

7    Ofc. Branon testified he arrived at the crime scene before any paramedics or other officers.

8    He saw that "[n]ear Mr. Elsen there were bloody footprints. There was blood on the floor, and

9    there were footprints nearby." Ofc. Branon told CSI Horn about the footprints but did not include

10   them in his own Officer's Report. Ofc. Branon testified regarding his description of the assailant

11   in his report. He stated the information was "predominately from Mr. Elsen and another witness .

12   . ." The description of "shoulder length Jeri curl type hair" was Ofc. Branon's own interpretation

13   of Hugo's representations. Ofc. Branon acknowledged photos of Browning on the date of the

14   incident were consistent with an Afro and not a Jheri curl. He said he was "surprised" when

15   Browning was arrested.

16   On December 7, 2001, the district court denied Browning's habeas petition. It found that (1)

17   Browning "lacks credibility" as his testimony was "inapposite" to Pike's testimony and

18   contradicted by other witnesses; (2) there was no evidence a "black Cuban had any connection to

19   the crime"; (3) there was no evidence the Wolfes received any undisclosed benefits; (4) Hugo's

20   description of the assailant was not material; and (5) Pike's treatment of the bloody shoeprints

21   was "good trial strategy." The Nevada Supreme Court affirmed the finding that "evidence of

22   Browning's guilt remains overwhelming: his fingerprints at the crime scene, identification by

23   three witnesses placing him at or near the crimes, his admissions of guilt to the Wolfes, and his

24   presence in a Motel room surrounded by the stolen jewelry." Browning v. State, 91 P.3d 39, 56

25   (Nev. 2004).

26        ii.    Federal Court Habeas Proceedings

27   Browning then filed a petition for writ of habeas corpus in the United States District Court,

28   District of Nevada. He argued (1) ineffective assistance of counsel ("IAC") against Attorney

1   Pike for an inadequate investigation, (2) misconduct regarding "the bloody shoeprints," and (3)

2   failure to disclose benefits provided to the Wolfes. The district court denied the petition,

3   Browning v. Baker, 3:05-cv-0087-RCJ-WGC, 2014 WL 3809094 (D. Nev. Aug. 1, 2014), and

4   Browning appealed to the Ninth Circuit Court of Appeals.

5       On November 3, 2017, in a 2-1 decision, a panel of the Ninth Circuit affirmed in part,

6   reversed in part, and remanded. See Browning v. Baker, 875 F.3d 444 (9th Cir. 2017). According

7   to the Ninth Circuit, the prosecutor's failure to disclose Ofc. Branon's "bloody shoeprint"

8   observations, the benefits the prosecutor provided to the Wolfes post-testimony, and the fact the

9   prosecutor failed to disclose that the witness who described the assailant's hair as a wet Jheri curl

10  hairstyle was Hugo, all constituted Brady violations. The Ninth Circuit held that, if this evidence

11  had been disclosed by the State, a reasonable possibility existed that the jury would have reached

12  a different result. The decision also found Attorney Pike was ineffective.

13          iii.    The State Court Dismisses Browning's Criminal Charges

14      After the Ninth Circuit issued its opinion, Browning filed a Motion to Dismiss his criminal

15  charges in Nevada state court. On March 27, 2019, the State court dismissed the criminal charges

16  because so many witnesses were deceased or otherwise unavailable, and a fair trial was no longer

17  available to Browning.

18      Subsequently, after the criminal charges were dismissed, Browning[2] filed this 42 U.S.C. §

19  1983 wrongful conviction lawsuit against LVMPD and some of the LVMPD officers involved in

20  the murder investigation. Plaintiff's Second Amended Complaint ("SAC") (#74) filed by

21  Browning's Estate on June 11, 2023, governs this litigation. It includes both federal law and state

22  law causes of action. Plaintiff's federal law claims include: (1) a § 1983 Fourteenth Amendment

23  due process claims for deliberately withholding exculpatory evidence and fabricating evidence;

24  (2) a § 1983 Fourth Amendment claim for malicious prosecution; (3) a § 1983 failure to

25  intervene claim; (4) a § 1983 civil conspiracy claim; (5) a Monell claim against LVMPD; and (6)

26  related state law claims for malicious prosecution, abuse of process, civil conspiracy,

27  indemnification, and violations of Nevada Constitution, Article I, Sections 8 and 18.

28

---

[2] Browning passed away after the filing of this lawsuit.

1   **II.      Legal Standard**

2         **A.  Summary Judgment**

3         Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

4   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to

5   any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed

6   R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party

7   bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex,

8   477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts

9   demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio

10  Corp., 475 U.S. 574, 587 (1986).

11        All justifiable inferences must be viewed in the light most favorable to the nonmoving party.

12  See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere

13  allegations or denials of his or her pleadings, but he or she must produce specific facts, by

14  affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine

15  issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Where evidence

16  is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is

17  inappropriate for resolution on summary judgment.'" Zetwick v. Cnty. of Yolo, 850 F.3d 436,

18  441 (9th Cir. 2017) (quoting Direct Techs., LLC v. Elec. Arts, Inc., 836 F.3d 1059, 1067 (9th

19  Cir. 2016)). "Credibility determinations, the weighing of the evidence, and the drawing of

20  legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S.

21  at 255.

22        **B.  42 U.S.C. § 1983**

23        Section 1983 is not itself a source of substantive rights, but merely the procedural vehicle by

24  which to vindicate federal rights elsewhere conferred. See Albright v. Oliver, 510 U.S. 266, 271

25  (1994). To make out a prima facie case under § 1983, a plaintiff must show that a defendant: (1)

26  acted under color of law, and (2) deprived the plaintiff of a constitutional right. See Borunda v.

27  Richmond, 885 F.2d 1384, 1391 (9th Cir. 1989). The Detectives do not dispute that they acted

28  under color of law. Therefore, the task of this court is to determine whether the Detectives violated

1    the Constitution. <u>See</u> <u>Albright</u>, 510 U.S. at 271. In addition, the individually named Defendants

2    have raised the affirmative defense of qualified immunity.

3        A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability

4    if his conduct did not violate clearly established statutory or constitutional rights of which a

5    reasonable person would have known. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The

6    Supreme Court has often stressed the importance of deciding qualified immunity "at the earliest

7    possible stage in litigation" in order to preserve the doctrine's status as a true "immunity from suit

8    rather than a mere defense to liability." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991).

9        "In determining whether an officer is entitled to qualified immunity, [a court] consider[s] (1)

10   whether there has been a violation of a constitutional right; and (2) whether that right was clearly

11   established at the time of the officer's alleged misconduct." <u>Lal v. California</u>, 746 F.3d 1112, 1116

12   (9th Cir. 2014) (citation omitted). Consequently, at summary judgment, a court can "only" deny

13   an officer qualified immunity in a § 1983 action "if (1) the facts alleged, taken in the light most

14   favorable to the party asserting injury, show that the officer's conduct violated a constitutional

15   right, and (2) the right at issue was clearly established at the time of the incident such that a

16   reasonable officer would have understood [his] conduct to be unlawful in that situation." <u>Torres v.</u>

17   <u>City of Madera</u>, 648 F.3d 1119, 1123 (9th Cir. 2011).

18   **III.   Analysis**

19           **A.  Procedural and Evidentiary Issues**

20                   i.   <u>Browning's 1989 Affidavit and 1999 Evidentiary Hearing</u>

21       Plaintiff's Opposition relies on factual assertions taken from Browning's 1989 Affidavit

22   ("Affidavit") filed in support of his habeas petition and his 1999 testimony at his evidentiary

23   hearing. Because Browning is now deceased and was never deposed in this case, his Affidavit

24   and testimony constitute inadmissible hearsay. Rule 56(c)(4) provides as follows: "[a]n affidavit

25   or declaration used to support or oppose a motion must be made on personal knowledge, set out

26   facts that would be admissible in evidence, and show that the affiant or declarant is competent to

27   testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "A party may object that the material cited

28   to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

Fed. R. Civ. P. 56(c)(2). "[W]hen evidence is not presented in admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider the evidence." See Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).

If Browning were still living, his 1989 Affidavit would be competent evidence to oppose summary judgment under Rule 56(c)(1)(A) ("Thus, [] affidavits, which are not admissible at trial, are appropriate at a summary-judgment hearing to the extent they contain admissible information that could be introduced as evidence at trial."). Because Browning is deceased, he is an unavailable declarant under Fed. R. Evid. 804(a)(4). Therefore, his Affidavit and prior testimony is hearsay as it contains numerous out-of-court statements, offered for the truth, and Browning was never cross-examined by any party at trial or in deposition. See Fed. R. Evid. 801; Luitpoid Pharm., Inc. v. Ed Geistlich Sohne A.G. Fur Chemische Industrie, 2015 WL 13860904, *1 (S.D.N.Y. July 24, 2015) (an affidavit that contained a recently deceased witness's "recollection of past conversations and past intent [] constitutes hearsay that would not be allowed a trial); ("[I]f offered in evidence at trial, the [deceased declarant's] affidavit would be inadmissible hearsay."); Beal v. Walgreen Co., 2009 WL 10665189, *3 (W.D. Tenn. Mar. 3, 2009) (deceased declarant's affidavit could not be considered because statement could not be converted into a form admissible at trial). Thus, the Court cannot consider Browning's Affidavit and testimony for purposes of this summary judgment motion.

### ii.   Issue Preclusion

The Ninth Circuit found the prosecutor's (1) failure to disclose Branon's "bloody shoeprint" observations, (2) providing of benefits to the Wolfes' post-testimony, and (3) failure to disclose it was Hugo who described the assailant's hair as a Jheri curl hairstyle, all constituted Brady violations. The Ninth Circuit's decision factored heavily into Plaintiff's civil complaint allegations and discovery responses. Browning, 875 F.3d at 444. Therefore, the issue is whether the Ninth Circuit's Brady findings have preclusive effect in this civil § 1983 lawsuit.

Collateral estoppel, also referred to as "issue preclusion," bars the re-litigation of an issue that was previously decided in a proceeding between the same parties. Where a federal court has

decided the earlier case, federal law controls the collateral estoppel analysis. Trevino v. Gates, 99 F.3d 911, 923 (9th Cir. 1996). The Ninth Circuit has stated in order to foreclose re-litigation of an issue under federal law, three elements must be met: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated against the party whom preclusion is asserted in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action. See Town of North Bonneville v. Callaway, 10 F.3d 1505, 1508 (9th Cir. 1993). Trial courts have broad discretion to determine when collateral estoppel should be applied, and collateral estoppel is more likely to be unfair when the estopped party is a defendant. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330-31 (1979).

Because Browning was prosecuted by the State of Nevada, none of the Defendants were parties to Browning's federal habeas proceedings and, therefore, did not have a "full and fair opportunity to litigate" the current issues. See Davis v. Eide, 439 F.2d 1077, 1078 (9th Cir. 1971) (police officers are witnesses in criminal proceedings – not parties).; see, e.g., Smith v. Kelly, 2013 WL 5770344, *9-10 (W.D. Wash. May 2, 2013) (refusing to grant offensive collateral estoppel in a § 1983 case).; Everett v. Perez, 78 F. Supp. 2d 1134, 1137 (E.D. Wash. 1999) (same); Duncan v. Clements, 744 F.2d 48, 52 (8th Cir. 1984) (noting that the officer "had no control over the prosecutor and did not make decisions with regard to the prosecution. [His] role at the . . . hearing was simply that of a witness for the prosecution."); Fraser v. City of New York, 2021 WL 1338795, *4 (S.D.N.Y. Apr. 9, 2021); Padilla v. Miller, 143 F. Supp. 2d 453, 466 (M.D. Penn. 1999) ("At the habeas corpus hearing, [the district attorney] represented the state's interest, not [the officers]. [The officer] did not have a personal stake in the outcome of [the] criminal proceedings."). Thus, the Court finds the Ninth Circuit's decision does not prevent the individual Defendants "from asserting in this proceeding that the facts do not support a finding of a constitutional violation entitling Plaintiff to damages." Fraser, 2021 WL 1338795 at *4 (quoting Poventud v. City of New York, 2015 WL 1062186, *6 (S.D.N.Y. Mar. 9, 2015).

Also, Brady standards differ significantly in habeas cases and § 1983 civil cases. In the criminal and habeas context, the suppression by the prosecution of evidence favorable to an

- 17 -

accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. See Tennison v. City and Cty. of San Francisco, 570 F.3d 1078, 1088 (9th Cir. 2009) (citing Brady, 373 U.S. at 87). Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." Id. (citing Daniels v. Williams, 474 U.S. 327, 330 (1986)). "[I]n any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." Daniels, 474 U.S. at 330. In a wrongful conviction claim, a § 1983 plaintiff must show that police officers not only suppressed evidence, but also acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors. Tennison, 570 F.3d at 1089. Thus, a plaintiff must not only prove a Brady violation committed by an individual defendant, but also that the defendant was deliberately indifferent or exhibited reckless disregard for Browning's constitutional rights.

Therefore, the Court is not bound by the Ninth Circuit's Brady findings during Browning's criminal habeas proceedings.

**B.  § 1983 Fourteenth Amendment and Nevada Constitution Due Process Claims**

Plaintiff alleges the officers violated Browning's federal and state law due process rights because: (1) Ofc. Branon failed to specifically disclose "it was Hugo Elsen who said the perpetrator had a hairstyle consistent with a Jeri Curl"; (2) "Defendants Horn and Branon suppressed evidence that they knew bloody shoeprints from a tennis shoe found at the scene . . . were [there] when they arrived, as opposed to having arrived or been made by other medics or law enforcement officers afterward", and (3) Ofc. Radcliffe knew the Wolfes were "unreliable" witnesses but "wrote his report in a way that made it appear as if they were reliable." The claims regarding the hair evidence and shoeprint evidence are Brady claims, and the claim regarding Ofc. Radcliffe's report is a fabrication of evidence claim. Plaintiff's Opposition also alleges the officers unconstitutionally performed "flawed" identifications of Browning.

i.   Due process Legal Standards

The due process standards governing Plaintiff's § 1983 due process claims are the same as

the legal standards controlling Plaintiff's state law due process claims. Brandon v. HDSP Medical Unit, No.: 2:20-cv-00113-APG-VCF, 2020 WL 6876201, *5 (D. Nev. 2020) (citing Wyman v. State, 217 P.3d 572, 578 (Nev. 2009)).

In the criminal case Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In addition to prosecutors, Brady confers upon law enforcement officers a duty to disclose Brady material. Carrillo v. Cty. of Los Angeles, 798 F.3d 1210, 1219-20 (9th Cir. 2015); Tennison, 570 F.3d at 1087.

To prevail on a civil Brady-based suppression of evidence due process claim against a police officer, a plaintiff must demonstrate the evidence in question was favorable to him, the police "suppressed" the favorable evidence, and prejudice ensued because the suppressed evidence was material. Smith v. Almada, 640 F.3d 931, 939 (9th Cir. 2011). Evidence is suppressed for Brady purposes if the defendant officer "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from the prosecutors." Tennison, 570 F.3d at 1088-89. Deliberate indifference is a "conscious or reckless disregard of the consequence of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or without knowledge that harm will result." Tatum v. Moody, 768 F.3d 806, 821 (9th Cir. 2014) (quoting Gantt v. City of Los Angeles, 717 F.3d 702, 708 (9th Cir. 2013)).

Three cases explore deliberate indifference in the context of a civil Brady claim. First, under Mellen v. Winn, both an actor's knowledge regarding the significance of withheld Brady exculpatory evidence and an actor's experience are relevant to the overall deliberate indifference culpability determination. 900 F.3d 1085, 1101-03 (9th Cir. 2018). Second, motive underlying nondisclosure can evidence deliberate indifference. Tennison, 570 F.3d at 1089-90. In Tennison, two police inspectors, Hendrix and Sanders, investigated Tennison for murder. Id. at 1081. During their investigation, conflicting accounts emerged concerning who committed the murder; two different suspects were identified, one of whom was Tennison. Id. at 1083. A month after a

jury found Tennison guilty, the other identified suspect was arrested for unrelated charges by two other officers, who taped an interview where that individual confessed to committing the murder. Id. at 1084. Although they provided this tape to Hendrix and Sanders, neither provided the tape to the district attorney or defense counsel. Id. Hendrix later testified in a deposition that he was angry that the interview was conducted without him and Sanders, and that he believed the confession was insincere. Id. at 1089-90. Based upon this conduct, the Ninth Circuit concluded that the inspectors' conduct displayed a "reckless disregard for [Tennison's] rights" beyond mere negligence. Id. Third, an officer is not liable for a Brady violation if the causal chain is attenuated or the claim is premised on the officer's negligent acts or omissions. Porter v. White, 483 F.3d 1294 (11th Cir. 2007) (citied favorably in Tennison, 570 F.3d at 1088).

With respect to Plaintiff's deliberate fabrication claim against Ofc. Radcliffe, deliberate fabrication can be established by either direct or circumstantial evidence. Spencer v. Peters, 857 F.3d 789, 793 (9th Cir. 2017). "[D]eliberate fabrication can be shown by direct evidence, for example, when 'an interviewer … deliberately mischaracterizes witness statements in her investigative report'." Id. (citing Costanich v. Dep't Soc. & Health Servs., 627 F.3d 1101, 1111 (9th Cir. 2010)). In direct evidence cases, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved. Id. In a circumstantial evidence case, a plaintiff must show that officials "continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent," and can raise the inference that the investigator has an "unlawful motivation" to frame an innocent person. Spencer, 857 F.3d at 793 (citations omitted). "To be sure, not all inaccuracies in an investigative report give rise to a constitutional claim." Id. (citations omitted). Mere "careless[ness]" is insufficient, as are mistakes of "tone." Id.

ii.   Due Process Claims – Hair and Shoeprint Evidence

a.  **Hugo Elsen's Description**

Plaintiff claims Ofc. Branon withheld evidence regarding Hugo's description of his attacker. Patrol officers Radcliffe, Branon, and Robertson were the first officers on scene, and each provided a description of the attacker. Ofc. Branon spoke with Hugo, Josy, and Coe and obtained "a rather complete description of the suspect, who was described as a black male adult in his late

20's, medium complexion, wearing a blue baseball cap, a blue windbreaker type jacket, blue levis [sic], bearing a mustache and, what was described as shoulder length geri [sic] curled type hair." At the criminal trial, Ofc. Branon testified his description of the suspect's hair as a Jheri curl was his own interpretation of the information he received. Browning's attorney never asked Ofc. Branon to explain who provided the hairstyle information. At the 1999 evidentiary hearing, Ofc. Branon, when asked, identified Hugo as his source for the Jheri curl information. At his 2022 deposition, Ofc. Branon confirmed Hugo never told him the suspect's hair was a "Jheri curl" and that he just "assumed" the suspect's hair was "relaxed" or in a Jheri curl.

The Court finds there is no evidence Ofc. Branon deliberately suppressed the hairstyle evidence. First, the Jheri curl evidence was included in Ofc. Branon's Officer's Report, and the report limited the source to three people – Hugo, Josy, and/or Coe. Because both Josy and Coe described the suspect's hair as "puffy" and "bushy" to other officers, Browning's defense team could easily deduce that Hugo was source of the information. Second, Hugo never told Ofc. Branon the suspect had a Jheri curl, and Ofc. Branon only "assumed" that is what Hugo meant by his description. Third, Browning's criminal attorney could easily have learned this information by interviewing Ofc. Branon or asking him the question at the criminal trial. At most, the evidence establishes that Ofc. Branon was negligent or careless in not specifically identifying Hugo as the source of the information. The fact that the information made it into Ofc. Branon's report establishes that he did not deliberately or recklessly conceal the information. See Porter, 483 F.3d at 1308-11; see also Gausvik v. Perez, 345 F.3d 813, 817 (9th Cir. 2003) ("careless or inaccurate" statements in reports do not give rise to a Fourteenth Amendment fabrication of evidence claim).

In addition, the hair evidence was not material or exculpatory. A fair-minded jury could easily reject the evidence just as the criminal jury did. It is undisputed that the suspect was wearing a blue hat. Therefore, the eyewitnesses only saw a limited amount of hair. Coe described hair that "stuck out" the bottom of the cap, and Josy described hair that "puffed out." Only Hugo potentially described a Jheri curl hairstyle. The criminal jury was well aware of the eyewitness discrepancies regarding hairstyle, and the issue was explored at the criminal trial. The jury

simply rejected it. Even the Ninth Circuit did not fault Ofc. Branon or attribute the violation to him. Rather, the Ninth Circuit referenced the fact the prosecutor, not the officers, improperly leveraged the hairstyle evidence during closing argument. Browning, 875 F.3d at 463.

Finally, the Ninth Circuit recently addressed a similar Fourteenth Amendment claim in O'Doan v. Sanford, 991 F.3d 1027 (9th Cir. 2021). In O'Doul, police officers arrested O'Doan for resisting a public officer and indecent exposure after he was found naked and acting erratically on a busy street. 991 F.3d at 1035. The officers received information from O'Doan, other witnesses, and medical professionals that O'Doan's illegal acts might be the result of him suffering a grand mal seizure. Id. at 1033-35. The officers arrested O'Doan, and their reports omitted any reference to O'Doan's alleged seizure defense. Id. After the criminal charges were dismissed, O'Doan sued the arresting officers. Relying on Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001), O'Doan claimed his due process rights were violated because the officers "did not discuss O'Doan's reported seizure in their police report and affidavit supporting probable cause." Id. at 1045. The Ninth Circuit disagreed and found no law "suggest[ing] the officers were required to provide more detail to avoid violating the constitution." Id. Because this issue was thoroughly explored at the criminal trial, no Fourteenth Amendment violation occurred. See Richards v. Cty. of San Bernardino, 39 F.4th 562, 573 (9th Cir. 2022) (the crux of a deliberate fabrication of evidence claim is the denial of the right to fair trial); see also Black v. Montgomery, 835 F.3d 358, 372 (3d Cir. 2016) (the alleged fabrication "was so significant it could have affected the outcome of the criminal case") (cited favorably in Spencer v. Peters, 857 F.3d 789, 798 (9th Cir. 2017)).

Based upon the above, the Court finds that Ofc. Branon did not violate Browning's due process rights by failing to identify Hugo as the source of the hairstyle evidence found in his report.

### b.  The Bloody Shoeprint Evidence

Plaintiff next claims CSI Horn and Ofc. Branon "suppressed evidence that they knew the bloody shoeprints from a tennis shoe found at the scene . . .where there when they arrived, as opposed to having arrived or been made by other medical or law enforcement officers

afterward." Plaintiff asserts that Ofc. Branon observed the bloody shoeprints leading away from Hugo's body and deliberately or recklessly concealed that fact from CSI Horn and the Homicide investigators.

First, the actual source of the shoeprints has never been determined and, therefore, has never been established as conclusively exculpatory.

Second, the presence of the unaccounted-for shoeprints has always been known to Browning and was intentionally left unexplored by Browning's defense attorney at the criminal trial. At the criminal trial, Browning's attorney called Ofc. Branon to the stand but never questioned him regarding the bloody shoeprints for strategic reasons.

Ofc. Branon never specifically testified there were shoeprints leading to the door upon his arrival. At the 1999 evidentiary hearing, he testified as follows:

> Q: Now, when you got there did you notice any footprints?
>
> A: Near Mr. Elsen there were bloody footprints. There was blood on the floor, and there were footprints nearby.
>
> Q: And can you describe those footprints?
>
> A: As best I can recall they appeared to be made from sneakers.

Thus, at the evidentiary hearing, Ofc. Branon only testified he saw shoeprints near Hugo.

When CSI Horn arrived at the crime scene, he saw bloody shoeprints leading from where Hugo's body had been to the front door of the store. The paramedics had already transported Hugo. CSI Horn photographed and documented the prints. The prints were consistent with a tennis shoe and did not match the shoes Browning was wearing at the time of his arrest. At the criminal trial, CSI Horn testified that he investigated whether the shoeprint matched the footwear Browning was wearing when he was arrested and that they did not. Thus, Horn excluded the shoes Browning was wearing at the time of his arrest as the shoes that made the prints. Upon direct questioning from the District Attorney, he agreed the prints were consistent with tennis shoes, but was prohibited by Browning's attorney from speculating as to the source. CSI Horn never testified as to who left the prints but did testify upon direct questioning it was not uncommon for first responders to wear tennis shoes. Thus, the jury was informed that the shoes

Browning was wearing at the time of his arrest did not make the prints and were left to speculate/determine whether (1) Browning was wearing a different pair of shoes at the time of the murder, (2) a paramedic or other first responder left the prints, (3) Josy or Coe (who admitted to being "near" Hugo) left the prints, (4) one of the first arriving officers left the prints, or (5) the prints belonged to the killer. Browning's attorney, Pike, purposefully and strategically left the shoeprint evidence unexplored so that he could argue that the prints did not belong to Browning and were possibly left by a different killer.

According to CSI Horn, he was never told the bloody shoeprints leading to the front door were present prior to the paramedics responding. Because the shoeprints were "in a big pile of blood" near the body, he assumed they were made by someone assisting Hugo. Horn could not tell if the bloody shoeprints were made by a male or female. It remains his opinion that either the murderer, Josy, or responding personnel made the prints leading towards the door.

Plaintiff's Opposition speculates that the bloody shoeprints that Ofc. Branon saw "near" Hugo's body included the footprints leading away from the body towards the door. See Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir. 1996) (A party's own speculation is insufficient to create a genuine issue of material fact). Browning's criminal counsel testified that he knew about the shoeprint issue but purposefully left it unexplored for strategic reasons.

This Court cannot find any evidence that Ofc. Branon intentionally or recklessly concealed the shoeprint evidence. The shoeprints were properly documented, photographed, and disclosed. See O'Doan, 991 F.3d at 1045-46 (officer did not violate the Constitution by omitting suspect's alleged medical defense from his Arrest Report). Under Brady's suppression prong, if "the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," the government's failure to bring the evidence to the direct attention of the defense does not constitute "suppression." Raley v. Yist, 470 F.3d 792, 804 (9th Cir. 2006) (citation omitted). The Ninth Circuit has clearly stated that "[i]n determining whether evidence has been suppressed for purposes of Brady, our Court has asked whether the [criminal] defendant 'has enough information to be able to ascertain the supposed Brady material on his own.' If so, there's no Brady violation." Milke v. Ryan, 711 F.3d 998, 1017 (9th Cir. 2013) (quoting United

1   States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991)); see also United States v. Bracy, 67 F.3d

2   1421, 1428-29 (9th Cir. 1995) (holding criminal history was not suppressed because the

3   government "disclos[ed] … all the information necessary for the defendants to discover the

4   alleged Brady material").

5       Finally, the bloody shoeprint evidence is not material. The source of the shoeprints remains

6   speculation. No evidence or testimony was obtained at the criminal trial or the 1999 evidentiary

7   hearing establishing the killer made the prints. The Court finds this evidence was properly

8   disclosed, and Browning's criminal defense attorney purposefully left it unexplored so that he

9   could argue the killer left the prints. There is no evidence of deliberate indifference or

10  recklessness with respect to Ofc. Branon's or CSI Horn's handling of this evidence.

11                    **c. The Wolfe's Credibility**

12      Plaintiff alleges that Ofc. Radcliffe knew the Wolfes were "unreliable" witnesses but "wrote

13  his report in a way that made it appear as if they were reliable." According to Ofc. Radcliffe's

14  report, Randy Wolfe approached him at the crime scene and reported Browning was in Randy's

15  apartment, "had just robbed someone and had hurt them bad," was "in possession of some

16  jewelry and a knife," and his wife "was still in the apartment with the suspect." All of these

17  representations were corroborated when the officers located and arrested Browning at the

18  Wolfe's apartment. Ofc. Radcliffe also wrote the Wolfes had "frequently [] given me

19  information over the last 5 ½ years that has turned out to be quite correct." At his 2022 civil

20  deposition, Ofc. Radcliffe testified the Wolfes were drug addicts, involved in prostitution, and

21  had provided him with information in the past. Ofc. Radcliffe never paid the Wolfes for

22  information, and he provided them with no benefits for the provided information in the

23  Browning case. Plaintiff did not produce any evidence contradicting Ofc. Radcliffe's testimony.

24  The issues regarding the Wolfes' criminal histories and credibility were explored extensively at

25  the criminal trial. Although the Wolfes' credibility was relevant, the issue was properly left to

26  the jury to evaluate.

27      Plaintiff generated no evidence that Ofc. Radcliffe suppressed evidence regarding the Wolfes.

28  It is undisputed Randy Wolfe arrived at the crime scene and accurately reported Browning was in

1    his [Randy's] motel room with jewelry. There is no evidence the Wolfes were "unreliable"

2    witnesses or Ofc. Radcliffe lied in his report about their credibility. Further, the Wolfes' drug

3    addictions and criminal histories were explored at the criminal trial. Thus, there is no evidence

4    supporting Plaintiff's withholding of evidence claim against Ofc. Radcliffe.

5    Finally, the evidence establishes the officers did not arrest Browning based solely on the

6    Wolfes' statements. Their statements steered the officers toward Browning but other evidence

7    supported their decision to arrest including Browning providing a false name, his fingerprints were

8    on the broken glass at the crime scene, his fingerprint was on a stolen watch, and that he had prior

9    convictions for armed robberies with a knife. In other words, other evidence unrelated to the

10   Wolfes' statements supported the arrest.

11   The Court finds that there is no evidence supporting Plaintiff's claim that Ofc. Radcliffe

12   violated Browning's due process rights.

13                    iii.    Fourteenth Amendment "Flawed" Identification Procedures

14   Plaintiff asserts that the officers used "flawed" identification procedures with respect to their

15   line-ups involving Josy, Debra Coe, Brad Hoffman, and Charles Woods.

16   A law enforcement's pre-trial identification procedure violates due process where procedure

17   "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

18   misidentification." Simmins v. United States, 390 U.S. 377, 384 (1986). In determining whether

19   the out-of-court identification procedure is so impermissibly suggestive as to taint later in-court

20   identifications in denial of a criminal defendant's due process rights, the court must examine the

21   totality of the circumstances. United States v. Nash, 946 F.2d 679, 681 (9th Cir. 1991). An

22   identification procedure that is so unduly suggestive as to give rise to a substantial likelihood of

23   mistaken identification may violate due process. Neil v. Biggers, 409 U.S. 188, 198 (1972). The

24   factors a court considers in evaluating the likelihood of misidentification include: (1) the

25   witness's opportunity to view the criminal at the time of crime; (2) the witness's degree of

26   attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of

27   certainty demonstrated by the witness at the confrontation; and (5) the length of time between the

28   crime and confrontation. See U.S. v. Jones, 84 F.3d 1206, 1209-10 (9th Cir. 1996) (citing

Biggers, 409 U.S. at 199-200). The Ninth Circuit has "upheld suggestive procedures, recognizing the benefit of permitting witnesses to make an identification while the image of the perpetrator is still fresh in their minds." See Jones, 84 F.3d at 1210 (citing United States v. Kessler, 692 F.2d 584, 585 (9th Cir. 1982)). "The fact that only one suspect is presented for identification does not make the identification procedure invalid." Id.; see also United States v. King, 148 F.3d 968, 970 (9th Cir. 1998) ("Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary."); McSherry v. City of Long Beach, 584 F.3d 1129, 1136 (9th Cir. 2009) (rejecting due process claim for use of an "improper, unreliable and suggestive identification procedure" on factual, rather than legal grounds).

In United States v. Kessler, 692 F.2d 584 (9th Cir. 1982), the criminal defendant was called a "suspect" and shown to the witnesses while "in handcuffs and surrounded by police officers." Id. at 586. The Kessler court stated that "[t]he use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with the protection of the officers and witnesses." Id.; see also U.S. v. Gaines, 200 F. App'x. 707 (9th Cir. 2006) (show-up identification not unduly suggestive when suspect observed getting out of police car, surrounded by officers, and handcuffed because it was conducted "less than three hours after the last robbery.").

### a.  Witness Identifications

Witnesses Debra Coe, Brad Hoffman, and Charles Woods were still at the scene after Browning's arrest, and Det. Leonard set up a "one-on-one confrontation, to see if [Browning] was the right suspect." The witnesses were told not to be influenced by the fact that the individual was in police custody and not to assume he was the suspect. During the show-up, Coe "[thought] it was the same guy," Woods said Browning was "definitely the same person that had come running out of nowhere . . .", and Hoffman said Browning was not the Cuban man he had seen. Thus, Det. Leonard's "show-up" identification generated both inculpatory and exculpatory evidence.

Det. Leonard's show-up line-up complied with the law. The witnesses all claimed to have seen a possible suspect, their observations were fresh in their minds, and Browning was presented to them within less than an hour of the crime. The Court finds no due process violation occurred, and, at a minimum, there was no clearly established law prohibiting Det. Leonard's actions, and he is entitled to qualified immunity on this claim as Plaintiff has not cited to any clearly established law at the time of the incident prohibiting the officers' identification procedures.

Plaintiff claims that the officers influenced Josy because she could not identify Browning on the date of the murder or a month later, but she did identify him at trial. Although Josy's trial identification is questionable, there is no evidence that any of the Defendants influenced her or even had any contact with her after she failed to identify Browning. Rather, the undisputed evidence only shows that Det. Leonard properly documented that Josy was never able to identify Browning while in their custody. There is no evidence that any of the officers had any contact with Josy after her failed identification attempts. Thus, the fact Josy made a positive identification of Browning at the criminal trial cannot be attributed to any of the officers. Plaintiff's argument on this issue is not supported by admissible evidence and is insufficient to defeat a motion for summary judgment.

### C. § 1983 Detention Without Probable Cause, Nevada State Constitution, and Malicious Prosecution Claims

Plaintiff alleges claims for § 1983 detention without probable cause, violation of the Nevada State Constitution, Article 1, § 18 claim, and malicious prosecution. All of these claims require a finding that the officers lacked probable cause to arrest Browning.

"A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others - including police officers and investigators - who wrongfully caused his prosecution." Smith v. Almada, 640 F.3d 931, 938 (9th Cir. 2011). "To maintain a § 1983 action for malicious prosecution, a plaintiff must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] [a] specific constitutional right." Id. (citations omitted). The standard for a state law malicious

prosecution claim is the same as a federal law malicious prosecution claim. See Lassiter v. City of Bremerton, 556 F.3d 1049, 1054-55 (9th Cir. 2009). A finding of probable cause is an absolute defense to malicious prosecution. Id. Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity" and "is not a high bar." District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (citations and quotations omitted). A plaintiff "can rebut a prima facie finding of probable cause by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." Awabdy v. City of Adelanto, 368 F.3d 1062, 1067 (9th Cir. 2004). There is a presumption that the prosecutor filing a criminal complaint exercised independent judgment in determining probable cause for an accused's arrest and presumption breaks the chain of causation between an arrest and prosecution and immunizes the investigating officers. Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008).

i.   Lack of Probable Cause

Plaintiff's Opposition argues that the officers failed to properly evaluate the Wolfes' credibility and, therefore, lacked probable cause. The evidence shows that the officers did not arrest Browning solely on the Wolfes' representations. Prior to arresting Browning, the officers had the following information: (1) the Wolfes' representations that Browning admitted to the crime, (2) Browning was found in the Wolfes' apartment with the jewelry; (3) Vanessa directed the officers to the knife and cap, and (4) the eyewitness identifications of Coe and Woods. After the initial arrest, the evidence supporting probable cause only increased (1) when Browning's fingerprints were found on the disturbed jewelry counter - both on the top side of the glass and on a fragment from the broken sliding-glass door on the vendor's side of the display case; (2) when Browning gave the investigators a false name; (3) when Browning tried to escape after being arrested, and (4) the detectives learned that Browning had a criminal history of armed robberies involving a knife.

Finally, "malice" is a necessary element of a malicious prosecution claim. See Almada, 640 F.3d at 937-38. In Nevada, malice is defined as "an evil intent, wish or design to vex, annoy or injure another person," and it "may be inferred from . . . an act wrongfully done without just

cause or excuse." NRS § 193.0175. Here, the Court finds there is no evidence on any of the officers or CSI Horn implying evil intent or improper purpose. The Court finds that the officers had probable cause to arrest Browning based upon the facts and circumstances known to them at the time of the arrest. Therefore, Plaintiff's § 1983 detention without probable cause, violation of the Nevada State Constitution Article 1, § 18 claim, and malicious prosecution claims fail as a matter of law.

### D.  § 1983 Failure to Intervene Claim

Plaintiff alleges the officers violated Browning's constitutional rights by failing to intervene and prevent the violation of Browning's constitutional rights.

Plaintiff's failure to intervene claim fails for two reasons. First, as discussed above, no constitutional violation occurred, and, therefore, the officers had no duty to intervene. See Greene v. City & Cnty. of San Francisco, 751 F.3d 1039, 1051 (9th Cir. 2014) (if there is no underlying constitutional violation, an officer cannot be liable for failing to intervene). Second, the Ninth Circuit has only recognized a claim for failing to intervene in the excessive force context. Police officers do not have a general duty to intervene in all alleged wrongdoings by a fellow officer. Briscoe v. Madrid, 1:17-CV-0716-DAD-SKO, 2018 WL 4586251, at *5 (E.D. Cal. Sep. 21, 2018); Dental v. City of Salem, No. 3:13-CV-01659-MO, 2015 WL 1524476, at *5 (D. Or. Apr. 2, 2015). The duty to intercede is "clearly limited to the context of excessive force" claims under the Fourth Amendment. Dental, 2015 WL 1524476, at *5 (finding that the duty to intercede did not apply to the plaintiff's wrongful arrest claim); Gillette v. Malheur Cty., 2:14-CV-01542 -SU, 2016 WL 3180228, *7 (D. Or. 2016); Milke v. City of Phoenix, No. CV-15-00462-PHX-ROS, 2016 WL 5339693 (D. Az. Jan. 8, 2016) (no duty to intervene outside of excessive force context). Therefore, no clearly established right existed at the time of the incident requiring the officers to intervene.

### E.  § 1983 Civil Conspiracy and State Law Conspiracy Claims

Plaintiff's civil conspiracy claims allege the officers conspired "to frame" Browning and to "exert influence to cause the prosecution of Plaintiff for a crime he did not commit."

To establish a cause of action for conspiracy under § 1983, a plaintiff must present facts

sufficient to demonstrate: (1) the existence of an express or implied agreement among the officers to deprive a person of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement. Ting v. United States, 927 F.2d 1504, 1512 (9th Cir. 1991). "Conspiracy is not an independent basis of liability in a § 1983 actions." Smith v. Gomez, 550 F.3d 613, 617 (7th Cir. 2008). Thus, the failure to prove a substantive constitutional injury precludes relief on a conspiracy claim. Cefalu v. Village of Elk Grove, 211 F.3d 416, 423 (7th Cir. 2000). Similarly, in Nevada, "[a]n actionable civil conspiracy consists of a combination of two or more persons who, by some concert of action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the acts." Consolidated Generator Nevada, Inc. v. Cummins Engine Co., Inc., 971 P.2d 1251, 1256 (Nev. 1988) (citations omitted).

Plaintiff has failed to establish an underlying constitutional violation or state law tort. Because no federal or state law violations occurred, these claims fail as matter of law because no unlawful objective existed.

Second, with respect to the § 1983 conspiracy claim, even if a conspiracy occurred between the officers, the claim is barred by the intra-corporate conspiracy doctrine, which states a conspiracy requires agreement between two or more persons or distinct business entities. Rabkin v. Dean, 856 F. Supp. 543, 550-52 (N.D. Cal. 1994). "[A]n agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." See Lobato v. Las Vegas Metro. Police Dep't, 2023 WL 6620306 (9th Cir. 2023) (citing Ziglar v. Abbasi, 582 U.S. 120, 153 (2017)).

### F. Monell Claim

Plaintiff alleges that defendant LVMPD promulgated unconstitutional policies, practices and customs that caused Browning's constitutional violations. The Opposition argues that LVMPD (1) failed to train its officers in their Brady obligations, (2) failed to "institute adequate procedural safeguards to ensure the preservation and production of material information that must be affirmatively disclosed by the police"; and (3) failed to train proper identification procedures.

In Monell v. Dep't of Social Svcs., 436 U.S. 658 (1978), the Supreme Court held that, when

a municipal policy of some nature is the cause of an unconstitutional action taken by municipal employees, the municipality itself will be liable. Liability only exists where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by municipal officers, or where the constitutional deprivation is visited pursuant to governmental "custom" even though such a "custom" has not received formal approval. Id. at 690-91. The doctrine of respondeat superior does not apply to 42 U.S.C. § 1983 claims against municipalities. Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986) (citing Monell, 436 U.S. at 691). In other words, municipal liability is not established merely by showing that a municipal employee committed a constitutional tort while within the scope of employment. Id. at 478-79. For liability to attach to a municipality, a plaintiff must establish that the wrongful act complained of was somehow caused by the municipality. Monell, 436 U.S. at 691-95.

Because the Court has already found that no constitutional violations occurred, this claim fails as a matter of law. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

### G. Abuse of Process Claim

"Abuse of process is a tort recognized to provide a remedy for cases in which legal procedure has been set in motion in proper form, with probable cause, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed." Rashid v. Albright, 818 F. Supp. 1354, 1358 (D. Nev. 1993) (citing Prosser & Keaton, Law of Torts 896 (1984)). The essence of the tort of abuse of process is the use of the legal system to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do. See Heck v. Humphrey, 512 U.S. 477, 486 n.5 (1994). To successfully state a claim for abuse of process under Nevada law, a plaintiff must allege: (1) the defendant had an ulterior purpose in the underlying lawsuit other than resolving a legal dispute, and (2) the defendant willfully and

1  improperly used the legal process to accomplish that purpose. <u>LaMantia v. Redisi</u>, 38 P.3d 877,

2  880 (Nev. 2002). An action for abuse of process hinges on misuse of regularly issued process.

3  <u>Dutt v. Kremp</u>, 844 P.2d 786, 790 (Nev. 1992) (citations omitted), overruled on other grounds by

4  <u>LaMantia v. Redisi</u>, 38 P.3d 877 (Nev. 2002).

5      The Court finds that Plaintiff has failed to generate any evidence suggesting the officers had

6  an ulterior purpose or that they willfully and improperly used the criminal case to accomplish an

7  ulterior purpose.

8          **H.  Intentional Infliction of Emotional Distress Claim ("IIED")**

9      To establish an IIED claim, a plaintiff must show evidence of "(1) extreme and outrageous

10 conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the

11 plaintiff having suffered severe or extreme emotional distress, and (3) actual or proximate

12 causation." <u>Star v. Rabello</u>, 625 P.2d 90, 91-92 (Nev. 1981). Because the Court has found that

13 the officers had probable cause to arrest Browning and did not violate his due process rights,

14 there is no evidence of any extreme or outrageous conduct and this claim also fails as a matter of

15 law.

16 **IV.    <u>Conclusion</u>**

17     Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment

18 (#81) is **GRANTED**. The Clerk of the Court shall enter **JUDGMENT** in favor of Defendants on

19 all of Plaintiff's claims.

20

21

22 Dated this 28th day of March 2024.

23

24                                              _____

25                                              Kent J. Dawson
                                                United States District Judge

26

27

28